UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT

--------------------------------------------------------

Peggy Zoulas

|                     Plaintiff

|          -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION: CARMEN ASSELTA, PEINCIPAL
OF PS 34K: MARIA LORE, ASSISTANT PRINCIPAL
OF PS 34K

|                     Defendants

--------------------------------------------------------

PLAINTIFF'S
OPPOSITION TO
DEFENDANT'S
MOTION FOR
SUMMARY
JUDGMENT

Case: 18-CV-2718-GHW


Plaintiff's Opposition to Defendant's Motion For Summary Judgment

Pro Se Plaintiff, Peggy Zoulas specifically responds to each numbered paragraph set forth
in Defendant's Local Rule 56.1 Statement in the corresponding numbered paragraphs
below and sets forth additional statements of material fact in the subsequently numbered
paragraphs:


**A. PROCEDURAL HISTORY**

1. On March 27, 2018, Plaintiff commenced the instant action in the United States
District Court, Southern District of New York, against the New York City Department of
Education ("DOE"), Carmen Asselta ("Asselta"), and Maria LoRe-Dioguardi ("LoRe-
Dioguardi"). See Plaintiff's Complaint ("Pl.'s Compl."), Exhibit "A;" See also Maria
LoRe- Dioguardi Deposition Transcript Excerpts ("LoRe-Dioguardi Tr."), Exhibit "B" at
6:12 – 6:19.

**Not disputed.**

2. On September 27, 2018, Plaintiff filed an amended complaint. See Amended
Complaint ("Am. Compl."), Exhibit "C." Plaintiff brings claims for age discrimination,
retaliation, and a hostile work environment pursuant to the Age Discrimination in
Employment Act of 1967 ("ADEA").

**Not disputed.**

3. On August 29, 2019, the Court granted in part and denied in part Defendants' motion to dismiss. The Court dismissed Plaintiff's religious and disability discrimination claims brought pursuant to Title VII of the Civil Rights Act of 1964 and the Americans with Disability Act. Further, the alleged discrete and retaliatory acts that occurred 300 days prior to the filing of her verified complaint with the New York State Division of Human Rights ("SDHR"), were dismissed as time-barred. Plaintiff expressly abandoned her New York State Executive Law § 296 ("State HRL") and the New York City Human Rights Law, New York City Administrative Code § 8-107 ("City HRL") claims in opposition to Defendant's motion to dismiss. See Memorandum Opinion and Order, ECF Docket No. 52.

**Not disputed.**

4. Plaintiff's deposition in this case was taken on July 1, 2020. See Plaintiff's Deposition Transcript Excerpts ("Pl.'s Tr."), Exhibit "D."

**Not disputed.**

5. Asselta was deposed on July 10, 2020. Carmen Asselta Deposition Transcript Excerpts ("Asselta Tr."), Exhibit "E."

**Not disputed.**

6. LoRe-Dioguardi was deposed on July 27, 2020. Maria LoRe-Dioguardi Tr., Ex. "B."

**Not disputed.**

## B. FACTUALBACKGROUND

7. Plaintiff was born in 1961 and is currently age fifty-nine years old. See Am. Compl., Ex. "C," ¶ 1; see also Pl.'s Tr., Ex. "D", at 9:8 – 9:10.

**Not disputed.**

8. Plaintiff is a DOE teacher and holds a Common Branches license. Plaintiff's Service Inquiry and Rating History ("Service and Rating History"), Exhibit "F," at 1; see also 2011-2012 Overall Rating Documents ("2011-2012 Overall Rating Docs."), Exhibit "G," at 4. Since February 1, 2000 Plaintiff has taught at Public School 34 Oliver H. Perry ("P.S. 34"). See id.

**Not disputed.**

9. Principal Asselta has been the Principal of P.S. 34 since the summer of 2012, replacing Superintendent Alicja Winnicki ("Winnicki") in the position. Asselta Tr., Ex. "E," at 372:20 – 372:25; see also LoRe-Dioguardi Tr., Ex. "B," at 26:8 – 27:2. Principal Asselta was born in 1966 and is 54. Asselta Tr., Ex. "E," at 17:6 – 17:14.

**Partially disputed.**

Principal Asselta is on terminal leave from PS 34K beginning on October 17, 2020, pending her January 2021 retirement. This was announced by her on October 9, 2020 during a Zoom staff meeting (Zoulas Decl. ¶ 2).

10. LoRe-Dioguardi is the former Assistant Principal of P.S. 34. LoRe- Dioguardi Tr., Ex. "B," at 21:4 – 21:8. LoRe-Dioguardi retired from the position of Assistant Principal after the 2017-2018 school year. Id. at 18:18 – 18:25. LoRe-Dioguardi was born in 1961 and is fifty-eight. Id. at 7:8 – 7:11.

**Partially disputed.**

LoRe-Dioguardi turned 59 years old on October 12, 2020 (Zoulas Decl. ¶ 3).

**2011-2012 school year**

11. During the 2011-2012 school year, Plaintiff received six letters to file from Superintendent, formerly Principal, Winnicki. See 2011-2012 Overall Rating Docs., Ex. "G," at 1-2; see also Asselta Tr., Ex. "E," at 372:20 – 372:25. Accordingly, Plaintiff received an "unsatisfactory" Overall Rating for the 2011-2012 school year. 2011-2012 Overall Rating Docs.. Ex. "G," at 1-2, 8. Plaintiff's challenge to her "unsatisfactory" rating was "sustained" because Plaintiff failed "to act appropriately and to carry out her professional responsibilities" and had not produced sufficient evidence to show that Plaintiff was unfairly treated. See id. at 3-8.

**Partially disputed.**

Plaintiff's challenge to the "unsatisfactory" Overall Rating for the 2011 to 2012 school year was sustained because it was heard by a hearing officer who is employed by the Department of Education and therefore he was not impartial. (Blair Decl. Exhibit "D", page 29, lines 10-12)

Plaintiff declares that Mrs. Winnicki behaved unprofessionally towards Plaintiff during her tenure at PS 34K. Alicja Winnicki repeatedly referenced Plaintiff's attire and physique. When Plaintiff complained to her union representative, Teri Macioli, Teri Masciol bad-mouthed her to then Principal Winnicki, and additionally disclosed private comments to then Principal Winnicki, that were meant to stay between Plaintiff and her union representative (Zoulas Decl. ¶ 4). Teri Mascioli had acquired an Administrative Certificate and was currying political favors to then Principal Winnicki, hoping to one day be supported for an administrative position. (Zoulas Decl. Exhibit "B" at 1-2). Alicja Winnicki demanded that the staff at PS 34K reveal their birth dates to her including the year. (Blair Decl., Exhibit "D", page 36, lines 8-16)

12. Plaintiff does not allege that Winnicki discriminated against her because of her age. Pl.'s Tr., Ex. "D," at 30:10 – 30:16.

**Not disputed.**

**Advance Rating System**

13. Consistent with New York State Education Law Section 3012-c, DOE educators are evaluated under the Advance teacher development and evaluation system. See 2015-2016 Advance Guide for Educators ("Advance Guide"), Exhibit "H," at 3-4.

**Partially disputed.**

Educators at PS 34K are evaluated differently using the Advance teacher development and evaluation system. There is a significant difference in the manner in which the Advance teacher development and evaluation system was used by each of the administrators, Asselta and LoRe-DioGuardi to observe and rate teachers. (Blair Decl. Exhibit "E", page 41, lines 17-25 page 42, lines 2-13. Blair Decl. Exhibit "B", page 73, lines 4-10).

The Advance teacher development and evaluation system states that, "Measuring teacher effectiveness and providing developmental opportunities to teachers is a complex and multi-faceted process". (Blair Decl., Exhibit "H", page 4) Asselta, however, stated in her deposition that, "I don't make it mandatory for teachers to attend PD." (Blair Decl. Exhibit "E", page 311, lines 6-7)

Also, some staff members were developed significantly more than others, especially young teachers were sent to significantly more professional development opportunities on a regular basis. (Zoulas Decl. Exhibit "K").

14. Under the Advance system, teachers are evaluated based on an Annual Professional Performance Review (APPR) and are given an Advance Overall Rating ("Overall Rating") on a 4-point "HEDI" (high effective, effective, developing, and ineffective) rating scale. Id. at 3, 6, 19.

**Not disputed.**

15. The Overall Rating is comprised of two components, the Measures of Teacher Practice ("MOTP") and the Measures of Student Learning ("MOSL"). Id. at 4-5.

**Not disputed.**

16. MOTP consists of frequent cycles of observation throughout the school year and are focused on eight key component areas. Id. at 6. MOTP account for sixty percent of a teacher's Overall Rating. Id. at 7. At the end of the school year, the school administrator and teacher meet for the Summative End-of-Year Conference where the parties reflect on the teacher's MOTP Final Summary Form and review available student data. Advance Guide, Ex. "H," at 4, 6, 10.

**Partially disputed.**

MOTP usually consists of 4 observations. Plaintiff has never reviewed available student data during the Summative End-of-Year Conference (Zoulas Decl. Exhibit "C", Zoulas Decl. Exhibit "FF").

17. MOSL measure student academic growth and are comprised of state and local measures. Id. at 5. "State Measures (20%) include state-determined measures (e.g. state tests), and for some grades and subjects, a list of allowable assessments (which are selected by principal when available)." Id. at 12. "Local Measures (20%) include options chosen from a state-approved list by the school's Local Measures Committee and submitted to the principal, who may accept the recommendation or opt for Local Measures default (school-wide) measure." Id. MOSL account for forty percent of a teacher's Overall Rating. See id. at 12, 19.

**Not disputed.**

18. For MOSL selections, "principals and Committees first make State and Local Selections for each grade/subject offered at their school. Making selections at the school-level ensures that Measures of Student Learning are applied consistently and fairly across all teachers of similar programs at a school and that students in the same grade/subject at the school are assessed in comparable ways." 2015-2016 MOSL School-Level Selections Guide ("2015- 2016 Selections Guide"), Exhibit "I," at 4.

**Partially disputed.**

MOSL scores are derived by comparing a teacher's students to a set of similar, ideal students that don't actually exist. They are avatars. MOSL selections for 2015-2016 used NYC Growth Models. (Zoulas Decl. Exhibit "D" at 1-2, Blair Decl., Exhibit "R" at 1-2)

MOSL calculations are not transparent nor are they shared with those to which they are assigned. Instead, they are calculated using a complex formula known as a "black box". (Zoulas Decl. Exhibit "D" at 1-2) Plaintiff made numerous attempts to identify the steps for calculating her MOSL scores, but to date has not been given an answer neither by the Teacher's Union, the UFT, nor by the Department of Education, DOE. (Blair Decl., Exhibit "M", page 13, Blair Decl. Exhibit "D", page 90, lines 24-25, page 91, lines 1-25, page 92, lines 1-25).

Plaintiff's MOSL score for the 2015-2016 school year was an attributed score, and therefore was not within her power to attain. (Zoulas Decl. Exhibit "R" at 2)

19. The School Local Measures Committee, generally comprised of eight members of the school community, "will recommend Local Measures selections to the principal for each grade/subject in the school." 2015-2016 MOSL Selections Guide, Ex. "I," at 5. "The Principal may accept the recommendations or opt for the Local Measures default." Id. at 5, 63.

**Not disputed.**

20. Membership of the MOSL committee at P.S. 34 included Principal Asselta, the chapter chair, the United Federation of Teachers ("UFT") representative, Assistant Principal, the literacy coach, and at least four teachers from different grade levels who volunteer to be on the committee. Asselta Tr., Ex. "E," at 25:23 - 26:9.

**Not disputed.**

21. LoRe-Dioguardi testified that the MOSL committee tried to pick the assessment teachers were best at to maximize the teacher ratings. See LoRe-Dioguardi Tr., Ex. "B," at 193:3 – 194:9; 207:12 – 209:7. LoRe-Dioguardi further explained that when choosing a target population, they "chose a population that [they] felt would best reflect [the] school's performance in a favorable way." Id. at 225:4 - 225:10. LoRe-Dioguardi testified that the MOSL committee did not discuss specific teachers but would discuss the grade levels. Id. at 218:14 - 218:18. LoRe-Dioguardi testified that she did not recall Principal Asselta ever rejecting the MOSL committee's selection. See id. at 206:2 - 206:7; 226:6 - 226:11.

**Partially disputed.**

During the 2015-2016 school year, Plaintiff and other teachers complained to Teri Mascioli, the UFT representative at the time, that they did not want the MOSL selection to be an attributed score. However, their requests were disregarded (Blair Decl. Exhibit "D", page 109, lines 16-21).

Selecting an attributed score for the MOSL can never "maximize a teacher's rating" or be "the assessment teachers are best at" as stated by LoRe Dioguardi because it is out of the teacher's ability to control (Blair Decl. Exhibit "B", page 208, lines 14-25, page 209, lines 2-7). A teacher cannot be "best" at the teaching that occurs in another teacher's classroom (Zoulas Decl. ¶ 5).

22. Principal Asselta testified that the school MOSL committee, based on options provided by the State in the fall, selected the assessments that can be used for the Local Measures rating. Asselta Tr., Ex. "E," at 25:6 – 25:17; 29:17 – 31:3. Calculations of the assessments were completed by the City and State. Id. at 75:16 - 76:6.

**Partially disputed.**

One component of the MOSL is done at the school and is graded locally (Blair Decl., Exhibit "E", page 24, lines 18-25, page 25, lines 2-5).

23. The combination of the MOTP and MOSL ratings result in a point evaluation and a corresponding Overall Rating of "highly effective," "effective," "developing," or "ineffective" for the applicable school year. Id.; see also Advance Guide, Ex. "H," at 19.

**Not disputed.**

24. A teacher who receives an overall "ineffective" or "developing" rating is placed on a Teacher Improvement Plan ("TIP") the following year. See id. at 10-11, 24; see also Pl.'s Tr., Ex. "D", at 38:3 – 38:10.

**Partially disputed.**

A teacher can be placed on a Teacher Improvement Plan (TIP), by receiving an Effective rating from the Principal, which is then combined with an attributed score for MOSL, which was calculated by using other teachers' scores. This is what occurred to Plaintiff during the 2015-2016 school year (Zoulas Decl. ¶ 6).

**2013-2014 school year**

25. During the 2013-2014 school year, Plaintiff was evaluated under the Advance rating system by Principal Asselta. See 2013-2014 Overall Rating Documents, Exhibit "J." Plaintiff received 48 points for her MOTP subcomponent score, which equated to an MOTP score of "effective." See id. at 14. Plaintiff received 13 points or a "developing" HEDI rating for her State Measures and 17 points or "effective" HEDI rating for her Local Measures subcomponents. Id. The sum of these three subcomponent scores resulted in a total of 78 points and an Overall Rating of "effective." Id.

**Not disputed.**

**2014-2015 school year**

26. During the 2014-2015 school year, Plaintiff was evaluated by Principal Asselta. See 2014-2015 Overall Rating Documents ("2014-2015 Overall Rating Docs."), Exhibit "K." For the 2014-2015 school year, Plaintiff opted to receive at least four informal classroom observations. See id. at 1. Informal observations must last a minimum of fifteen minutes. See id. at 2; see also Asselta Tr., Ex. "E," at 241:22 – 242:2. Plaintiff received 47 points for her MOTP subcomponent score, which equated to an MOTP score of "effective." See 2014-2015 Overall Rating Docs., Ex. "K," at 12-13. Plaintiff received 17 and 15 points, respectively, for her State Measures and Local Measures subcomponents which equated to "effective" HEDI ratings. Id. at 13. The sum of these three subcomponent scores resulted in a total of 79 points and an Overall Rating of "effective." Id.

**Not disputed.**

**2015-2016 school year**

27. For the 2015-2016 school year, Plaintiff taught fourth grade. See Organization Sheets, Exhibit "L," at 3.

**Not disputed.**

28. Pursuant to the MOSL Implementation Timeline, by September 28, 2015, schools made school-level MOSL selections "aligned with student needs, instructional priorities, and strategic assessment plans," and by November 6, 2015, the school made teacher level selections. See 2015-2016 MOSL Selections Guide, Ex. "I," at 3.

**Partially disputed.**

There has been a lawsuit brought by teacher Sheri Lederman of Long Island that had been successfully litigated and won (Zoulas Decl. Exhibit "D" at 1-2). The MOSL selection for the 2015-2016 school year was to combine the scores of all teachers at the school for the NYS ELA and Math tests then attribute those scores to all the teachers at the school. These same state test scores and the process by which they were derived are unfair and the process too convoluted and complex. Since the state test scores were then forbidden to be used for teacher ratings, the state then allowed them to be used for MOSL scores (Zoulas Decl. ¶ 7).

During Asselta's deposition, she stated that even though all the teachers at the school received a Developing rating for their MOSL score for the very first time ever for the 2015-2016 school year, she could not recall what the MOSL selection was for that school year (Blair Decl. Exhibit "E", page 207, lines 9-23).

29. During the 2015-2016 school year, Plaintiff was evaluated by Principal Asselta. See 2015-2016 Overall Rating Documents ("2015-2016 Overall Rating Docs."), Exhibit "M," at 2-9. For the 2015-2016 school year, Plaintiff opted to receive at least four informal classroom observations. See id. at 1. Plaintiff was observed on February 29, 2016, April 8, 2016, May 31, 2016, and June 2, 2016, receiving "effective," "developing," and "ineffective" component ratings. Id. at 1-9.

**Partially disputed.**

During the 2015-2016 school year, Asselta began rating Plaintiff harshly and undeservedly (Zoulas Decl. ¶ 8). Asselta gave Plaintiff the lowest possible score under the effective range, a 45 (Blair Decl. Exhibit "E", page 303, lines 23-25, page 304, lines 2-8).

However, Lore-Dioguardi testified during her deposition for this case that Plaintiff demonstrated good qualities of instruction (Blair Decl. Exhibit "B", page 241, lines 17-24).

30. On March 9, 2016, Plaintiff loudly reprimanded one of her students in the schoolyard during dismissal in the presence of school personnel, parents, and students. See March 31, 2016 Letter to File Documents, Exhibit "N," at 1. School Safety Agent officer Raul Fantauzzi ("Fantauzzi") and teacher Mrs. Belfiore submitted statements about the incident. See id. at 2-3.

**Partially dispute.**

On March 9, 2016, Plaintiff did not reprimand the student, Nicole P., loudly. The incident was unfolding in a loud and noisy schoolyard. Plaintiff needed to ensure that the child could clearly hear her. Plaintiff had called out twice to the child as the 9-year-old child was racing towards the schoolyard gate, unaccompanied. Nicole P. did not hear the Plaintiff calling out to her and continued on her path towards the street. Additionally, LoRe-DioGuardi demanded that Mr. Fantuzzi and Ms. Belfiore write witness statements against Plaintiff, the contents of which were dictated by her. They complied due to administrator pressure that she inflicted on them (Zoulas Decl. ¶ 9).

31. LoRe-Dioguardi testified that she intervened and requested that everyone come into the building. LoRe-Dioguardi Tr., Ex. "B," at 264:13 - 266:13. LoRe-Dioguardi testified that it was "clearly inappropriate" for Plaintiff to be discussing something with the parent while the child was crying and Plaintiff was in an agitated state. See id. at 266:10 – 266:13; 267:6 – 268:15; 276:12 – 276:24.

**Partially disputed.**

LoRe-Dioguardi was confused when she testified about a schoolyard incident that occurred on March 9, 2016 (Zoulas Decl. ¶ 10). She was asked by attorney Sofia Suarez to explain the incident that was related to the letter for file given to Plaintiff, dated March 31, 2016 (Blair Decl. Exhibit "N" at 1). Asselta, who authored the letter for file, dated March 31, 2016, never explained in the letter that a student, Nicole P., attempted to run out of the schoolyard and was stopped from doing so by Plaintiff. Therefore, LoRe-Dioguardi could not remember what had occurred, (Zoulas Decl. ¶ 11) and instead testified about an unrelated situation (Blair Decl. Exhibit "B", pages 262-269).

32. On March 31, 2016, Plaintiff received a letter to file for the March 9, 2016 incident during schoolyard dismissal on. See March 31, 2016 Letter to File, Ex. "N," at 1. Principal Asselta wrote that she met with Plaintiff, who declined to have union representation during the meeting, on March 17, 2016, to discuss the allegation that Plaintiff engaged in unprofessional behavior, loudly reprimanding a student who was visibly crying. See id. Plaintiff was provided with the opportunity to respond and said she did not yell at the child, but instead spoke sharply. Id. Plaintiff also alleged that LoRe-Dioguardi was trying to create a problem for Plaintiff. Id. After reviewing the allegations, witness statements, and Plaintiff's explanation, Principal Asselta concluded that Plaintiff engaged in unprofessional conduct. Id.

**Partially disputed.**

Up until this point in time of March 2016, Plaintiff had not experienced any systematic false accusations or other patterns of professionally-damaging behavior by Defendant Asselta. Additionally, Plaintiff believed that LoRe-DioGuardi had behaved in a bizarre and unprofessional manner with regards to the incident that occurred on March 9, 2016. Plaintiff was therefore looking forward to having an open discussion about the incident with Asselta. Plaintiff therefore did not see a need to have union representation during the meeting with Asselta on March 17, 2016. However, during the meeting, Asselta

mocked Plaintiff when Plaintiff stated that her student, Nicole P. suddenly took off across the schoolyard and was heading quickly towards the street. Defendant Asselta stated, "What did you think was going to happen, Ms. Zoulas?" (Zoulas Decl. ¶ 12)

Additionally, Asselta did not explain in the Letter for File that she wrote, that the child suddenly took off and headed for the schoolyard exit and street on March 9, 2016 (Blair Decl. Exhibit "N" at 1). Instead, Asselta stated only that the Plaintiff behaved unprofessionally by yelling and making the child cry, when it was LoRe-DioGuardi who had made the child cry by shaming her in front of other people. Asselta, never described how the child put herself in immediate danger by running off towards the street nor gave Plaintiff credit for thinking and acting quickly to catch up with Nicole P. before she had the chance to get past the schoolyard gate. Additionally, during LoRe-DioGuardi's Deposition, when she was questioned about that incident, she failed to recall what had occurred because the letter for file never stated that information (Zoulas Decl. ¶ 13). Instead, she spoke about a totally unrelated event (Blair Decl. Exhibit "B", pages 262-267, page 275, lines 23-25, pages 276-279, 280 lines 2-7).

Defendant LoRe DioGuardi, who was present in the schoolyard on march 9, 2016, chose to immediately escalate the situation with Nicole P. instead of deescalate it as is required by trained staff. LoRe-DioGuardi created a scene in the schoolyard by yelling at Plaintiff that she and she alone would be in charge of the incident. LoRe DioGuardi began shaming the child, telling her she should be ashamed of herself for running off without permission. This was the reason the child cried. Additionally, LoRe DioGuardi then refused to allow Plaintiff to speak to Nicole P.'s parent when the parent came to pick her up. When Plaintiff tried to speak to Asselta, by walking over to her office door, LoRe-DioGuardi, who was already in there, began screaming for the security guard, Mr. Raul Fantuzzi, to escort Plaintiff away from Asselta's office (Zoulas Decl. ¶ 14).

33. On May 27, 2016, Evelyn Vazquez ("Vazquez"), Deputy Director, Elementary Programs, emailed Principal Asselta and detailed how Plaintiff had yelled at Renata while Vazquez and another individual were observing Renata facilitating literacy. Email Complaints Concerning Plaintiff, Exhibit "O," at 1. Vazquez wrote that Plaintiff yelled that participants were not allowed to use the staff bathroom. Id. Renata had previously sent a child to use the bathroom since it was right next to the room Renata was using and she could keep watch while in the room. See id. Vazquez wrote that it was "an extremely uncomfortable situation" and Renata had felt "embarrassed for being yelled at in front of the participants." Id.

**Disputed.**

Evelyn Vazquez did not witness the incident involving a child entering the adult bathroom at PS 34K nor did she witness anything of which she wrote about in the email she sent to Defendant Asselta on May 27, 2016. She was not present at the time. Therefore, this is hearsay (Zoulas Decl. ¶ 15). In addition, the email was sent at 9:31 p.m. that same evening (Blair Decl. Exhibit "O" at 1)

On May 27, 2016, Plaintiff was attempting to use the adult bathroom on the second floor when she witnessed Renata, an employee of the After-School Settlement Program, send a child to use this adult bathroom at PS 34K (Zoulas Decl. ¶ 16). This a violation of OSHA Law as referenced by the United Federation of Teachers policy (Zoulas Decl. Exhibit "E" at 3).

Plaintiff denies that she yelled at Renata on May 27, 2016. Plaintiff states that she is the one who expressed to Renata that she feels embarrassed and uncomfortable to see students entering the adult bathroom. Principal Asselta, never discussed the illegal use of the staff bathrooms with Plaintiff, nor did she inquire as to what had occurred on that day (Zoulas Decl. ¶ 17).

34. On June 28, 2016, Plaintiff signed her MOTP summary report, which stated her MOTP HEDI rating. See 2015-2016 Overall Rating Docs., Ex. "M," at 10. Plaintiff received 45 points for her MOTP subcomponent score, which equated to an "effective" MOTP HEDI rating. See id.

**Partially disputed.**

Defendant Asselta gave Plaintiff the lowest possible rating within the Effective range (Blair Decl. Exhibit "M" at 14).

Concurrently, Asselta moved Plaintiff's classroom for the coming school year, 2016-2017, directly above her office, where they are only separated by an open metal staircase that reverberates sounds loudly. Plaintiff's classroom was the only class located above Asselta's office. This move was completely illogical and unnecessary as Plaintiff's then room, 207 was given to another 4th grade classroom. However, there is no rational explanation for why Plaintiff was not assigned to that particular incoming fourth grade, nor why some students were not shifted to Plaintiff's roster. This would have avoided the unnecessary, chaotic, and disruptive movement of teacher classrooms (Zoulas Decl. ¶ 18). Asselta claimed that the other 4th grade had more children and needed a larger room Blair Decl. Exhibit "E", page 283, lines 15-25, page 284, lines 2-25, page 285, lines 2-11). However, Asselta could not explain why Plaintiff was the only teacher on a teacher improvement plan for the 2016-2017 school year and was also the only teacher whose classroom was moved directly above Asselta's office (Blair Decl. Exhibit "E", page 288, lines 5-24).

35. In June 2016, Plaintiff volunteered to participate in three days of paid training with Principal Asselta and additional teachers at the Apple Institute. See Zoulas Professional Development, Exhibit "P," at 1-5. Principal Asselta thanked the teachers, including Principal Asselta, for volunteering to attend with her and explained that the "training was focused on 'enhancing teaching and learning through the use of technology and various apps which address multiple access points for students.'" See id. at 1, 5. The training took place in July 2016. Id. at 3, 5.

**Partially disputed.**

Defendant Asselta had invited certain teachers to participate in the Apple Institute that
took place in July 2016. This included Ms. Visconti, Ms. Marshall, Ms. Zabroni, and Ms.
Panopoulos. Plaintiff was not invited. Instead, as the date for the Institute approached and
vacancies existed, Asselta announced to staff at the end of a faculty conference in late
June of that year, that there were still spots left for the Apple Institute. Staff had already
risen from their seats and were walking towards the exits. When Plaintiff announced
she'd like to attend, Defendant LoRe-DioGuardi turned to Defendant Asselta and stated,
"What do we do now?" Asselta responded, "We have to let her come". Asselta then very
slowly and reluctantly stated to Plaintiff that she could attend. Additionally, during the
three-day Apple Institute, Defendant LoRe Dioguardi repeatedly harassed Plaintiff by
demanding she attend workshop groups with Asselta and not the one's she chose for
herself. LoRe-DioGuardi did not demand this of the other teachers who were also
attending the Apple Institute (Zoulas Decl. ¶ 19).

After the Apple Institute was completed, Plaintiff sent Asselta an email expressing her
satisfaction with the workshop and offered some technology ideas for possible use at the
school (Zoulas Decl. Exhibit "F" at 1). Asselta responded to Plaintiff immediately with
an email stating she will be on vacation beginning August 11, 2016, but never
acknowledged Plaintiff's ideas that she had just shared. Plaintiff was the only person to
whom the email was addressed (Zoulas Decl. Exhibit "F" at 12).

36. On June 29, 2016, Principal Asselta approved Plaintiff's request for per session
employment beginning June 29th for the Leader in Me training program. See Per Session
Documents, Exhibit "Q," at 1.

**Partially disputed.**

All staff members were asked to attend this training either during the summer or at
another time. (Zoulas Decl. Exhibit "F" at 3). The Leader in Me training program was
required by the school. This training was not uniquely offered to Plaintiff as is implied in
this Motion (Zoulas Decl. ¶ 20).

37. Plaintiff testified that she applied for two per session positions, a test scoring per
session and the Green Stem after school program, after the 2015-2016 school year but
was not selected for either position. Pl.'s Tr., Ex. "D", at 143:6 – 145:7.

**Partially disputed.**

(Blair Decl. Exhibit "Q" at 2).

**2016-2017 school year**

38. For the 2016-2017 school year, Plaintiff's was moved from classroom 4- 207 to 4-
201. See Organization Sheets, Ex. "L," at 2; see also Am. Compl., Ex. "C," ¶ 44.
Principal Asselta testified that Plaintiff's room assignment was changed because she
reorganized the building based on overall class sizes and Plaintiff's class could be used

for a larger class size than the one she was teaching. See Asselta Tr., Ex. "E," at 282:12 –
282:22; 284:18 – 284:20. Principal Asselta testified that teacher Jeanne Marshall
("Marshall"), who was moved to Plaintiff's former classroom, had a bigger class size
than Plaintiff during the 2016-2017 school year. See id. at 284:5 – 284:12; 284:21 -
285:22; see also Organization Sheets, Ex. "L," at 2.

**Partially disputed.**

Defendant Asselta moved Plaintiff's classroom for the 2016-2017 school year directly
above her office, where they are only separated by an open metal staircase that
reverberates sounds loudly. Plaintiff's classroom was the only class located above
Asselta's office (Blair Decl. Exhibit "E", page 288, lines 5-24). This move was
completely illogical and unnecessary as Plaintiff's then room, 207 was given to another
4th grade classroom, class 401. Asselta claimed that the other 4th grade, 401, had more
children and needed a larger room (Blair Decl. Exhibit "E", page 282-285). However,
there is no rational explanation for why Plaintiff was not assigned to that particular
incoming fourth grade, class 401, nor why some students were not shifted to Plaintiff's
roster. This would have avoided the unnecessary, chaotic, and disruptive movement of
teacher classrooms Plaintiff also notes that Asselta made this decision to move her
classroom, while Plaintiff received an overall Developing rating for the very first time
(Zoulas Decl. ¶ 21). When Defendant Asselta was questioned about this during her
Deposition, she became very defensive (Blair Decl. Exhibit "E", page 288, lines 5-24).
However, this unnecessary moving of Plaintiff's classroom to above Asselta's office was
part of an overall pattern of behavior that began on or about when Plaintiff turned 55
years of age, on March 20, 2016 (Zoulas Decl. ¶ 22).

39. Before the start of the school year, Plaintiff asked three students to help her move her
class items. Am. Compl., Ex. "C," ¶¶ 45-47; see Pl.'s Tr., Ex. "D", at 95:20 – 95:5.
Principal Asselta told Plaintiff that the students had to leave and could not assist Plaintiff
in moving her belongings. See Pl.'s Tr., Ex. "D", at 96:7 – 96:11. Principal Asselta
testified that Plaintiff did not request permission to have the students help her move and
that it was a liability issue to have the students engaged in such activities while the school
building was closed. See Asselta Tr., Ex. "E," at 289:14 - 289:20; 290:22 - 291:4; 292:6 -
292:16. Principal Asselta testified that other teachers have obtained permission to have
their adult children or spouses to assist them in moving, and that she offered to have the
custodian and school aid help Plaintiff move. See Asselta Tr., Ex. "E," at 287:5 - 287:9;
290:6 - 290:21; 291:5 - 291:9.

**Partially disputed.**

Plaintiff had asked three students to assist her to move her classroom before the 2016-
2017 school year started, Harry S., Nicole P., and Adam W. (Zoulas Decl. Exhibit "F" at
2). Plaintiff has witnessed on numerous occasions, younger teachers had brought their
underage children to PS 34K to assist them in setting up their classrooms. Several of
these underage children were also students of PS 34K. One teacher who brought her
underage children to assist her set up her classroom before the school year started and

who were students at PS 34K was Ms. Belfiore, who brought her two sons, ages 8 and 12. Another teacher who brought her underage 11-year-old daughter to set up her classroom was Ms.Visconti. Additionally, Ms. Marshall was permitted to bring her two young sons, ages 3 and 5 because she had no babysitter (Zoulas Decl. ¶ 23) (Blair Decl. Exhibit "C" at 45-47).

Defendant Asselta gave Plaintiff false information that the children were not covered by the building insurance because the 2016-2017 school year had not begun. Plaintiff responded to Defendant Asselta that the school year had not begun for anyone. She additionally stated that many teachers had brought their underage children to help them set up their classrooms. (Blair Decl. Exhibit "D", page 95, line 25, page 96, lines 1-24). In late August of 2016 before the 2016-2017 school year started, Defendant Asselta demanded that the children helpers leave Plaintiff's room immediately and instructed the School secretary, Ms. Tabala to call their parents and have them picked up. Neither the custodian nor the school aid was asked to assist Plaintiff. No one assisted Plaintiff (Zoulas Decl. ¶ 24).

Asselta was aware that Plaintiff had begun walking with a limp, yet Plaintiff was denied the opportunity to receive assistance with setting up her classroom and moving (Blair Decl. Exhibit "E", page 285, lines 23-25, page 286, lines 2-12).

In late August 2016, after Plaintiff's student helpers were sent home by Asselta, Plaintiff then called her Union representative, Ira Munet to relay what had just occurred and to inquire about what recourse she had. Ira Munet responded to Plaintiff that she only needed to have desks, chairs and books ready for students in order to begin the school year (Zoulas Decl. ¶ 25).

40. On September 1, 2016, Plaintiff received her Overall Rating for the 2015- 2016 school year. See 2015-2016 Overall Rating Docs., Ex. "M," at 11-12. Principal Asselta met with Plaintiff to give Plaintiff her rating. See id. at 13; see also Asselta Tr., Ex. "E," at 156:4 - 156:21. Principal Asselta testified that she tried to explain Plaintiff's score to her, but it was not a "friendly conversation" because Plaintiff was very upset. See Asselta Tr., Ex. "E," at 156:4 - 156:21; 158:10 - 159:11; 218:11 - 219:7.

**Partially disputed.**

Asselta did not explain the score. Plaintiff repeatedly requested both verbally and in writing, that the MOSL score calculation, formula, and who is responsible for the process be explained to her (Blair Decl. Exhibit "M" at 13). Asselta has previously claimed that she tried to explain the MOSL score to Plaintiff, but then blamed Plaintiff for not actually explaining the MOSL score to her (Blair Decl. Exhibit "E", page 156, lines 4-21). This is a right that any teacher should be able to request to have the MOSL score calculation, formula, and who is responsible for the process, explained.  Plaintiff was denied an explanation of the MOSL score calculation, formula, and who is responsible for the process by Asselta when she requested this in September 2016. Plaintiff did not prevent

Defendant Asselta from explaining the MOSL score. This is a false statement that Asselta made during her deposition (Zoulas Decl. ¶ 26).

LoRe-Dioguardi testified during her deposition that the MOSL calculation was "very complicated" and that no one understands it (Blair Decl. Exhibit "B", page 190, lines 15-25, page 191-192, page 193, line 2). Asselta testified during her deposition that she also does not have an answer as to how the MOSL score is calculated. Additionally she testified that she does not remember what the MOSL choice was for the 2015-2016 school year, even though the entire staff of teachers at PS 34K received a Developing rating for the MOSL score that year (Blair Decl. Exhibit "E", page 74, lines 7-25, page 75, lines 2-25, page 76, 2-11).

41. For the 2015-2016 school year, Plaintiff's State Measures score was "dropped" due to Transition Rules. See 2015-2016 Overall Rating Docs., Ex. "M," at 11, 13. Accordingly, Plaintiff's Overall Rating was comprised of her Local Measures and MOTP ratings, which resulted in a "developing" Overall Rating. See id. at 13.

**Partially disputed.**

The State Test Score Measures were "dropped" due to the Lederman case, in which it was shown that the State was using virtual, avatar students in which to compare teachers' students' test scores. The "growth scores" that were derived from, the State Test Scores were found to be "arbitrary and capricious." (Zoulas Decl. Exhibit "D" at 1-2) However, those same New York State ELA and Math test scores were then permitted to be used for MOSL scores, using an obscure "black box" formula. This was after it was decided during the 2015-2016 school year, that the New York State test scores would no longer be used to calculate a teachers' overall rating (Zoulas Decl. ¶ 27).

42. The local assessments chosen for Plaintiff were the same as the other fourth grade teachers, Sarah Andonov and Anna Rzerziacha, and consisted of the NYC Performance Tasks for all grades and English Language Arts ("ELA") and a "school" target population. See id. at 16; 2015-2016 Teacher Level MOSL Selections, Exhibit "R;" see also 2015-2016 MOSL Selections Guide, Ex. "I," at 10. All evaluated teachers at P.S. 34 received a "developing" local measures score for the 2015-2016 school year. See Teacher Evaluation Ratings, Exhibit "S," at 1-2; see also Asselta Tr., Ex. "E," at 163:24 - 164:5; Pl.'s Tr., Ex. "D", at 108:13 – 108:16.

**Partially disputed.**

The MOSL choice selected for the 2015-2016 school year consisted of the NYS Test scores from the school's testing grades. This was an attributed score. The targeted population was the whole school (Blair Decl. Exhibit "R" at 1-2). All teachers received a Developing MOSL rating that year, however, it was ONLY Plaintiff who received a Developing Overall rating (Blair Decl. Exhibit "S," at 1-2). Plaintiff sent Asselta a typed complaint through her union representative, Teri Mascioli (Zoulas Decl. Exhibit "B" at 3). Asselta, however, could not remember what the MOSL selection was for the 2015-

2016 school year, nor how it was calculated (Blair Decl. Exhibit "E" page 164, lines 6-25, page 165, lines 2-10).

Additionally, LoRe-DioGuardi testified that receiving an overall Developing rating is very serious and that it can lead to loss of tenure, pension, and seniority (Blair Decl. Exhibit "B", page 238, lines 4-25, page 239, lines 2-6 and 20-24).

43. Plaintiff wrote comments all over her rating sheet, with comments that the score was "based on the NYC & NYS Education Dept. being unprepared to calculate an educationally sound rating." See Pl.'s Tr., Ex. "D", at 85:23 – 86:8; 86:20 – 87:2. Plaintiff added that there was "NO" basis to calculate the local measures twice when it was calculated once in the past. Id. Further, wrote that the scores did not correlate with the "very efficient" rating she received on the state tests for that year. Id. Plaintiff refused to sign her APPR rating sheet until March 23, 2017. See id. at 13. Plaintiff added an additional comment when signing that the scores were not explained to her when she asked for an explanation. See id. at 13.

**Partially disputed.**

Plaintiff reiterates that MOSL score calculations were never explained to her. Plaintiff was responding to the rating in writing, as she is permitted to do. The rating was being disputed through the APPR process, until March 23, 2017 (Zoulas Decl. ¶ 28). Plaintiff never refused to sign this document, but instead notified Asselta that she would sign the document as soon as the APPR process was completed (Blair Decl. Exhibit "V" at 1, Zoulas Decl. Exhibit "B" at 3, Blair Decl. Exhibit "D", page 88, lines 4-25, page 89, lines 1-17).

44. Plaintiff testified that she tried speaking to the union about her rating but that the person she was directed to tried to avoid speaking to her and made it "very difficult," referring Plaintiff to the Advance Guide to look up the requested information. See Pl.'s Tr., Ex. "D", at 91:19 – 92:20.

**Partially disputed.**

The Advance Guide has a generic explanation of the Advance Rating System used by the Department of Education, NYC. Plaintiff was not seeking a generic explanation, but a specific explanation for how her rating was calculated (Zoulas Decl. ¶ 29).

45. Plaintiff alleges that Lore-Dioguardi lost Plaintiff's articulation cards, which meant Plaintiff only knew her student's names when she stated the school year. See Am. Compl., Ex. "C," ¶¶ 244-245. Plaintiff alleges that at the end of the school year Lore-Dioguardi secretly put the cards in Plaintiff's desk. Id.

**Not disputed.**

46. Plaintiff alleges that on September 8, 2016, she asked three students to "grab some piles of books" that need to be moved to her new room and that LoRe-Dioguardi stopped them and told Plaintiff that the students were not able to carry Plaintiff's books. See id. at ¶¶ 48-50; see also Pl.'s Tr., Ex. "D", at 97:5 – 97:13. Plaintiff alleges that the action was rude, disrespectful, and embarrassing as it allegedly happened in front of Plaintiff's students. Pl.'s Tr., Ex. "D", at 97:14 – 97:16.

**Partially disputed.**

One student whom Plaintiff had asked to assist her in carrying heavy piles of books was Rafal P., a student assigned to Plaintiff's classroom for the 2016-2017 school year. LoRe-DioGuardi, however, prevented him and other student helpers from carrying the heavy books by yelling loudly at them to put the books back. She also yelled loudly that if Plaintiff needs the books moved, she should do it herself. She yelled this to Plaintiff in front of her whole class, thereby humiliating her and diminishing her authority (Zoulas Decl. ¶ 30) (Blair Decl. Exhibit "C" at 48-49).

47. On September 22, 2016, a parent, on behalf of himself and three additional parents of students in Plaintiff's class, reported to the DOE's Office of Special Investigations ("OSI") that Plaintiff "yells at her students, children are afraid to ask questions, and that children are physically put in a corner for misbehaving." December 19, 2016 Letter to File Documents ("December 19, 2016 Letter to File Docs."), Exhibit "T," at 1. The parent added that his child was yelled at and made to sit in front of the class on September 21, 2016, and was now afraid to come to school, saying to his parent, "[t]he teacher hates me." Id. at 1. As a part of her investigation of the allegations, Principal Asselta gathered witness statements from students and met with Plaintiff. See id. 5-13; 2-11.

**Partially disputed.**

Plaintiff states that none of what the Defendants reference in paragraph 47 of their 56.1 statement occurred, (Zoulas Decl. ¶ 31). Parents cannot be witnesses to allegations for which they were never present. All of the parent allegations are hearsay (Blair Decl. Exhibit "D" page 159, lines 13-22). Additionally, Asselta conducted the investigation in violation of Chancellor's Regulation A-420 and A-421, which clearly states that all witness statements must be gathered as quickly as possible. Asselta did not do this (Blair Decl. Exhibit T at 7-10). Asselta disregarded the investigation rules and interviewed students over a three-week period, thereby allowing students to discuss the allegations with each other (Zoulas Decl. Exhibit "G" at 6-9, Zoulas Decl. Exhibit "CC" at 6-8).

Plaintiff overheard her students laughing at her and making statements out loud such as, "Ms. Zoulas is going to be fired, then we don't have to do any homework" in the lunchroom when she went to pick them up during the three-week period for which the witness statements were being collected. Additionally, Plaintiff has the right to bring order to her classroom by using a loud teacher voice, and that this does not constitute verbal abuse. Plaintiff used a loud teacher voice to say, "Three, Two, One", a verbal

signal to students to be quiet. Plaintiff also used a loud teacher voice to say, "Sit down, go to your seat, be quiet" to students that were out of their seats and laughing during instruction. This does not constitute verbal abuse. Additionally, Asselta never offered assistance or support to Plaintiff concerning poor student behavior (Zoulas Decl. ¶ 32).

Several parents who were part of this complaint, signed a document later on in the school year requesting for Plaintiff to teach their children for fifth grade. (Zoulas Decl. Exhibit "H", Blair Decl. Exhibit "E", page 358, lines 17-25, page 359, lines 2-21).

48. Pursuant to the Advance Guide, Plaintiff was placed on a TIP for the 2016- 2017 school year. See Advance Guide, Ex. "H," at 10-11, 24; see also 2016-2017 Overall Rating Documents ("2016-2017 Overall Rating Docs."), Exhibit "U," at 1-4; see also Pl.'s Tr., Ex. "D," at 90:1 – 91:15; 140:4 – 140:11. On September 22, 2016 Plaintiff met with Principal Asselta and signed the TIP. See 2016-2017 Overall Rating Docs., Ex. "U," at 2. Plaintiff alleges that the TIP was age discrimination by Principal Asselta. Id. at 140:17 – 141:6.

**Partially disputed.**

Plaintiff asserts that it is not solely being placed on a TIP that constitutes age discrimination, but the totality of the fabricated letters for file, fabricated observation reports, undeserved ratings, TIP Plan, administrator behaviors and comments, age-related animus, issues with feedback, failure to support, denial of assistance, being told to ask young, inexperienced teachers for teaching advice, discriminatory system for notifying and sending staff for professional development opportunities, notebook documenting of Plaintiff's statements and behavior, and other components of the First Amended Complaint, and the fact that ALL of this begin on or about the time Plaintiff turned 55 years of age on March 20, 2016, and not solely the TIP that constitutes age discrimination by Asselta. (Zoulas Decl. ¶ 33).

49. Principal Asselta testified that in drafting the TIP, she utilized the Advance guide and "tried to be as thorough as possible to try and give [Plaintiff] every opportunity to improve and succeed." Asselta Tr., Ex. "E," at 85. Principal Asselta testified that when a teacher is on a professional development plan, she tried to provide professional development opportunities that would help the teacher. Id. at 313:8 – 313:14. During the school year, Principal Asselta sent Plaintiff to professional development opportunities that focused on. See Asselta Tr., Ex. "E," at 331:16 – 333:9.

**Partially disputed.**

In paragraph 49 of the Defendants' 56.1 statement, Asselta claims that she drafted the TIP because she wanted to give Plaintiff every opportunity to succeed. Plaintiff was not in need of assistance after the 2015-2016 school year. Plaintiff received an Effective rating on her MOTP. Plaintiff received a Developing rating on her MOSL, which was an attributed score, in which she had no control over how other teachers taught in their classrooms. Plaintiff never received professional development concerning differentiation.

Plaintiff was sent to a professional development entitled "RTI" which stands for Response to Intervention, a multi-tier approach to the early identification and support of students with learning and behavioral needs. During this professional development workshop, the instructor informed participants that the workshop was geared towards Special Education teachers and students. Plaintiff never taught special education students (Zoulas Decl. ¶ 34). Asselta, however, claimed that she sent Plaintiff to a workshop for differentiation, but didn't know what RTI stands for (Blair Decl. Exhibit "E", page 332, lines 20-25, page 333, lines 1-13).

Asselta, however, sent herself to professional development opportunities to learn more about differentiation (Blair Decl. Exhibit "E", page 95, lines 16-19).

Additionally, Asselta, repeatedly wrote in Plaintiff's observation reports that she did not differentiate when she did (Zoulas Decl. ¶ 35).

50. On September 23, 2016, Plaintiff submitted an APPR Resolution Assistance Request. See APPR Resolution Assistance Request ("APPR Request"), Exhibit "V," at 1. Plaintiff complained that her Initial Planning Conference ("IPC") "was not provided to [her] in the deadline that is require[d]" and "as such," the rating she received should be "null and void." Id. Plaintiff also complained that she did not receive a "thorough explanation" of how the MOSL rating was calculated, that the rating was "arbitrary and capricious," and included assessments of other teachers. See id. Plaintiff forwarded the request to Principal Asselta on September 25, 2016. See id, at 1.

**Not disputed.**

51. On October 6, 2016, Principal Asselta observed Plaintiff screaming at her class. See January 6, 2017 Letter to File, Exhibit "W;" see also Asselta Tr., Ex. "E," at 165:25 – 166:21; 173:24 – 174:11; 175:3 – 175:16.

**Partly disputed.**

Plaintiff was not screaming. Plaintiff was using a loud teacher voice because an unruly student had just finished knocking down a projector stand and other objects in the classroom. As a result children were screaming loudly in the classroom, making it difficult for Plaintiff to be heard, and creating a chaotic, and dangerous situation in the classroom. This was all explained to Asselta during the meeting held on October 13, 2016 (Blair Decl. Exhibit "W").

Additionally, both administrators, Asselta and LoRe-Dioguardi entered Plaintiff's classroom on October 6, 2016, after Filip K. had knocked over the projector and stand However, neither administrator offered any assistance during this situation, nor did they inquire as to what had occurred. Additionally, LoRe-Dioguardi went to the closet to look inside, then proceeded to look under the children's desks. Plaintiff was never told what she was looking for in this bizarre manner, however, to Plaintiff it appeared that LoRe-Dioguardi was creating a scene and mocking the situation (Zoulas Decl. ¶ 36).

52. Plaintiff alleges that on October 6, 2016 and October 13, 2016, respectively, Principal Asselta and LoRe-Dioguardi responded to unruly students in her class and reprimanded Plaintiff, but not the children. See Am. Compl., Ex. "C," ¶¶ 122, 124; see also Pl.'s Tr., Ex. "D", at 97:19 – 98:3; 102:23 – 104:3.

**Partially disputed.**

Plaintiff states that neither administrator offered assistance or support on October 6, 2016 or at a later date, when Filip K. knocked over the projector stand in the classroom when he jumped out of his seat without permission and tripped.  Neither administrator spoke to the child, Filip K., nor called in his parent to review school rules. Neither administrator spoke to Plaintiff to offer support or assistance (Zoulas Decl. ¶ 37).

53. On October 13, 2017, Plaintiff complained that the staff directory distributed to the staff was missing her name. Zoulas Emails, Exhibit "X," at 3. Plaintiff requested that all "erroneous directories be collected and discarded." Id. at 4. Plaintiff spoke with Principal Asselta about the directories and expressed that it was "upsetting" for her, she was "deeply offended" by the error, and it was embarrassing her. Principal Asselta responded that the directories would be collected. Id. at 5.

**Partially disputed.**

The 2017-2018 school directories, in which Plaintiff's name had been omitted and instead had a row of stars in place of her name, were never collected. Teachers were never instructed that they received directories that had Plaintiff's name omitted and replaced by a row of stars, and that they should discard those directories, (Zoulas Decl. ¶ 38)

The directory had Plaintiff's name omitted and replaced with a row of stars, (Zoulas Decl. Exhibit "J" at 1-2).

Plaintiff filed two grievances concerning this incident. The first grievance was filed on October 16, 2017, but was not heard until October 27, 2017 (Blair Decl. Exhibit "AA" at 27). All the while, the directories were not collected nor were teachers and staff informed that they should discard the directories. A Step-Two grievance was held on November 30, 2017, however, the directories were not collected nor were teachers and staff informed that they should discard the directories (Blair Decl. Exhibit "AA" at 28). A second Step-One grievance was filed on December 1, 2017, however, once again, the directories were not collected, nor were teachers and staff informed that they should discard the directories (Blair Decl. Exhibit "AA" at 34).

The previous year, in 2016, there was also an error on the staff directory concerning Plaintiff, where Plaintiff's extension was typed under her name and Ms. Larkin's name, (Zoulas Decl. Exhibit "J" at 3). Thereby, Plaintiff received numerous disruptive calls to her classroom during the 2016-2017 school year, asking for Ms. Larkin. During both

school years, 2016-2017 and 2017-2018, Plaintiff was the only staff member who had errors concerning the staff directories (Zoulas Decl. ¶ 39).

Additionally, Plaintiff wrote several emails to Asselta and one to her UFT representative concerning this incident (Blair Decl. Exhibit "X" at 3, 4, and 5, Zoulas Decl. Exhibit "F" at 10). Sometime in December of 2017, when new directories were printed that were formatted in the customary manner and that included Plaintiff's name, LoRe-Dioguardi took them and threw them like a pile of trash in the corner of the teacher's room floor (Zoulas Decl. ¶ 40).

54. Principal Asselta testified that the omission of Plaintiff's name with stars was a typographical error by the paraprofessional that was immediately corrected when it was brought to Principal Asselta's attention. See Asselta Tr., Ex. "E," at 295:10 – 297:20. The amended directory was distributed, and teachers were asked to replace the old directory. See Asselta Tr., Ex. "E," at 298:14 - 298:25.

**Partially disputed.**

In October of 2017, LoRe-DioGuardi instructed a school paraprofessional, to type a new staff directory, one that deviated significantly from the customary format. LoRe Dioguardi instructed the paraprofessional, Ms. Domarecki, to omit Plaintiff's name and that she should instead type a row of stars. Asselta testified falsely during her deposition, that the error was immediately corrected, however, this never occurred. Plaintiff spoke to Asselta in her office on October 13, 2017, immediately after she received the directory with her name omitted. Additionally, Plaintiff filed two grievances, wrote 5 emails, and had a step-two grievance and still the directories were never collected. To this day, the directories were never collected, nor were teachers and staff informed that they should be discarded. New directories were not produced until mid-December, at least two full months later. (Zoulas Decl. ¶ 41).

55. Plaintiff alleges that on an unspecified date in 2016, LoRe-Dioguardi instructed the custodian to remove the printer from Plaintiff's classroom and replaced it with a broken printer. See Am. Compl., Ex. "C," ¶ 248.Plaintiff alleges that none of the computer equipment works in her classroom. See id. ¶ 249.

**Not disputed.**

56. On October 20, 2016, teacher Teri Mascioli emailed LoRe-Diogaurdi and Principal Asselta about an incident at lunch where Plaintiff screamed at her class to quiet them down and told them they would all have a writing assignment when they got back to the classroom. See January 20, 2017 Letter to File, Exhibit "Y," at 1, 4-5; see also Organization Sheets, Ex. "L," at 2. Principal Asselta reported to OSI that Plaintiff had gone to the cafeteria to pick up her class and while trying to quiet the class, took the microphone and began screaming at her students and told them they would be "receiving an extra assignment for homework as punishment for being loud at lunchtime." Id. at 2, 4. Plaintiff took the students to the classroom and wrote the assignment on the board, and

directed the entire class, including several students who were not in the lunchroom at the time of the incident, to do the assignment. Id. Former Assistant Principal LoRe-Dioguardi told Plaintiff it was improper to give the punishment assignment and Plaintiff told the assistant principal to leave her classroom. Id. Plaintiff cancelled the assignment and had one of the class parents apologize to the parents and notify them of the cancellation. See id.; see also Zoulas Emails, Ex. "X," at 19.

**Partially disputed.**

Asselta testified that she did not witness what occurred in the lunchroom (Blair Decl. Exhibit "E," page 186, lines 8-24). Plaintiff never screamed at her students during this incident on October 20, 2016. Plaintiff utilized a microphone.  Teri Mascioli was nowhere to be found when Plaintiff went to pick up her class after lunch, in the basement on that day. Teri Mascioli had abandoned her duties, but showed up after Plaintiff had quieted her class by using the microphone. Teri Mascioli, however, then emailed Asselta and lied that Plaintiff had yelled at her class over the microphone. Plaintiff found her class was screaming at the top of their lungs, and when she tried to tell them to be quiet, they were unable to hear her, nor did they respond to her presence in the basement. She then picked up the microphone and asked students to quiet down (Zoulas Decl. ¶ 42).

Plaintiff planned to give students a reflection assignment, a chance for students to reflect on what had occurred and why it was not an acceptable situation to have children screaming at the top of their lungs while a teacher was trying to get their attention. The assignment was to be educational (Blair Decl. Exhibit "E", page 182, lines 19-25, page 183, lines 2-9, Zoulas Exhibit "Z" at 1). All students were in the lunchroom at the time the screaming occurred on October 20, 2016. LoRe-Dioguardi entered Plaintiff's classroom at the end of the school day, and was able to see on the whiteboard, the words: Reflection Assignment, but proceeded to call it a punishment. Plaintiff contacted parents to cancel the assignment because LoRe-Dioguardi was calling it a punishment (Zoulas Decl. ¶ 43).

Plaintiff also requested the assistance of the class parent, Ms. Grazda to help and make sure that the message was given to all parents in the class (Blair Decl. Exhibit "E", page 183, lines 4-25, page 184, line 2). Plaintiff never requested for the class parent, Ms. Grazda to apologize., and you can see in Ms. Grazda's email that she sent to all of Plaintiff's parents that it does not include an apology (Blair Decl. Exhibit "X" at 19) Additionally, Plaintiff, herself, did not apologize to parents for giving the reflection assignment and then cancelling it on October 20, 2016, as there was no need for this. It was an assignment that was being canceled (Zoulas Decl. ¶ 44).

 Asselta reported incorrect information to OSI when she stated that Plaintiff gave a punishment (Defendant Decl. Exhibit "Y" at 2).

57. On October 21, 2016, Plaintiff participated in a professional development workshop. See Plaintiff's Professional Development, Exhibit "W," at 13.

**Partially disputed.**

The workshop that is referenced in paragraph 57 of the Defendants' 56.1 statement, was called, RTI: Pathway to Positive Behavior Supports and Strategic Interventions. This workshop was geared towards special education teachers. Plaintiff is not a special education teacher nor does she teach special education children (Zoulas Decl. ¶ 45).

58. On October 24, 2016, all faculty participated in an Algebra for All workshop with Amanda Bueno. See id.

**Not disputed.**

59. On October 27, 2016, a parent of a student in Plaintiff's class reported to Principal Asselta that Plaintiff had put her son in the corner as punishment for talking and that he was told to take his chair and book and sit in the far corner of the room and made to do his work on his lab. January 26, 2017 Letter to File Documents ("January 26, 2017 Letter to File Docs."), Exhibit "Z." The parent reported that the student felt humiliated and did not want to report back to school. Id.

**Partially disputed.**

The incident described in paragraph 59 of Defendant's 56.1 Statement of Facts never occurred. The parent and child fabricated this incident. Asselta, never came upstairs to Plaintiff's classroom to ascertain where the child, Aiden M. was moved to. During the meeting that was held on December 13, 2016, Plaintiff requested that Asselta come upstairs to her classroom so that Plaintiff can show her where she had moved Aiden M. to. He received a desk and chair and was placed next to Filip K. in the last row center of the classroom (Zoulas Decl. ¶ 46). Asselta refused to go upstairs and ignored Plaintiff and her union representative, Ms. Marshall's requests to go upstairs (Blair Decl. Exhibit "E", page 127, lines 11-18) Plaintiff testified that the child was never placed in the corner. Additionally, Plaintiff explained where the child was moved to and how she directs children to move to another location in the classroom (Blair Decl. Exhibit "D", page 154, lines 14-25, page 155, lines 1-23, Zoulas Decl. Exhibit "Z" at 1-3).

At a later date, Filip K. told his mother that "The principal wants to get rid of Ms. Zoulas, and she wants me to help." (Blair Decl. Exhibit "D", page 211, lines 6-15).

Additionally, Asselta did not follow standard procedure as is outlined in the Chancellor's Regulations, A-420 and A-421, for how to conduct a school investigation concerning the October 26, 2016 incident where it was alleged that Plaintiff placed a child in the corner (Zoulas Decl. ¶ 47). Asselta did not call in witnesses quickly as is stated, but instead, collected witness statements within a two-week range of time, thereby allowing children to discuss the allegations. (Zoulas Decl. Exhibit "G" at 6-9, Zoulas Decl. Exhibit "CC" at 6-8)

Additionally, many other errors were made. Plaintiff filed a grievance with the UFT and created a document in which these numerous errors were documented. This document was sent to Sierra Jorgensen during the UFT grievance procedure. (Zoulas Decl. Exhibit "L").

This includes that the letter for file makes references to verbal abuse when Plaintiff was never questioned about this on December 13, 2016 (Blair Decl. Exhibit "AA" at 12-14).

Plaintiff also overheard her students discussing the allegations in the lunchroom during the two weeks in which witness statements were being collected concerning the October 26, 2016 incident in which it was alleged that Plaintiff had put a child in the corner. Plaintiff overheard several of her students state that she was going to be fired. Also, she heard them laughing and saying," the corner, the corner, ha, ha, ha she put him in the corner. " Plaintiff felt humiliated by these comments (Zoulas Decl. ¶ 48).

60. On November 4, 2016, Plaintiff attended the Pathway for Positive Behavioral Supports and Strategic Intervention professional development workshop. See Zoulas Professional Development, Ex. "P," at 6-9.

**Not disputed.**

61. On November 8, 2016, and again on November 21, 2016, all faculty participated in Leader in Me professional development training. See id. at 13-14.

**Not disputed.**

62. On November 14, 2017, Plaintiff emailed Principal Asselta and notified her that her student's poster was not submitted for the Respect for All contest and the student was not acknowledged as a participant during the morning line up. Zoulas Emails, Ex. "X," at 6. Plaintiff wrote that she had confirmed with Parent Coordinator Deise Kowalksi that the poster was given to LoRe-Dioguardi. Id.; see also Organization Sheets, "L," at 1.

**Not disputed.**

63. On November 22, 2016, Plaintiff had a disciplinary conference with Principal Asselta and her union representative concerning an allegation of verbal abuse and corporal punishment for the October 20, 2016 lunchroom and classroom assignment incident. January 20, 2017 Letter to File, Ex. "Y," at 2-3. Plaintiff alleges that she was called over the intercom to the Principal's office for the disciplinary conference. See Am. Compl., Ex. "C," ¶ 24

**Partially disputed.**

On Thursday, January 26, 2017, Asselta called Plaintiff on the school intercom to announce that she should go to the Principal's office immediately (Zoulas Decl. Exhibit "F" at 13).

A colleague, Yolanda Zeiba, commented to Plaintiff later that afternoon on November 22, 2016, that she heard Plaintiff being summoned to the Principal's office by Asselta on the school intercom, and asked Plaintiff if something was wrong.

The school intercom could also be heard outdoors because at the time there were speakers that connected the intercom system to the outdoors (Zoulas Decl. ¶ 49).

64. On December 2, 2016, Plaintiff attended the RTI: Pathway for Positive Behavioral Supports and Strategic Interventions workshop. See Zoulas Professional Development, Ex. "P," at 14.

**Partially disputed.**

Plaintiff was sent to this professional development called RTI: Pathway for Positive Behavioral Supports and Strategic Interventions workshop on December 2, 2016, because she was on a TIP plan. However, this workshop was specifically geared for teachers with special education students. Plaintiff is not a special education teacher nor does she teach special education students (Zoulas Decl. ¶ 50).

65. On December 9, 2016, a teacher sent an email to Principal Asselta complaining that Plaintiff had been speaking "disrespectfully" about a fellow teacher in the grocery store. Email Complaints Concerning Plaintiff, Ex. "O," at 2. The parent wrote that she found Plaintiff's behavior "disturbing." Id.

**Partially disputed.**

Jeannie Sheehan is a parent at the school and not a teacher. Jeannie Sheehan did not provide enough detail to this portion of her email to determine who and what she is referring to. We don't know what she means by "disrespectful" nor whom she believes she overheard Plaintiff talking about. Plaintiff denies that she was speaking about another teacher. Additionally Plaintiff denies that she was speaking "disrespectfully". Additionally, Plaintiff has never seen Ms. Sheehan in or near her classroom nor at the supermarket (Zoulas Decl. ¶ 51).

66. On December 13, 2016, 3rd, 4th, and 5th grade teachers participated in the Algebra for All professional development workshop with Amanda Bueno. See Zoulas Professional Development, Ex. "P," at 15.

**Not disputed.**

67. On December 19, 2016, Plaintiff received a letter to file for the incident on September 21, 2016. December 19, 2016 Letter to File Docs., Ex. "T," at 12-13. Principal Asselta wrote that she met with Plaintiff and her union representative on November 8, 2016 to discuss the allegation Plaintiff had yelled at various students in her classroom and made one student cry for not having his test signed. See id. Principal Asselta explained that the incident was investigated and that the "student in question, as well as other students in the

classroom, confirmed that the incident of verbal abuse did occur." Id. The students also said Plaintiff frequently yells at the class and makes students sit in the corner. Id. When asked for her response, Plaintiff stated "[n]one of the statements are for a specific reason, the statements don't pertain to anything, the statements are vague comments, and none of this goes on in my classroom." Id. After reviewing the allegations, witness statements, and Plaintiff's explanation, Principal Asselta concluded that Plaintiff verbally abused her class. Id. Plaintiff alleges that she felt humiliated by the investigation. See Am. Compl., Ex. "C," ¶¶ 22-23.

**Partially disputed.**

All witness statements were vague and did not refer to a specific date, time, or specific allegation (Blair Decl. Exhibit "T" at 7-10). This shows the investigation was not carried out properly. Additionally, Asselta violated Chancellor's Regulations A-420 and A-421 on proper procedure for collecting witness statements. Witnesses were not called in quickly as stated in the regulations. Witnesses were called in over a three-week period of time (Zoulas Decl. Exhibit "G" at 6-9, Zoulas Decl. Exhibit "CC" at 6-8).  With regards to the investigation that was conducted for the September 21, 2016 allegation about Plaintiff yelling and causing a child to cry, student witnesses were called in over a three-week period of time. This provided children an opportunity to discuss the investigation with each other before they were called in to write statements (Zoulas Decl. ¶ 52).

Plaintiff does not scream at children. Plaintiff uses a loud teacher voice on occasion, in order to be heard above the loud classroom noise that occurs from time to time. Plaintiff has a duty to bring the classroom back to the instruction at hand when students sidetrack and misbehave.  Plaintiff had consistently been given the most difficult-to-manage students on or about the time she turned 55 years of age. Additionally, Plaintiff was not given support in any manner, when children misbehaved (Zoulas Decl. ¶ 53). Students with known behavior problems were consistently and exclusively placed in Plaintiff's classroom instead of being spread out throughout the grade as required by CBA (Zoulas Decl. Exhibit "M" at 11-12)

Plaintiff has never placed a child in the corner (Zoulas Decl. Exhibit "Z" at 1-3). Defendant Asselta had begun creating a false narrative about Plaintiff  after she turned 55 years of age, by spreading false rumors to parents and their children, then conducting investigations that violated the Chancellor's Regulations. Children believed that "the teacher" Plaintiff, would be fired and they wouldn't have any more homework (Zoulas Decl. ¶ 54).

68. Principal Asselta testified that one letter to file would not lead to a teacher's termination and that language concerning possible termination is standard language used at the end of letters to file to notify a teacher that repeated behavior may lead to possible charges under the education law. See Asselta Tr., Ex. "E," at 150:10 – 150:2.

**Partially disputed.**

Asselta included language concerning Plaintiff's termination at the ends of the letters for file that she had written after Plaintiff turned 55 years of age, because Defendant Asselta was building a case against Plaintiff, in which an alternative narrative was created about Plaintiff and in which many details were fabricated (Zoulas Decl. ¶ 55) (Defendant Decl. Exhibit "C" at 258 and 263).

In late February 2015, Asselta attended a conference for elementary school principals led by then schools Chancellor, Carmen, on "How to Purge Bad Teachers". Politico News then printed Farina's comments on how this is done. The methods described were the same as were used against Plaintiff (Zoulas Decl. ¶ 56). In the article, Farina explained that administrators have to be in "that" teacher's classroom on a regular basis, keeping records, taking notes. She also explained that one teacher who was good with children, but not moving the needle for them academically was convinced to retire, but then was hired back to work two days a week. Farina also reminded principals that a teacher with two "ineffective" ratings can be removed from teaching more quickly (Zoulas Decl. Exhibit "N").  In sworn deposition testimony, Asselta admitted that she attended this conference and that she has met Carmen Farina on several occasions. The elementary school conference was held in February of 2015 (Blair Decl. Exhibit "E", page 368, lines 3-25, page 369, lines 2-11 and 17-25, page 370, lines 2-25, page 371, lines 2-25, page 372, lines 2-15).

69. Plaintiff received a letter to file, dated January 6, 2017, Plaintiff for the incident on October 6, 2016 in which Principal Asselta observed Plaintiff engaging in unprofessional conduct. See January 6, 2017 Letter to File, Ex. "W." On October 13, 2016, Principal Asselta met with Plaintiff, who declined the opportunity to have union representation at the meeting. Id. During the meeting, Plaintiff was provided with the opportunity to explain why Plaintiff was screaming at her class. Id. Plaintiff answered that she had her back to the class and when she turned around, a student jumped out of his seat and knocked everything off the projector stand. Id. Plaintiff explained that she interpreted the incident as dangerous and that her voice "naturally goes up," and that she was not yelling but speaking loudly. Id. Principal Asselta explained that Plaintiff's demeanor was accusatory when asked certain questions Id. Principal Asselta substantiated the allegation of verbal abuse and corporal punishment that Plaintiff had screamed at her class in the lunchroom and assigned them a written punishment for homework. Id. Plaintiff alleges that she was called over the intercom during her preparation period to the Principal's office to pick up her letter to file. See Am. Compl., Ex. "C," ¶ 26.

**Partially disputed.**

Plaintiff was not screaming. Plaintiff was using a loud teacher voice because an unruly student had just finished knocking down a projector stand and other objects in the classroom. As a result children were screaming loudly in the classroom, making it difficult for Plaintiff to be heard, and creating a chaotic, and dangerous situation in the classroom. This was all explained to Asselta during the meeting held on October 13, 2016 (Blair Decl. Exhibit "W").

Additionally, both administrators, Asselta and LoRe-Dioguardi entered Plaintiff's classroom on October 6, 2016 after Filip K. knocked over the projector stand. However, neither administrator offered any assistance during this situation, nor did they inquire as to what had occurred. Additionally, LoRe-Dioguardi went to the closet to look inside, then proceeded to look under the children's desks. Plaintiff was never told what she was looking for in this bizarre manner, however, to Plaintiff it appeared that LoRe-Dioguardi was creating a scene and mocking the situation. It was the Plaintiff who stated that the Defendant Asselta's demeanor was accusatory when she entered Plaintiff's classroom that day (Zoulas Decl. ¶ 57).

Point 69 ends with a sentence that refers to another letter for file dated, January 20, 2017. Plaintiff denies that she screamed at her class in the lunchroom. Plaintiff used a microphone (Blair Decl. Exhibit "E", page 186, lines 8-24). Plaintiff denies that she gave a punishment on October 20, 2016 after she had gone to pick the students up from the lunchroom and found them screaming at the top of their lungs. The word punishment as used in this instance was made up by LoRe-Dioguardi in order to create an alternative narrative that makes it appear that Plaintiff did something wrong when she didn't (Zoulas Decl. ¶ 58). Plaintiff assigned an educational reflection assignment (Blair Decl. Exhibit "Y" at 4-5)

A colleague, Yolanda Zeiba, commented to Plaintiff later that afternoon on November 22, 2016, that she heard Plaintiff being summoned to the Principal's office by Asselta on the school intercom, and asked Plaintiff if something was wrong (Zoulas Decl. ¶ 59).

70. Principal Asselta explained that she gave the letter to file because the punishment assignment and Plaintiff's behavior were not appropriate. Asselta Tr., Ex. "E," at 184:15 - 184:23; 185:14 - 186:2. Further, Principal Asselta testified that DOE does not allow punishment assignments as "everything needed to be tied to academics." See id. at 181:24 - 182:5.

**Partially disputed.**

Defendant Asselta's comments are her opinion. A reflection assignment was appropriate and instructive after the children were found unsupervised and screaming at the top of their lungs in the basement on October 20, 2016. Children were asked to reflect on what had occurred and what could be done better next time. It was LoRe-Dioguardi that began calling the assignment a "punishment assignment". Then Asselta continued using this derogatory term. This was done to continue the false narrative that had been created against Plaintiff in order to accuse Plaintiff of doing something wrong (Zoulas Decl. ¶ 60).

71. On January 6, 2017, Plaintiff registered for the Word Work and Word Play: Teaching Vocabulary with Fiction and Nonfiction Texts Grades K-5 workshop scheduled for January 31, 2017. See Zoulas Professional Development, Ex. "P," 10.

**Partially disputed.**

Plaintiff was sent to this professional development, Word Work and Word Play: Teaching Vocabulary with Fiction and Nonfiction Texts Grades K-5 workshop scheduled for January 31, 2017 because she was on a TIP plan (Zoulas Decl. ¶ 61).

72. On January 9th and 10th, 2017, Plaintiff attended the Design and Delivery of Explicit Instruction professional development with Anita Archer training. See id. at 11, 15.

**Partially disputed.**

While Plaintiff was sent to this two-day workshop because of her TIP Plan, a young teacher, about 32 years old, Ms. Brahmstedt, was also sent. Ms. Brahmstedt was not on a TIP plan (Zoulas Decl. Exhibit "O" at 3).

73. On January 14, 2017, Plaintiff applied for a per session state scoring position to grade ELA and Math. See Per Session Documents, Ex. "Q," at 2. Plaintiff sent the request to Division of Teaching and Learning. See id.

**Partially disputed.**

Plaintiff was not hired for this per-session work involving a state scoring position to grade ELA and Math, even though Plaintiff had prior experience in scoring the New York State Tests. The requirement stated that the applicant needed to have an Effective or Highly Effective rating (Zoulas Decl. ¶ 62). Plaintiff had received a Developing overall rating for the 2015-2016 school year (Blair Decl. Exhibit "M" at 13)

Additionally, Asselta testified in her sworn deposition that in order for teachers to be considered for per-session employment, they were required to have an effective or highly effective rating (Blair Decl. Exhibit "E", page 343, lines 5-25, page 344, lines 2-18).

74. On January 19, 2017, Plaintiff requested a Step I conference. Plaintiff's Grievances ("Pl.'s Grievances"), Exhibit "AA," at 1. Plaintiff complained that on "several occasions" she requested to set up a meeting to receive her teacher file but no meeting was scheduled. See id. On February 1, 2017, Plaintiff requested a Step II grievance request. Id. at 2. Principal Asselta was notified of Plaintiff's grievance concerning her file on February 3, 2017.

See id. at 3. By decision dated February 23, 2017, Plaintiff's grievance was denied as moot as an appointment had been scheduled for Plaintiff to review her file. See id. at 4.

**Partially disputed.**

Plaintiff's original request to review her teacher file was emailed on November 20, 2016 (Zoulas Decl. Exhibit "F" at 5). On November 22, 2016, Ms. Panek emailed that she informed Defendant Asselta (Zoulas Decl. Exhibit "F" at 6). On January 19, 2017, a step one grievance was sent to Defendant Asselta that stated that Plaintiff had not been given access to her teacher file so that she can examine it (Blair Decl. Exhibit "AA" at 1). On

February 1, 2017, a Step Two Grievance was scheduled and emailed to Defendant
Asselta stating that Plaintiff had not yet been given access to her teacher file (Blair Decl.
Exhibit "AA" at 2-3). On February 16, 2017, although an appointment had been
scheduled for Plaintiff to review her teacher file, the file was given to Plaintiff with all
data beyond and including 2012 missing. Plaintiff emailed Defendant Asselta to
document a complaint, on February 16, 2017 and again on March 21, 2017. (Zoulas Decl.
Exhibit "F" at 7). On February 27, 2017, Plaintiff emailed Defendant Asselta to
document that she had not been given access to her teacher file, even though she had
initially made the request on November 20, 2016. (Zoulas Decl. Exhibit "F" at 8). The
grievance was not moot, as claimed by Altagracia Santana, in a grievance decision dated
02/23/17 because Defendant Asselta had not complied with the directive that she was
given during the Step Two grievance hearing (Blair Decl. Exhibit "AA" at 4). On April
03, 2017, Plaintiff filed a Step One grievance that she had requested a copy of her entire
teacher file on March 23, 2017, but did not receive it (Blair Decl. Exhibit "AA" at 19).
Plaintiff requested a complete copy of her teacher file because she had not been permitted
to examine her entire file, but only documents dated 2011 and earlier. Plaintiff had
originally requested to view her teacher file, on November 20, 2016. On May 02, 2017, a
Step Two grievance was scheduled for Plaintiff to continue requesting a copy of her
entire teacher file. Defendant Asselta had not given Plaintiff access to her teacher file nor
had she been given a copy of her entire teacher file (Blair Decl. Exhibit "AA" at 21-23)

It is not reasonable to believe that Plaintiff would continue pursuing a grievance
concerning access to her teacher file for six months, had Defendant Asselta provided her
with it (Zoulas Decl. ¶ 63).

75. On January 19, 2017, Plaintiff submitted an additional grievance, requesting a copy
of her IPC options sheet. See id. at 5-6. Principal Asselta was notified of Plaintiff's
grievance concerning her IPC options sheet on February 3, 2017. See id. at 7.

**Partially disputed.**

Defendant Asselta has established a pattern of denying she received documents through
email. Additionally, Defendant Asselta has established a pattern of harassing Plaintiff and
retaliating against Plaintiff for exercising her union rights (Zoulas Decl. ¶ 64).

On September 23, 2016, Plaintiff delivered a typed complaint to Asselta in her office. In
the complaint, Plaintiff stated she had not received her IPC, Initial Planning Conference,
by the deadline. Plaintiff received the IPC on September 22, 2016, which is a day late.
Asselta did not provide Plaintiff with a dated copy of the IPC. (Zoulas Decl. Exhibit "B"
at 3). On September 23 2016, Plaintiff filed an APPR Resolution Request, in which one
of Plaintiff's complaints was that she was not provided with her IPC, Initial Planning
Conference, by the required deadline. The APPR Complaint was emailed to Asselta on
09/25, 2016 by Plaintiff (Blair Decl. Exhibit "V" at 1, Zoulas Decl. Exhibit "F" at 3). On
October 07, 2016, Asselta responded with a letter stating that she was denying Plaintiff's
complaint because no procedural violations had occurred. Thereby Asselta acknowledged
she had received the complaint about the IPC, Initial  Planning Conference (Zoulas Decl.

Exhibit "F" at 4). On January 19, 2017, Plaintiff filed a Step One grievance complaining that she did not receive her IPC Options Sheet yet (Blair Decl. Exhibit "AA" at 5). Asselta did not respond to this Step One request, which was emailed to her by the UFT. A Step Two grievance was scheduled for 02/17/2017 (Blair Decl. Exhibit "AA" at 6-7). Once again, in a decision dated 02/23/2017, Altagracia Santana claimed that the grievance was moot, however, Plaintiff had waited and complained for five months before she received the IPC document (Zoulas Decl. Exhibit "F" at 8).

76. On January 20, 2017, Plaintiff received a letter to file for the incident on October 20, 2016. January 20, 2017 Letter to File, Ex. "Y" at 4-5. Principal Asselta met with Plaintiff and her union representative Linda King on November 22, 2016 to discuss the allegation that Plaintiff had engaged in verbal abuse and corporal punishment of her students. See id. at 4. Plaintiff was provided with the opportunity to explain why Plaintiff had screamed at her students while picking them up from lunch and gave them a written punishment assignment. Id. Plaintiff responded that she did not scream at her students and gave them the assignment to "reflect and learn something from the situation." Id. When asked why Plaintiff contacted her class parent to tell the parents to apologize and tell them the assignment was cancelled, Plaintiff explained that she "realized someone took it the wrong way and that there was a complaint made." Id. After reviewing the allegations, witness statements, and Plaintiff's explanation, Principal Asselta substantiated the allegation of verbal abuse and corporal punishment that Plaintiff had screamed at her class in the lunchroom and assigned them a written punishment for homework. Id. at 5; see also Asselta Tr., Ex. "E," at 178:21 - 178:3; 179:14 - 180:24.

**Partially disputed.**

Plaintiff denies that she screamed at the students on October 20, 2016 when students were screaming at the top of their lungs in the lunchroom. Plaintiff utilized a microphone that was available, because students were not able to hear her when she requested their attention. Additionally, children were not aware that Plaintiff had stepped into the room to pick them up. A witness, school-aide, Ms. Lynn Shoresky who witnessed the entire situation, was never questioned, even though Plaintiff had requested that she be asked to give a statement.  Teri Mascioli gave a false statement to Asselta. Teri Mascioli had left the children unsupervised. A reflection assignment was appropriate and instructive after the children were found unsupervised and screaming at the top of their lungs in the basement. Children were asked to reflect on what had occurred and what could be done better next time. Plaintiff never asked the class parent to apologize to parents. She only asked that she let them know the assignment was canceled. Defendant Asselta did not address the students' inappropriate school behavior with the students. Defendant Asselta, did not show support for Plaintiff, with regards to the behavior management of students. Children were permitted to run through the school building, screaming at the top of their lungs. This behavior was consistently witnessed and ignored by both administrators (Zoulas Decl. ¶ 65).

Teri Mascioli has an administrator's license and is interested in becoming principal (Zoulas Decl. Exhibit "B" at 1-2).

77. On January 26, 2017, Plaintiff received a letter to file for the incident on October 26, 2016. See January 26, 2017 Letter to File Docs., Ex. "Z," at 3. Principal Asselta wrote that she met with Plaintiff and her union representative Iradies "Ira" Munet ("Munet") on December 13, 2016 to discuss the allegation that Plaintiff had engaged in verbal abuse and corporal punishment. Id. Plaintiff was provided with the opportunity to explain "why [Plaintiff] had put the student in the corner to do his work without a desk." Id. Plaintiff explained that there were no corners in her room or isolated spots, but that she would move children away from distractions and they "always have a table and chair." Id. After reviewing the allegations, witness statements, and Plaintiff's explanation, Principal Asselta substantiated the allegation of verbal abuse and corporal punishment that Plaintiff had placed one of her students in the corner to do his work on his lap. Id.

**Partially disputed.**

Plaintiff testified during her deposition that moving children to another desk in the classroom is a common practice by teachers and does not constitute corporal punishment, and that in this particular instance, Aiden M. was moved to sit next to Filip K, in the last row center. He had a desk and chair. Plaintiff had explained to Aiden M. that he was distracting himself and other children nearby. Plaintiff had requested of Aiden M. that he stop talking, but he refused to cooperate (Blair Decl. Exhibit "D", page 154, lines 14-25, page 155, lines 1-23, Zoulas Decl. Exhibit "Z").

Plaintiff declares that she never placed any child in the corner. This was a rumor perpetuated by the students due to Asselta spreading rumors about her to the parents. Additionally, Plaintiff states that both Aiden M. and his mother made false statements about Plaintiff to Defendant Asselta, who then made false statements to OSI. Plaintiff states that Asselta had been spreading false rumors about her to the parents and requested their assistance to "get rid" of her. Filip K. stated to his mother on January 30, 2017, that the principal wanted to "get rid" of Plaintiff and wanted him to help (Zoulas Decl. ¶ 66).

The investigation that was subsequently conducted had numerous procedural violations, including that the witness statements were collected over a two-week period, thereby giving children the opportunity to discuss the investigation with each other (Zoulas Decl. Exhibit "P").

78. Principal Asselta testified that she had been to Plaintiff's classroom and could see "where students' desks could be moved to a corner." Asselta Tr., Ex. "E," at 127:24 - 128:18. Principal Asselta explained that if a teacher, in moving desks, is "letting the student know that they're doing something wrong and that they are physically separating them from the class and putting them in an area that they consider a corner," that is considered putting the student in the corner. Asselta Tr., Ex. "E," at 128:19 - 129:4; 198:15 - 199:19.

**Partially disputed.**

Asselta's statements about a teacher moving desks is hypothetical and does not pertain to this particular incident that was alleged to have occurred on October 26, 2016. Additionally neither Aiden M. nor his mother visited Plaintiff's classroom to identify where Aiden M. was asked to sit (Zoulas Decl. ¶ 67). Defendant Asselta was asked to go upstairs to Plaintiff's classroom so that Plaintiff could show her where Aiden M. was placed, but she refused. Asselta did not visit the classroom at any time to gather this information (Blair Decl. Exhibit "E", page 127, lines 11-23, and Exhibit "Z").

A witness, Filip K. had written a witness statement in which he stated that Aiden M. was placed at the end of the room, which referred to the last row center, next to Filip K. (Zoulas Decl. Exhibit "P" at 1, Zoulas Decl. Exhibit "Z" at 1).

79. On January 26, 2017, UFT representative Munet notified Superintendent Winnicki that Plaintiff filed an Article 23 Special Complaint and requested Winnicki's assistance to resolve the issues. See Special Complaint and Decision Documents ("Special Complaint Docs."), Exhibit "BB," at 2.

**Not disputed.**

80. A "special complaint" is a complaint by an employee in the bargaining unit that persons or groups are engaging in a course of harassing conduct, or in acts of intimidation, which are being directed against him/her in the course of his/her employment and that the school principal or community or assistant superintendent has not afforded the employee adequate relief against such course of conduct or acts of intimidation." See Collective Bargaining Agreement Chapter 23, Exhibit "CC," at 1.

**Partially disputed.**

The school principal, Asselta and Assistant Principal, LoRe-Dioguardi, have been directly involved with the harassment of Plaintiff and in many instances, initiated the harassment or instructed other Department of Education employees to contribute to the harassment, including Angelika Panek, the payroll secretary, Ms. Domarecki, Ms. Peluso, Teri Mascioli, Ms. Belfiore (Zoulas Decl. ¶ 68).

81. On February 6, 2017, Winnicki responded that she spoke with Principal Asselta regarding the special complaint and that Principal Asselta "assured [her] that the matter of the complaint about [Plaintiff] being called to disciplinary conferences on Fridays will be resolved." Special Complaint Docs., Ex. "BB," at 1. Munet thanked Winnicki for her assistance and responded that Plaintiff also complained that the Principal Asselta does not schedule Step I grievances and has asked for a copy of her IPC options page and to review her file, but that those requests have not been met. Id. On February 13, 2017, Winnicki responded that Plaintiff received a copy of her IPC, Principal Asselta had not received a Step I grievance, and Principal Asselta would schedule an appointment with Plaintiff to review her file in the Principal's office. Id. at 4.

**Partially disputed.**

Defendant Asselta most certainly received all the Step One grievances. Step One grievances are sent by the UFT. Additionally, Asselta was notified by the school chapter leader, Teri Mascioli (Zoulas Decl. ¶ 69). As of May 2, 2017, Plaintiff had not been given access to her teacher file and was awaiting a Step Two Grievance (Blair Decl. Exhibit "AA" at 19-20). On April 3, 2017, Plaintiff filed a Step One grievance, however, once again Defendant Asselta did not schedule a Step One grievance (Blair Decl. Exhibit "AA" at 17). On May 12, 2017, Plaintiff filed a Step One grievance concerning the removal of nine expired letters for file. Defendant Asselta refused to hear the grievance and it went immediately to Step Two. On the Step Two grievance request form, it clearly states that Asselta continues to ignore grievance procedure by not scheduling Step One grievance meetings (Zoulas Decl. Exhibit "Q" at 1-2).

82. On February 1, 2017, Plaintiff requested a Step II grievance for her December 19, 2016 letter to file. See Pl.'s Grievances, Ex. "AA," at 8. Plaintiff complained that the allegation was from September 21, 2016, but the students were interviewed in October and their statements did not refer to September 21, 2016. Id. Plaintiff also complained that she was not interviewed until November. Id. Principal Asselta was notified of Plaintiff's grievance concerning her IPC options sheet on February 3, 2017. See id. at 9. By decision dated February 23, 2017, Plaintiff's grievance was denied. Id. at 10-11.

**Partially disputed.**

Department of Education and Asselta violated Chancellor's Regulations A-420 and A-421 Investigation Procedures (Zoulas Decl. Exhibit "CC" at 6-9, Zoulas Decl. Exhibit "G" at 6-8). As such, this letter for file dated December 19, 2016, should have been removed from Plaintiff's file. Department of Education refuses to remove letters to file for procedural violations when they are required to do so. Just because the UFT chose not to pursue this matter further does not mean that there were no procedural violations (Zoulas Decl. ¶ 70). This grievance was not denied on February 23, 2017. This grievance was heard by a UFT Appeals Panel during a hearing on November 13, 2017 (Zoulas Decl. Exhibit "R").

83. On February 8, 2017, Plaintiff requested a Step I grievance conference for her January 26, 2017 letter to file. See id. at 12. Plaintiff complained that the investigation was faulty because none of the statements allegedly referenced a specific allegation on October 26, 2016. Id. Plaintiff requested a Step II grievance on March 9, 2017. See id. at 13. On March 10, 2017, Principal Asselta was notified of the Step II grievance conference. See id. at 14. By decision dated April 4, 2017, Plaintiff's grievance was denied. Id. at 15-16.

**Partially disputed.**

This is not at all what Plaintiff stated. Plaintiff stated she was never questioned about an allegation of verbal abuse, yet Asselta substantiated that it occurred. (Blair Decl. Exhibit "Z"). Additionally, Plaintiff stated that the letter for file dated January 26, 2017, was based on a faulty investigation (Zoulas Decl. ¶ 71). Additionally, this grievance was not

denied on April 4, 2017. This grievance was given an appeal hearing date by the UFT on November 13 2017 (Zoulas Decl. Exhibit "R", Zoulas Decl. Exhibit "L"). Because the UFT failed to provide Plaintiff with her contractual rights, Plaintiff pursued an Improper Practice charge against the UFT in the PERB Court. (Zoulas Decl. Exhibit "S").

84. On February 13, 2017, Principal Asselta notified Plaintiff in an email that she was scheduling time for Plaintiff to review her file. See Special Complaint Docs., Ex. "BB," at 3. After reviewing her file, Plaintiff alleged that certain documents were missing. See id. at 7.

**Not disputed.**

85. On February 15, 2017, Plaintiff emailed Principal Asselta about scheduling changes. See Zoulas Emails, Ex. "X," at 1. Plaintiff wrote that she had been approached by LoRe-Dioguardi on February 14, 2017 while she was dismissing her students and that LoRe-Dioguardi began discussing the dance program for the next week. Id. Plaintiff complained that LoRe-Dioguardi's actions were "offensive" and "a safety concern," and that she did not want LoRe-Dioguardi to approach her during dismissal to try and have a conversation, and that schedule changes should be in writing. Id. After being forwarded Plaintiff's message, LoRe-Dioguardi responded to Principal Asselta that Plaintiff's class had been dismissed when she told Plaintiff of the dance class schedule change and that the change did not have to be in writing. Id. LoRe-Dioguardi also wrote that Plaintiff's comment that approaching Plaintiff was "offensive" was "unprofessional and inappropriate." Id.

**Partially disputed.**

Plaintiff still had two students to dismiss on February 14, 2017 when she was approached by LoRe-Dioguardi. With decades of school experience, LoRe Dioguardi , was aware that approaching a teacher to engage in conversation during dismissal is inappropriate and unnecessary. According to the CBA, all correspondence concerning schedule changes should be in writing.  On or about when Plaintiff turned 55 years of age, all of her comments began to be overly scrutinized. This had never occurred before (Zoulas Decl. ¶ 72).

86. In a decision dated February 23, 2017, Plaintiff's grievance of her December 19, 2016 letter to file was denied. Pl.'s Grievances, Ex. "AA," at 2.

**Partially disputed.**

The December 19, 2016 letter for file was pursued by Plaintiff and UFT to a hearing held on November 13, 2017. Ultimately, the UFT chose not to take this matter to arbitration, as UFT and DOE have a policy that letters for file cannot be grieved even if there are procedural errors, which is a violation of the CBA. This matter was also pursued in a PERB Improper Practice case against the UFT. (Zoulas Decl. Exhibit "R", Zoulas Decl. Exhibit "S", Zoulas Decl. Exhibit "T").

87. On March 5, 2017, Winnicki emailed Principal Asselta and wrote that Plaintiff continued to complain that she did not receive her IPC options sheet or TIP sheet and claims that her file is missing materials from after 2012. See Special Complaint Docs., Ex. "BB," at 6-7. Principal Asselta responded that she was informed by the school secretary, Angelika Panek ("Panek"), that Plaintiff received copies of both documents last week. Id. at 7. Further, Principal Asselta explained that Plaintiff previously refused to accept the observation selection form when presented with it by Panek, and was given the TIP sheet on September 22, 2016, when the met Principal Asselta for their conference. Id. Finally, Plaintiff was allowed to see her and was told that Principal Asselta would review the file with a secretary and then give Plaintiff another appointment. Id.

**Partially disputed.**

Plaintiff continued grieving the lack of access to her teacher file until May 2, 2017 (Blair Decl. Exhibit "AA" at 21). Plaintiff continued grieving that she didn't receive a copy of her IPC Options sheet, until she finally received it in March of 2017 (Blair Decl. Exhibit "AA" at 5-7).

88. For the 2016-2017 school year, Plaintiff received one formal observation and three informal observations. See 2016-2017 Overall Rating Docs., Ex. "U," at 5.

**Not disputed.**

89. On March 17, 2017, Plaintiff was informally observed and evaluated by Principal Asselta. See id. at 6-8. Plaintiff received predominantly "developing" and one "ineffective" component rating. See id. Principal Asselta provided observations for each component rating. See id. For Plaintiff's "ineffective" component rating, Principal Asselta explained that Plaintiff did not provide peer editing or monitoring assessment, and instead proceeded to complete the math problem for the students. Id. at 7. Principal Asselta wrote under "evaluator notes" that there was "no evidence of the school wide professional development with Amanda Bueno on making Math thinking visible" in Plaintiff's lesson. See id. at 8. Plaintiff was referred to her TIP and the Danielson Rubric. Id.

**Partially disputed.**

Defendant Asselta observed 20 minutes to the introduction portion of a math lesson. Children are not expected to do peer editing during this portion of the lesson. Instead, they are being given instruction on the skill, in this case commutative and associative property. Afterwards, children were asked to complete two checkmark problems in order for Plaintiff to ascertain which children did not grasp the concept and what type of support they would need. This method is the approach used by the "Go Math" Program that the school uses. Plaintiff was sent to Go Math training to learn this method. Plaintiff used her professional discretion to decide that students struggled long enough and needed to be given one of the answers to a math problem. Giving an answer is absolutely

permitted when it is clear that children are "stuck". Asselta left the classroom immediately after Plaintiff circulated the room to see children's work on the two check-mark problems. Amanda Bueno is a middle school teacher and has no experience with younger children. Amanda Bueno never made any effort to assist teachers at The School to use her middle-school math ideas for elementary-school children. At the time, none of the other fourth grade teachers believed Amanda Bueno had shared any ideas that they could use in the classroom. This included Ms. Martinez and Ms. Marshall. In addition, Amanda Bueno has difficulty with articulation, and therefore had difficulty conveying her ideas. Teachers were never given a directive by Asselta that we were required to incorporate certain math ideas from Amanda Bueno into our lessons. On March 17, 2017, it was the first time Asselta entered my classroom since the beginning of the school year in September 2016. She stayed for 25 minutes. The first 5 minutes were spent with students getting their notebooks and other materials out. It was Friday afternoon, and students had just come back from gym and were sweating, hot, and thirsty. This is the year Plaintiff was on a TIP Plan (Zoulas Decl. ¶ 73) (Zoulas Decl. Exhibit "U").

90. On March 6, 2017, UFT, on Plaintiff's behalf, filed a special harassment complaint pursuant to Article 23 of the Collective Bargaining Agreement against Principal Asselta, and requested that a Joint Investigating Committee be convened. Special Complaint Docs., Ex. "BB," at 8-9.

**Not disputed.**

91. On March 7, 2017 and again on March 14, 2017, 3rd, 4th, and 5th grade teachers participated in an Algebra for All workshop professional development with Amanda Bueno. See Zoulas Professional Development, Ex. "P," at 15.

**Not disputed.**

92. Plaintiff alleges that during a Math inter-visitation on April 3, 2017, LoRe-Dioguardi arrived ten minutes late and took out phone to have conversation. Am. Compl., Ex. "C," ¶¶ 143-147.

**Partially disputed.**

LoRe-Dioguardi walked into Plaintiff's classroom on April 3, 2017 during a Math inter-visitation, talking on her cell phone, and stayed on the cell phone, talking in front of the students for the next three minutes. Students were staring and laughing. (Zoulas Decl. ¶ 74).

93. On April 3, 2017, Plaintiff requested a Step I grievance conference. Pl.'s Grievances, Ex. "AA," at 17-18. Plaintiff complained that in March 2017 she had requested her entire teacher file, including every document in her twenty-year employment with DOE, but was not provided with a copy. See id. at 17. Plaintiff requested a Step II grievance on April 15, 2017. See id. at 19. On May 24, 2017 the request for a grievance conference was withdrawn. See id. at 20-21.

**Not disputed.**

94. On April 18, 2017, Plaintiff submitted an APPR Resolution Assistance Request for
her March 17, 2017 classroom observation report. See APPR Request, "Ex. "V," at 2.
Plaintiff complained that Principal Asselta had not provided her with feedback within
fifteen days of the informal classroom observation. See id. Plaintiff alleged that the report
contained statements that were "false and baseless." Id. Plaintiff requested that the
observation report be removed and considered "null and void." Id.

**Not disputed.**

95. On April 28, 2017, Plaintiff was informally observed and evaluated by Principal
Asselta. See 2016-2017 Overall Rating Docs., Ex. "U," at 9-11. Plaintiff received
"developing" and "ineffective" component ratings. See id. Principal Asselta provided
observations for each component rating. See id. Principal Asselta explained on the
observation report that Plaintiff was reading aloud to a few students when the principal
entered the class and said Principal Assell "would not see group work, or differentiated
instruction of any sort because this was not a lesson." Id. at 11. Principal Asselta referred
Plaintiff to her conversation on preparation and planning during the TIP meeting. Id.
Principal Asselta wrote that "[e]ducators are expected to ensure that teaching occurs
during every instructional period." Id. She continued, that Plaintiff's "lack of a structured
lesson and [] assertion that there would be no teaching indicates a disregard for
professional responsibility and is a source of concern for [Principal Asselta]." Id.

**Partially disputed.**

At the immediate moment when Asselta entered the classroom on April 28, 2017,
children had just returned from gym and were "dripping in sweat". Plaintiff informed
Asselta that children needed several minutes to transition back to work. Plaintiff observed
that Asselta had been waiting by the stairs, then entered her classroom immediately as
soon as children walked into the room from gym. Plaintiff explained to Asselta that
children needed a few moments to transition, but Asselta refused to speak to Plaintiff nor
look in her direction to acknowledge her. Thereby, Asselta behaved in a hostile manner
towards Plaintiff. Asselta, never once spoke to students nor did she ask for a lesson plan.
A read aloud with questions and discussion is instruction (Zoulas Decl. ¶ 75).

Plaintiff immediately wrote to her union representative, Ira Munet, to complain about
what had occurred, and shared with him her rebuttal document. All of this was attached
to Plaintiff's APPR complaint for this lesson observation. (Blair Decl. Exhibit "V" at 4,
Zoulas Decl. Exhibit "I").

96. Principal Asselta testified that "[d]ifferentiation is where a teacher builds into their
plans attainable practices for each of the students or groups of students in their
classrooms" to reach different types of students. Asselta Tr., Ex. "E," at 94:16 - 95:15.

**Not disputed.**

97. Principal Asselta also testified that homework review can be a lesson when the children are learning and questioning rather than recall and providing answers. Id. at 231:22 - 233:8.

**Partially disputed.**

Although this was Asselta's testimony, it is at the teacher's professional discretion to plan for the allocation of time during the children's school day. It is not feasible to review all homework as "lessons". Additionally, if in the teacher's professional observation, children need more time with a topic or skill, the teacher can plan for review lessons that properly address those needs (Zoulas Decl. ¶ 76).

98. On May 5, 2017, Plaintiff submitted an APPR Resolution Assistance Request for her April 28, 2017 classroom observation report. See APPR Request, "Ex. "V," at 4. Plaintiff complained that the comments by Principal Asselta in her observation report were "baseless and false." Id. That Principal Asselta made "omissions that were observable," and that Principal Asselta did not ask for a lesson plan. Id. Plaintiff asserted that reading aloud with questions and discussion is instruction. Id. Plaintiff asked that the observation report be removed from the Advance website. Plaintiff forwarded the request to Principal Asselta on May 5, 2020. Id. In her email forwarding the request on May 5, 2020, Plaintiff wrote that she was complaining to her union representative that Principal Asselta was harassing her by continuing to observe Plaintiff during 7th period on Fridays after gym class and providing Plaintiff's observation reports on Friday afternoons. Id. Plaintiff told Principal Asselta to not "take [her] words out of context," and she had told Principal Asselta she would not be teaching a "traditional lesson" because the students were "dripping with sweat." Principal Asselta testified that there should always be a lesson. Asselta Tr., Ex. "E," at 230:14 - 231:21.

**Partially disputed.**

Asselta did observe a lesson on April 28, 2017 (Zoulas Decl. ¶ 77).

99. On May 12, 2017, Plaintiff requested a Step I grievance conference for her request that nine letters to file be removed from her file. See Pl.'s Grievances, Ex. "AA," at 22-23. Plaintiff requested a Step II grievance on May 23, 2017. See id. at 24. On May 24, 2017, Principal Asselta was notified of the Step II grievance conference. See id. at 25. By decision dated June 23, 2017, the grievance was denied as moot as Principal Asselta agreed to remove the letters to file. Id. at 26.

**Partially disputed.**

The UFT teacher's contract is very clear on this topic (Zoulas Decl. Exhibit "DD"). Asselta was also notified of the Step 1 grievance. Asselta harassed Plaintiff by making Plaintiff wait 6 weeks to have the requested, expired material removed.  Additionally, Plaintiff had to travel once again to downtown Manhattan to attend a Step 2 grievance.

Each time Plaintiff traveled to a Step 2 grievance, her students had to be left with a substitute teacher for most of the school day (Zoulas Decl. ¶ 78).

100. For the 2017-2018 school year, Plaintiff listed her teacher preferences as 5th grade, 4th grade, and then 3rd grade. See Preference Sheet, Exhibit "DD." Plaintiff did not receive her first choice and was assigned to the fourth grade. Am. Compl., Ex. "C," ¶ 39.

**Not disputed.**

101. Principal Asselta testified that she did not assign Plaintiff to teach the fifth grade because she felt it was important to keep the teachers that would be working together to teach the fifth-grade classes "as one unit as opposed to working independently." Asselta Tr., Ex. "E," at 360:18 - 361:10.

**Partially disputed.**

Asselta stated, she believed that the parents were under the impression that they would have Ms. Zoulas for all of the content areas. If this was true, Asselta could have clarified this with parents, but didn't (Blair Decl. Exhibit "E", page 360, lines 21-25 then page 361, lines 1-2).

Parents from Plaintiff's class wrote a document specifically requesting for Plaintiff to teach their children for fifth grade the following year. Twenty parents, or about 80 %, signed the document (Zoulas Decl. Exhibit "H").

102. On May 17, 2017, Plaintiff was formally observed by Principal Asselta. See 2016-2017 Overall Rating Docs., Ex. "U," at 12-15. Plaintiff received "developing" and "effective" component ratings. See id. Principal Asselta wrote in the observation report that Plaintiff had explained during the pre-observation conference that the "lesson follows other lessons." Id. at 15. Principal Asselta wrote that Plaintiff did not provide her with any assessment sheets and stated that she would not share them with Principal Asselta as they were her personal notes. Id. Principal Asselta suggested that Plaintiff use the criteria for Danielson domains one and three to plan her lessons as the lesson was not rigorous. Id.

**Partially disputed.**

Asselta was given a blank copy of the assessment sheet that would be used for this lesson on May 17, 2017. Plaintiff then used the assessment sheet to jot down her personal notes and observations of the student work as Plaintiff circulated the room. Teachers are not expected to share their personal notes with an administrator nor is an administrator supposed to ask for that. Additionally, Plaintiff gave Asselta completed student work from the lesson from each child, which is an assessment of student work and learning. Asselta reviewed the lesson plan during the Pre-Observation Conference and approved it in its entirety, but then claimed in the Post-Observation Conference that it was not "rigorous". When Plaintiff went into Asselta's office for the post-observation conference.

Asselta proceeded to berate Plaintiff's lesson, undeservedly and falsely (Zoulas Decl. ¶ 79).

Asselta gave no lesson-specific evidence for components 1a (obs.), 1e (obs.), 2a, 2d, 3b, 3c, 3d, 4e (obs.) nor is the evidence anywhere in the observation report Additionally, Asselta completed the punitive section of the observation report, components 1a (p&p), 1e (p&p) without providing teacher-specific evidence, nor was this observed within the prior 15 days as is stated directly on the observation report as well as in the Advance Guide (Zoulas Decl. Exhibit "A", at 9).

For these reasons, Plaintiff filed an APPR Complaint concerning this observation and observation report. (Blair Decl. Exhibit "V" at 6).

This was a formal observation with a pre-observation conference and post-observation conference. The purpose of a pre-observation conference is for the teacher to review the lesson plan with an administrator, including the objectives, activities, and expectations that will occur during the formal observation and to discuss it (Zoulas Decl. Exhibit "A" at 9).

Asselta, testified in her sworn deposition that she received extensive and continuous training in conducting and writing teacher observations (Blair Decl. Exhibit "E", page 34, lines 22-25, page 35, lines 2-14).

Additionally, LoRe-Dioguardi testified in her sworn deposition, that both she and Asselta received extensive and continuous training in conducting and recording teacher observations with the Advance System using the HEDI ratings, and that that training continued until LoRe-Dioguardi left at the end of the 2017-2018 school year (Blair Decl. Exhibit "B". page 58, lines 11-25, page 59, lines 2-25, page 60, lines 2-25, page 61, lines 2-23).

103. On May 18, 2017, Plaintiff filed a verified complaint of discrimination with the SDHR, which was cross-filed with the EEOC, alleging age discrimination. Plaintiff's SDHR Complaint and Determination, Exhibit "EE," at 1-8.

**Not disputed.**

104. Principal Asselta testified that she knew of Plaintiff's allegation that she felt she was being harassed but did not remember Plaintiff specifically stating anything about age. Asselta Tr., Ex. "E," at 215:2 - 215:9.

**Partially disputed.**

Asselta stated that she was aware of Plaintiff's Special Harassment Complaint, but stated that she doesn't remember Plaintiff stating anything about age. This was a "Special Harassment" Complaint as per UFT teacher's contract that was filed by Plaintiff during the 2016-2017 school year. This was not the proper venue for a complaint for age

discrimination. Plaintiff was told by her union representative, Ira Munet, to jot down all incidents of harassment that had occurred and state when they occurred (Zoulas Decl. ¶ 80) (Blair Decl. Exhibit "CC").

105. Principal Asselta testified that she came became aware of Plaintiff's age discrimination claim when Plaintiff filed her SDHR complaint. Asselta Tr., Ex. "E," at 225:11 - 226:24.

**Not disputed.**

106. On June 1, 2017, Plaintiff was informally observed by Principal Asselta. See 2016-2017 Overall Rating Docs., Ex. "U," at 16-17. Plaintiff received "developing" and "ineffective" component ratings. Id. Principal Asselta wrote in the observation report that students need criteria to know what to look for in good questioning as they listened to different groups asking questions as there was no purpose for listening. See id. at 17.

**Partially disputed.**

On June 1, 2017, Asselta came to Plaintiff's classroom under severe emotional duress. Asselta had been absent on numerous occasions and was absent as well on May 29, 2017, May 30, 2017, May 31, 2017, June 2, 2017 among other dates. She sighed repeatedly throughout the 20 minutes she was in Plaintiff's classroom (Zoulas Decl. Exhibit "V" at 1).

Asselta was under severe emotional duress in May and June of 2017. This was because her mother was suffering a terminal illness. Asselta refused to allow LoRe-Dioguardi to conduct the observation and instead drove to the school from her home in Staten Island on June 1, 2017, to conduct Plaintiff's required 4th observation on the deadline date of June 1, 2017. At that moment, Asselta's mother was deathly ill and in fact died the following morning on June 2, 2017. During the lesson observation, Asselta appeared upset and sad. Although Asselta's mother's death was very sad news, it was inappropriate for Asselta to conduct this observation under duress. Plaintiff disputes the comments that Asselta made on this observation report for this lesson as being untrue and unsubstantiated. Nowhere in the observation report does Asselta state that the lesson was on "Book Clubs". None of the comments were factual and additionally, were written in vague, subjective terms. None of Plaintiff's questions were cited nor were any student responses (Zoulas Decl. ¶ 81).

The 2016-2017 Advance Guide specifically states that the Evaluator must gather specific evidence of teacher practice and record this on the Evaluator Form (Zoulas Decl. Exhibit "A" at 9).

Additionally, Asselta gave a Developing rating for component 1e (p&p) on the June 1, 2017 lesson observation, which is for punitive purposes. She provided no evidence that she witnessed something concerning Plaintiff's designing coherent instruction within 15 school days of this observation (Zoulas Decl. ¶ 82). It clearly states at the top of the

second page of the observation report that each form must contain teacher-specific evidence for each of the components observed. This is also clearly stated in the 2016-2017 Advance Guide (Zoulas Decl. Exhibit "A" at 9).

Additionally, there is no supporting lesson-specific or teacher-specific evidence for five of the components on the first page of this lesson observation. Plaintiff's feedback was not given until June 22, 2017. This was one day late, as per the Advance Guide (Blair Decl. Exhibit "U" at 16-18, Zoulas Decl. Exhibit "A" at 9) (Blair Decl. Exhibit "U" at 17).

107. On June 14, 2017, Plaintiff requested that nine letters to file from 2011 and 2012 be removed from her file. See Zoulas Emails, Ex. "X," at 2.

**Partially disputed.**

Plaintiff filed a step one grievance on May 12, 2017, to have the nine letters removed (Blair Decl. Exhibit "AA" at 22-23).

108. On June 21, 2017, Plaintiff submitted an APPR Resolution Assistance Request for her June 1, 2017 classroom observation report. See APPR Request, "Ex. "V," at 5. Plaintiff complained that she did not receive feedback from Principal Asselta within fifteen days of her observation and that the principal did not provide evidence for the components where required. See id. Plaintiff requested that the observation be removed from her record. Id. Plaintiff forwarded the request to Principal Asselta on June 22, 2017. Plaintiff forwarded the request to Principal Asselta on June 22, 2017. See id. at 6.

**Not disputed.**

109. On June 21, 2017, Plaintiff submitted another APPR Resolution Assistance Request for her May 17, 2017 classroom observation report. See APPR Request, "Ex. "V," at 6. Plaintiff complained that Principal Asselta provided no evidence for the Danielson's Components comments and that the comments were "completely fabricated." See id. Plaintiff requested that the observation report be removed from her record. See id.

**Not disputed.**

110. On June 22, 2017, Principal Asselta emailed Plaintiff with feedback from the June 1, 2017 observation. The principal thanked Plaintiff for her patience during this difficult time, as Principal Asselta's mother had died. See 2016-2017 Overall Rating Docs., Ex. "U," at 15; see also Asselta Tr., Exhibit, "Insert," at 100:15 -100:20; 101:23 - 101:7. Principal Asselta detailed her observations from the less and provided feedback, writing that the discussion would have been more productive if the students had "a clear sense" of the kinds of questions to ask in book group, which would help produced deeper thinking. Id. On June 23, 2017, Plaintiff responded that the "feedback timeline" had already expired and that Principal Asselta could have spoken to Plaintiff "much sooner but chose not to." Id. at 16. Plaintiff continued that Principal Asselta could have provided

Plaintiff with immediate feedback before she left the classroom as Principal Asselta tells Plaintiff to do with the students. Id. Plaintiff ended that Principal Asselta "has done this before as well and [it] shows a pattern of being unhelpful." Id. Plaintiff sent another email and added that she had a lesson plan and tried to give it to Principal Asselta but that she was not available. Id. at 17.

**Not disputed.**

111. On June 23, 2017, Plaintiff had a final meeting with Principal Asselta concerning her improvement plan. See Improvement Plan at 4.

**Partially disputed.**

On June 22, 2017, Plaintiff emailed Asselta numerous (8 dozen) artifacts from lessons conducted at different points in the school year. These were examples of student assessments and reflections with positive feedback written from Plaintiff. This was evidence of work done towards the TIP Plan (Blair Decl. Exhibit "U" at 1, Zoulas Decl. Exhibit "W"). However, after Plaintiff sent Asselta 8 dozen artifacts to support her work on the TIP plan, Asselta called her into her office and complained to Plaintiff that she was confused and didn't know why Plaintiff sent the artifacts to her, (Zoulas Decl. ¶ 83).

112. Plaintiff alleges that on June 23, 2017, Principal Asselta met with staff and informed them that DOE was going to close one of the Kindergarten classes. Plaintiff alleges that Principal Asselta said there were private companies to work at if people wanted to leave. Am. Compl., Ex. "D," at ¶¶ 194 -195

**Not disputed.**

113. In a decision dated June 23, 2017, Plaintiff's Special Complaint, following an investigation and hearing, was dismissed as there was "no evidence Plaintiff had been subjected to harassment as contemplated by Article 23." See Special Complaint Docs., Ex. "BB," at 10-12.

**Partially disputed.**

Plaintiff provided the investigator, Mr. Kshensky with the name and phone number of Mrs. Kaminski., the parent that discussed with Plaintiff that her son, had told her that "The principal is trying to get rid of Ms. Zoulas and she wants me to help her." However, he claimed in the Special Complaint Decision that Plaintiff did not provide any witnesses, however, she most certainly did. Additionally, the Chancellor's representative, Mr. Lichtenstein, called her complaints, "slights", which shows he was mocking Plaintiff (Zoulas Decl. ¶ 84) (Blair Decl. Exhibit "BB" at 12).

114. Plaintiff received a "developing" MOTP rating. See 2016-2017 Overall Rating Docs., Ex. "U," at 20-21.

**Partially disputed.**

Plaintiff received a point score of 1.82 on her MOTP on June 23, 2017. This score is at the very bottom of "Developing" whereas Plaintiff was at the very bottom of "Effective" a year prior. Thereby, within one school year, Plaintiff's MOTP rating was dropped by a full 25%. (Blair Decl. Exhibit "U" at 20, Zoulas Decl. Exhibit "X").

115. On June 28, 2017, Plaintiff submitted an Amended Improper Practice Charge to the State of New York Public Employment Relations Board ("PERB"). 2016-2017 Id. at 22-26. Plaintiff alleged that after she filed her APPR complaint concerning her initial planning conference, on or about September 22, 2016, Principal Asselta had been giving Plaintiff "a pattern of unwarranted disciplinary letters" for incidents that occurred in September and October. See id. at 5, ¶ 5. Plaintiff also alleged that after she filed her special harassment complaint, Principal Asselta allegedly became aware of on March 6, 2017, and she received observation reports with "developing" or "ineffective" ratings. Id. at 5, ¶ 9. Plaintiff alleged that she was being retaliated against for exercising her union activities, including her APPR requests, grievances, and special harassment complaint. Id. at 5, ¶ 11.

**Not disputed.**

**2017-2018 school year**

116. In September 2017, Plaintiff received an "effective" Overall Rating for the 2016-2017 school year. See Am. Compl., Ex. "C," ¶ 76; see also Pl.'s Tr., Ex. "D", at 200:12 – 201:5; see also Service and Rating History, Ex. "F," at 3.

**Not disputed.**

117. Plaintiff alleges that on an unspecified date in September 2017, she overheard Principal Asselta telling Substance Abuse Prevention and Intervention Specialists ("SAPIS") Counselor Ms. Peluso ("Peluso") that she's not allowed to speak to Plaintiff. Am. Compl., Ex. "C," ¶ 298; see also Organization Sheets, Ex. "L," at 1. Plaintiff also alleges that on an unspecified date Guidance Counselor Ms. Omoigberie went to Plaintiff's room and questioned that Plaintiff was still at the school because Principal Asselta and LoRe-Dioguardi were trying to get rid of her. Id. at ¶ 299; see also Organization Sheets, Ex. "L," at 1.

**Not disputed.**

118. On October 16, 2017, Plaintiff requested a Step I grievance. See Grievance, Ex. "AA," at 27. Plaintiff complained that the staff directory, distributed on October 13, 2017, omitted her name and instead had a row of starts in lieu of her information. Id. On March 10, 2017, Principal Asselta was notified of a Step II grievance conference concerning "untimely Step I decisions. See id. at 28.

**Partially disputed.**

As per UFT protocol, Asselta was emailed the Step One grievance by the UFT, concerning the Staff Directory that had Plaintiff's name omitted and replaced with a row of stars. The directory had been distributed on October 13, 2017. Plaintiff made a verbal complaint to Asselta immediately after the incident occurred (Zoulas Decl. ¶ 85). Additionally Plaintiff emailed Asselta to complain as well. However, Asselta ignored her complaints (Blair Decl. Exhibit "X" at 3-5).

119. In a Determination and Order After Investigation, dated November 7, 2017, SDHR dismissed Plaintiff's Verified Complaint, finding that there was "no probable cause" to support Plaintiff's case. SDHR Complaint and Determination, Ex. "EE," at 9-15. Plaintiff alleges that after her SDHR complaint was dismissed that Principal Asselta and LoRe-Dioguardi engaged in "covert" retaliatory acts. See Am. Compl., Ex. "C," ¶¶ 221-222.

**Not disputed.**

120. After SDHR complaint dismissed, Plaintiff alleges that Peluso began accusing Plaintiff's class of making noise as she walked through the building. Id. at ¶¶ 278 - 280. Plaintiff alleges that Peluso was recruited by Principal Asselta to harass and make false allegations against Plaintiff. Id. at ¶ 279. Accordingly, Peluso allegedly harassed Plaintiff in the presence of her class and offered unsolicited assistance to help Plaintiff quiet her class. Id.at ¶¶ 278, 280-281.

**Not disputed.**

121. On November 14, 2017, Plaintiff requested a Step I grievance conference for a trip plan she filed on November 3, 2017. See Pl.'s Grievances, Ex. "AA," at 29. Plaintiff complained that the trip plan "ended up on the Principal's desk" and the principal has not released the trip plan or discuss the issue with Plaintiff. See id. Plaintiff requested a Step II grievance on December 12, 2017. See id. at 30. On December 15, 2017, Principal Asselta was notified of the Step II grievance conference. See id. at 31. By decision dated January 1, 2018, Plaintiff's grievance was denied. Id. at 32-33. The decision explained that the decision to approve a trip is "within the sole discretion of the administration and is not a grievable issue." See id. at 33. Further, Principal Asselta was waiting for Plaintiff to provide additional information as there could be conflicts with school shows and a lack of available chaperones. Id. at 32. Plaintiff was notified by Panek on January 2, 2018 that the trip had been approved. See Zoulas Emails, Ex. "X," at 7; see also Am. Compl., Ex. "C," ¶¶ 273-276.

**Partially disputed.**

LoRe-Dioguardi refused to approve the trip to Brooklyn Bridge Park, which was submitted on November 3, 2017, without any basis, and instead brought the trip request into Asselta's office.  The trip did not interfere with any school functions as it was a morning trip that lasted from 9:30 a.m. to 12:00 noon, nor did Plaintiff request any

chaperones. These excuses are baseless. Neither LoRe-Dioguardi nor Asselta discussed the trip with Plaintiff, but instead ignored the Step One grievance request that was sent to Asselta as per UFT protocol. Plaintiff had no choice, but to go through the grievance process in order to eventually get approval for the trip. Both administrators behaved in an extremely hostile manner towards Plaintiff with regards to this school trip. This did not happen to other teachers that submitted trip plans. Plaintiff was harassed for two months, in order to get approval for this school trip.  (Zoulas Decl. ¶ 86) (Blair Decl. Exhibit "AA" at 29-31)

Eventually, approval was given on a post-it note (Blair Decl. Exhibit "X" at 7).

122. On December 1, 2017, Plaintiff requested a Step I grievance conference concerning the school directory and Principal Asselta's failure to instruct the staff about the error in the school directory concerning Plaintiff's name. See Pl.'s Grievances, Ex. "AA," at 34.

**Not disputed.**

123. On January 22, 2018, Plaintiff emailed Principal Asselta, demanding that Principal Asselta to explain an unannounced visit and guest to her classroom. Zoulas Emails, Ex. "X," at 8. Plaintiff wrote that Principal Asselta spoke only to a student in the classroom and took out a laptop during the visit, and that other teachers, like Ms. Zabroni, were informed in advanced that Principal Asselta would be visiting with a guest. Id. Principal Asselta testified that the unannounced person was an Advance trainer for principals. See Asselta Tr., Ex. "E," at 227:12 - 228:2.

**Partially disputed.**

When Asselta came to Plaintiff's room on January 22, 2018 with an unannounced guest, Plaintiff asked her who the guest was, but Asselta looked at the guest then they both laughed as if something was funny about Plaintiff's question. She never answered Plaintiff's question. Asselta embarrassed Plaintiff in front of this guest and in front of Plaintiff's students (Zoulas Decl. ¶ 87).

During sworn testimony, Asselta stated in her Deposition that she only recalled that the person was an Advance trainer, but did not give the name of the Advance trainer for principals, even though they had corresponded numerous times through email and in-person school visits (Blair Decl. Exhibit "E", page 227, lines 4-22).

Plaintiff never "demanded" the principal explain an unannounced visit. The language of the email reads that Plaintiff was "asking" that Asselta explain what the purpose was for the visit (Blair Decl. Exhibit "X" at 8).

124. Principal Asselta explained that twice a year, she is given in-school training on Advance to calibrate her ratings with the trainer. Id. at 228:2 - 228:24. LoRe- Dioguardi also testified that someone from the district office would come to the school to do

observations with Principal Asselta and herself. See LoRe-Dioguardi Tr., Ex. "B," at 60:5 - 61:23; 62:18 - 62:19; 118:3 - 118:19.

**Partially disputed.**

Although both administrators, Asselta and LoRe-Dioguardi received the same training, LoRe-Dioguardi allowed teachers to redo lessons that didn't come out well the first time. Additionally, she would observe and document good practices when she was not doing a lesson observation. Asselta did not do this (Blair Decl. Exhibit "B", page 73, lines 4-10, page 106, lines 11-25, page 127, line 25, page 128, lines 2-24, page 131, lines 11-25, page 132, lines 2-19).

125. On January 26, 2018, Plaintiff emailed Principal Asselta that there was a disruption in her class. Zoulas Emails, Ex. "X," at 9. Plaintiff followed up on January 27, 2018 and wrote that when Peluso and LoRe-Dioguardi came to her classroom, neither had asked her what had occurred, which she found "troubling." Id. at 10. Plaintiff also objected to the "best friend" of the student involved in the incident being called by LoRe-Dioguardi to give a statement, as she, "the teacher of the classroom," had already written a statement. Id. Plaintiff complained that she was not being provided with support and that she was retaliated against when she asked for assistance during the incident with the student. Id. Plaintiff alleges that her authority was diminished and she was humiliated in front of her students and colleague, Peluso. See Am. Compl., Ex. "C," ¶ 156.

**Not disputed.**

126. On January 31, 2018, Plaintiff was informally observed and evaluated by Principal Asselta. Plaintiff received "developing," "effective," and "ineffective" subcomponent scores. See 2017-2018 Overall Rating Documents ("2017-2018 Overall Rating Docs."), Exhibit "FF," at 1-3. Pursuant to an Arbitration award, Plaintiff's January 31, 2018 observation report was removed from Plaintiff's file and was not used in the calculation of Plaintiff's 2017-2018 Overall rating. See id. at 7-9. The arbitrator ruled that the Union had met its burden of proof that certain components did not have lesson-specific evidence as comments were copy and pasted from the Danielson Rubric. See id.

**Partially disputed.**

Asselta made comments on the observation report about parts of the lesson she did not observe because she chose to leave the room 15 minutes after the lesson had begun.  This was concerning the January 31, 2018 lesson observation. This math lesson took 65 minutes of time to complete (Zoulas Decl. ¶ 88).  For example, in component 1e (obs.) Asselta stated that there was no differentiation for different students (Blair Decl. Exhibit "FF" at 1-3)

Additionally, Asselta made untruthful comments throughout the lesson observation that was conducted on January 31, 2018, including vague and untruthful comments in section 4e (p&p) which is a section that is used for a punitive purpose (Zoulas Decl. ¶ 89)

(Zoulas Decl. Exhibit "AA", page 8). Asselta made the following vague, untruthful, and unsubstantiated comments in section 4e (p&p) of the January 31, 2018 lesson observation report, "The teacher makes no effort to share knowledge with others or to assume professional responsibilities. The teacher resists feedback on teaching performance from either supervisors or more experienced colleagues. Teacher becomes irate with administration and staff." (Blair Decl. Exhibit "FF" at 1-3) (Zoulas Decl. ¶ 90).

Additionally, Arbitrator Jay M. Siegel stated that for section 4e (p&p), there is no teacher specific-evidence observed during the fifteen school days immediately preceding the observation (Blair Decl. Exhibit "FF" at page 8, lines 1-3).

127. Principal Asselta testified to her belief that she provided specific evidence. Asselta Tr., Ex. "E," at 270:15 - 270:19; 271:9 - 271:14. Plaintiff explained that the writing of Advance has evolved with a great emphasis on what is happening in the classroom versus the language, from the components of the Danielson Rubric, used. See Asselta 272:5 - 273:2.

**Partially disputed.**

In her sworn deposition, Asselta stated that she does not believe she failed regarding writing the January 31, 2018 observation report because the writing of Advance has evolved (Blair Decl. Exhibit "E". page 271, lines 9-14, page 272, lines 5-25, page 273, line 2). However, the 2017-2018 Advance Guide for Educators, page 8, states that during an observation, the evaluator gathers specific evidence of teacher practice, aligns it with the Framework for Teaching, and records it on the teacher observation report (Zoulas Decl Exhibit "AA", page 8).

Additionally, LoRe-Dioguardi testified in her sworn deposition, that both she and Asselta received extensive and continuous training in conducting and recording teacher observations with the Advance System using the HEDI ratings, and that that training continued until LoRe-Dioguardi left at the end of the 2017-2018 school year (Blair Decl. Exhibit "B". page 58, lines 11-25, page 59, lines 2-25, page 60, lines 2-25, page 61, lines 2-23). Asselta, testified in her sworn deposition that she also received extensive and continuous training in conducting and writing teacher observations (Blair Decl. Exhibit "E", page 34, lines 22-25, page 35, lines 2-14).

128. Plaintiff alleges that Principal Asselta and LoRe-Dioguardi would call Plaintiff's classroom, disrupting her teaching and "thereby harassing her repeatedly." Am. Compl., Ex. "C," ¶ 304. For example, Plaintiff alleges that on January 26, 2018, Principal Asselta attempted to conduct a meeting with Plaintiff on the phone concerning Plaintiff's promotion in doubt standards. Id.

**Not disputed.**

129. On February 15, 2018, Principal Asselta met with Plaintiff to discuss the observation. See 2017-2018 Overall Rating Docs., Ex. "FF," at 4. Following the meeting,

Plaintiff responded in three successive emails, asserting that Principal Asselta did not immediately provide Plaintiff with the requisite feedback, that the feedback that was provided was given three weeks after the observation, and wrote that questions asking if Plaintiff knew the Danielson Rubric were retaliation and harassment for engaging in protected union activities. See id. at 4-6; see also Pl.'s Tr., Ex. "D", at 197:9 – 197:13; 197:21 – 198:3. Plaintiff further complained that Principal Asselta only observed Plaintiff's class for fifteen minutes, adding that "NOTHING [Principal Asselta] said was true," her observations were "lies," declaring that Plaintiff was an "outstanding" math teacher and in all caps: AND I CAN PROVE IT! See id at 5.

**Partially disputed.**

After Plaintiff received feedback from Asselta for the January 31, 2018 lesson observation, Plaintiff sent several emails to Asselta concerning the feedback. Plaintiff stated in the email that the feedback was given three weeks after the math lesson. Students had long since completed the entire math chapter and had been given a formal assessment on it, in which they had performed very well. The feedback was therefore outdated (Zoulas Decl. ¶ 91).

Plaintiff is stating that Asselta has made numerous statements on the observation report for the January 31, 2018 observation, that are out of context as well as numerous opinion statements with no supporting documentation. For example, it says in 1e (obs.) that, "Some of the learning activities and materials are aligned with the instructional outcomes and represent a moderate cognitive challenge." However, Asselta does not explain which ones she is referring to. In 3d(obs.) Asselta states, "Students do not appear to be aware of assessment criteria." Yet Asselta did not question any children about this, but instead gave her opinion of how it "appeared" (Zoulas Decl. ¶ 92) (Blair Decl. Exhibit "FF" at 1-3).

Asselta did not provide any feedback for the portion of the lesson that she actually observed (Blair Decl. Exhibit "FF" at 5).

On January 23, 2019, Arbitrator Jay Siegel agreed that the lesson observation was poorly written with numerous flaws. He ordered that it be removed from Plaintiff's record (Blair Decl. Exhibit "FF" at 7-9).

130. Plaintiff found Principal Asselta's taking of notes during their meetings to be harassment. See id. ¶¶ 82, 100, 114.

**Partially disputed.**

On or about the time Plaintiff turned 55 years of age, Asselta began documenting many of her comments in a special notebook. Asselta was not taking notes, she was documenting. During informal conversations, Asselta, would take out the special notebook in mid conversation and write down a phrase or particular comment that Plaintiff made. One example was when Plaintiff was receiving feedback for a previous

observation and defended herself by stating she is a good teacher, Asselta took out the special notebook from her desk drawer and wrote down this comment. On another occasion, Plaintiff was complaining to Asselta about the overall behavior of children in the school building, by stating they were behaving "wildly". Asselta immediately took out her special notebook from her desk, and wrote down the word, "wildly". However, Asselta never offered Plaintiff a solution or assistance (Zoulas Decl. ¶ 93).

In the Carmen Farina article, Farina stated that, administrators should be in "that" teacher's classroom on a regular basis, keeping records, taking notes (Zoulas Decl. Exhibit "N"). Asselta attended a conference in February of 2015, in which Carmen Farina explained to principals how to get rid of bad teachers (Blair Decl. Exhibit "E" page 370, lines 24-25, page 371, lines 2-25, page 372, lines 2-9).

131. On February 27, 2018, Plaintiff sent an email to Principal Asselta explaining the seating arrangement of one of her students after the student's counselor had asked. Zoulas Emails, Ex. "X," at 11; see also Am. Compl., Ex. "C," ¶¶ 288-289. Plaintiff explained that the student requested to sit in the front of the classroom towards the middle. Id. Plaintiff alleges that the child was directed to disobey and that school counselor, Mr. Guito, was recruited by Principal Asselta to harass Plaintiff and make false accusations. See id. at ¶¶ 160-164; 287.

**Partially disputed.**

Plaintiff disputes that the child, Raymond C., was directed to disobey. This is not referenced in the email Plaintiff sent to Asselta on February 27, 2018. Mr. John Guito, the new counselor, had made a false statement to Plaintiff while he was in her classroom observing Raymond C., that the child, Raymond C., was sitting in the corner. Plaintiff corrected him and noted the child was indeed sitting in the front towards the middle. Plaintiff believes that the comment was so bizarre and inaccurate that she believes that Mr. John Guito was instructed by Asselta to harass her and make false accusations (Zoulas Decl. ¶ 94) (Blair Decl. Exhibit "X" at 11, Zoulas Exhibit "V" at 2).

132. Plaintiff alleges that during morning line up on February 28, 2018 and March 1, LoRe-Dioguardi yelled sharply at Plaintiff's students in retaliation for sending the email about Guito to Principal Asselta on February 27, 2018. See Am. Compl., Ex. "C," ¶¶ 290- 291.

**Partially disputed.**

Plaintiff recalls the particular students who were yelled at by LoRe-Dioguardi in front of the entire school, in the basement were very upset and vocalized this to Plaintiff immediately after it occurred. The students were Meagan T. on February 28, 2018 and Jan B. and Raymond C. on March 1, 2018. As Plaintiff led students through the basement to go to their classrooms, LoRe-Dioguardi yelled loudly, "Meagan, why are you talking?" But, Meagan is shy and only whispers. LoRe-Dioguardi did not scream at students from

other classes in this aggressive and publicly- displayed manner (Zoulas Decl. ¶ 95)
(Zoulas Decl. Exhibit "V" at 3-4)

133. Plaintiff alleges that LoRe-Dioguardi "crank-called" Plaintiff's classroom and
harassed Plaintiff by calling and asking for students that were in other teacher's rooms on
many occasions during the 2017-2018 school year. Am. Compl., Ex. "C," ¶¶ 309-311.
For example, Plaintiff alleges that in March 2018, LoRe-Dioguardi called Plaintiff's
classroom and asked for student to come to the main office, but when he arrived,
responded that they meant another student. Id. at ¶ 310.

**Not disputed.**

134. On or about March 2018, Fantauzzi was removed as the school safety agent at P.S.
34 after a parent reported him for sleeping in his chair. See Fantauzzi Emails, Exhibit
"GG," at 1-3. School parents submitted a letter in support of Mr. Fantauzzi. Id. at 3.
Superintendent Winnicki responded that they all felt Mr. Fantauzzi was a part of the "PS
34 family however, the safety of all children must come first." See id. at 2-3.

**Partially disputed.**

Asselta had begun harassing Mr. Raul Fantuzzi for the previous two years as a pattern of
age discrimination. Additionally, Asselta had told several parents that she wanted to get
rid of Mr. Fantuzzi and needed their help. Plaintiff witnessed one such parent, Ms.
Khamo, had become very argumentative and rude towards Mr. Fantauzzi and began
following him around with her camera-phone. Mr. Fantauzzi was not sleeping. He had
shut his eyes for two seconds, momentarily. as people do occasionally, especially if they
wear glasses (Zoulas Decl. ¶ 96).

135. On March 16, 2018, Plaintiff sent an email to AP and Angelika Panek asking that
they stop calling Plaintiff's classroom to "request grades etc." Zoulas Emails, Ex. "X," at
12. Plaintiff alleges that she was harassed about folders on dozens of occasions. Am.
Compl., Ex. "C," ¶ 305.

**Not disputed.**

136. Plaintiff alleges that on March 14, 2018, Peluso interfered with the management of
Plaintiff's class while they were having a dance instruction. Am. Compl., Ex. "C," ¶¶
281-283. Plaintiff alleges that LoRe-Dioguardi screamed loudly at Plaintiff's student in
retaliation for Plaintiff sending an email to Peluso requesting that she not interfere with
Plaintiff's class. Id. at ¶¶ 284-286.

**Partially disputed**.

There was another screaming incident in the basement during morning line-up where
once again, LoRe-Dioguardi screamed very loudly at the same child, Meagan T. on
March 15, 2018 in an aggressive and publicly-displayed manner. This happened

immediately the day after Plaintiff sent an email to Ms. Peluso, asking her to stop interfering with her class, (Zoulas Decl. ¶ 97) (Zoulas Decl. Exhibit "F" at 11).  Meagan T. is a very shy and quiet girl who only whispers (Zoulas Decl. Exhibit "V" at 5).

137. On March 22, 2018, Plaintiff submitted an APPR Resolution Assistance Request for her January 31, 2018 classroom observation report. See APPR Request, "Ex. "V," at 7. Plaintiff complained that Principal Asselta did not give her verbal and written feedback within the fifteen days of her classroom observation. See id.

**Not disputed.**

138. Plaintiff alleges that on March 23, 2018, she was harassed by Panek and then LoRe-Dioguardi to sign an observation report after she had already signed out for the day. See Am. Compl., Ex. "C," ¶¶ 255-258. In the section of the report for a teacher's signature, it states: "I have read and received a copy of the above and understand that a copy will be placed in my file." See 2017-2018 Overall Rating Docs., Ex. "FF," at 3. Panek made a notation on Plaintiff's January 31, 2018 observation report that Plaintiff had refused to sign as the observation was in dispute. See id. at 1.

**Partially disputed.**

On Friday, March 23,. 2018, Ms. Panek, the school secretary and LoRe-DioGuardi demanded that Plaintiff sign for an observation report after Plaintiff had already signed out for the day. This is not the correct protocol for delivering an observation report to a teacher.  Nor is there any urgency to obtain a signature since the reports are already posted online on the Advance website under each teacher's individual account. I had already signed out for the day when the secretary, Ms. Panek literally shoved the document towards me. March 23, 2018 was a Friday, therefore both Ms. Panek and LoRe-dioguardi demanded that I sign for the observation report after my weekend had already started. LoRe-Dioguardi became visibly irate when I explained to her that I had already signed out for the day and that I could sign for the report on Monday (Zoulas Decl. ¶ 98).

During Asselta's deposition, she stated that the best time for Ms. Panek to deliver the observation reports to teachers is during their lunch period or during their preparation period (Blair Decl. Exhibit "E" at page 248, lines 4-12).

What is most notable, however, is that a secret message was later written at the top of the observation report, for the January 31, 2018 lesson observation, without the Plaintiff's knowledge. Plaintiff didn't realize until the end-of-year summative conference that there were two versions of this observation report, one with a secret note written at the top and one without the secret note (Zoulas Decl. ¶ 99). After Plaintiff realized this, she filed a grievance dated, September 21, 2018 (Blair Decl. Exhibit "AA" at 41-42, Zoulas Decl. Exhibit "Q" at 3-4).

139. On March 28, 2018, Plaintiff was informally observed and evaluated by Principal Asselta. 2017-2018 Overall Rating Docs., Ex. "FF," at 10-12. Plaintiff received "developing" and "effective" component ratings. See id. On the observation report, Principal Asselta wrote that as a "next step," the students needed to push each other to think more analytically about math concepts when speaking to each other. See id. at 12. Principal Asselta continued that it was important the students knew what math partnerships looked and sounded like, that it was important to differentiate the lesson to provide multiple entry points, such as access to the information and work. Id. Principal Asselta recommended Plaintiff speak to the special education teacher in the fourth grade ICT, Ms. Lodola, for examples on how to follow through on Principal Asselta's observations. Id.

**Partially disputed.**

In 2018, Ms. Lodola was a 35-year-old ICT teacher with less than one year of teaching experience (Zoulas Decl. Exhibit "B" at 4-5). On the March 28, 2018 lesson observation report, Asselta advised Plaintiff to seek the advise of Ms. Lodola, a then 35 year-old ICT teacher with less than one year of teaching experience. Ms. Valentina Lodola-Rahaman graduated from high school in 2001, as confirmed on her Linkedin account. During the 2017-2018 school year, Plaintiff did not have any special education students in her classroom nor students with academically-focused IEP's. Additionally, should Plaintiff have needed assistance with a special education student, Asselta could have referred her to Ms. Iwona Borys who was the head of special education at the school and who had serviced many of Plaintiff's at-risk students over the years. Asselta could also have referred Plaintiff to a then 55-year-old teacher who was co-teaching with Ms. Lodola, Ms. Panopoulos. Asselta once-again made comments that were out of context, opinion-oriented, and had no documentation to support them. For example, in 3d, Asselta stated that, "Students appear to be only partially aware of assessment criteria." However, Asselta never discussed this with any of the students. All students were aware of the assessment criteria because this had been reinforced on a daily basis since the beginning of the school year. In 3d, Asselta also stated that "Teacher monitors student learning for the class as a whole." This is absolutely false. Plaintiff attends to each student, individually, and this was evident during the lesson and in all Plaintiff's lessons. Asselta also stated that, "Teacher uses a stamp which says "Super" as the assessment for student understanding." This was written out of context. Plaintiff doesn't solely use a stamp, but uses it in conjunction with a quick discussion with each student on what went well on the two check-mark problems and where there was a misunderstanding or in what capacity the student needs more support. In 3c, once again, Asselta states, "The learning tasks are partially aligned with the instructional outcomes, but require only minimal thinking by students." However, this is not true. The lesson and all the tasks are from the Go Math Program that Asselta has the entire school using. Additionally, when reviewing the lesson in it's entirety, you can see there are many opportunities for students to extend their thinking, and additionally to work on an enrichment activity, which is attached to every math lesson. For students that need additional support, Plaintiff offers a reteach sheet where she models the skill again. Additionally, Plaintiff uses flexible grouping during

every math lesson, which is a differentiation technique (Zoulas Decl.¶ 100) (Blair Decl. Exhibit "FF" at 10-12).

Additionally, Arbitrator Jay M. Siegel Esq. stated that because the totality of the observation is so flawed it must be removed and that there was far too much cutting and pasting from the Danielson's Rubric with virtually no lesson-specific evidence cited (Blair Decl. Exhibit "FF" at 19-21).

140. On April 25, 2018, Principal Asselta emailed Plaintiff with feedback from the observation. See 2017-2018 Overall Rating Docs., Ex. "FF," at 13. Principal Asselta complimented the fact that students were encouraged to partner during the lesson, but encouraged Plaintiff, again, to plan for differentiation rather than having the students all work on the same work. See id. In five successive emails, Plaintiff complained that Principal Asselta only observed the introductory portion of Plaintiff's lesson and that Principal Asselta's comments were "erroneous" and "full of errors." See id. at 12-18.

**Partially disputed.**

Once again, on the March 28, 2018 lesson observation report, Asselta claimed that Plaintiff did not differentiate when she did. The differentiation is built into the Go Math Program for each lesson. There are multiple opportunities for early finishers to think more deeply and for struggling students to receive more assistance in the form of reteach, teacher modeling, and manipulatives that are available and used for every lesson. Asselta consistently arrives to watch the first fifteen minutes of a math lesson, then chooses to leave rather than observe the entire lesson. Then she claims she didn't "see" any differentiation. She didn't see it because she wasn't there, and she didn't look (Zoulas Decl. ¶ 101).

Additionally, Asselta never once sent Plaintiff out for professional development for differentiation, yet sent herself on numerous occasions (Blair Decl. Exhibit "E", page 95, lines 16-19).

141. Pursuant to an Arbitration Award, Plaintiff's March 28, 2018 observation report was removed from Plaintiff's file and was not used in the calculation of Plaintiff's 2017- 2018 Overall rating. See 2017-2018 Overall Rating Docs., Ex. "FF," at 19-21. The Arbitrator ruled that the observation report was flawed in certain components, comments were not in the appropriate observation section and certain components did not have lesson specific evidence, as components were cut and pasted from the Danielson Rubric. See id.

**Partially Disputed.**

The arbitrator also stated that there was no teacher-specific evidence for components 3c (p&p) and 3d (p&p). Additionally, the March 28, 2018 observation report was flawed in about 10 different components (Blair Decl. Exhibit "FF" at 19-21)

142. On May 8, 2018, Plaintiff emailed Principal Asselta complaining that Principal Asselta had sent Panek to Plaintiff's classroom while she was teaching to obtain her signature for an observation report. Zoulas Emails, Ex. "X," at 13. Plaintiff wrote that she found the action to be "very offensive" as this was not the time to sign the report and Plaintiff could access and sign the report at her discretion. Id. On Plaintiff's March 28, 2018 observation report, Panek made a notation that Plaintiff had refused to sign as the observation report and "got upset and very unpleasant." See 2017-2018 Overall Rating, Ex. "FF," at 10.

**Partially disputed.**

On May 8, 2018, Ms. Panek, the school secretary, was sent to Plaintiff's classroom by Asselta, while Plaintiff was teaching, to obtain a signature for an observation report. Plaintiff was unable to sign for the report because she was teaching her class. Asselta had then instructed the school secretary, Ms. Panek to write a secret notation at the top of the observation report. Plaintiff was never made aware of this alteration until the end-of-year summative conference when she was asked to sign for her MOTP rating( Zoulas Decl. ¶ 102).

Plaintiff later grieved that there were two versions of this observation report and that the version that was posted on the Advance website was the one without the hand-written notation (Blair Decl. Exhibit "AA" at 41-42).

On May 8, 2018, Ms. Panek had entered Plaintiff's classroom while Plaintiff was in the middle of instruction. Plaintiff did not speak to Ms. Panek, but instead used hand gestures to say "no" and waved her hand for her to leave. Plaintiff, then turned around to avoid any further distraction, and continued teaching. Plaintiff denies that she refused to sign this document. Plaintiff was unable to sign at that moment. The hand-written note that was secretly written at the top of the March 28, 2018 observation report was malicious and false (Zoulas Decl. ¶ 103).

During Asselta's sworn testimony she explained that this was not an appropriate manner to hand out observation reports and request a signature (Blair Decl. Exhibit "E", page 247, lines 10-25, page 248, lines 2-17).

143. Principal Asselta testified that when she learned Panek was trying to have Plaintiff sign her observation reports during class, she asked her to refrain from doing so because it was interrupting instruction. Asselta Tr., Ex. "E," at 247:10 – 248:17.

**Not disputed.**

144. On May 9, 2018, Plaintiff sent an email to Principal Asselta notifying her that she had submitted an APPR request for her March 28, 2018 classroom observation report. See APPR Request, "Ex. "V," at 8.

**Not disputed.**

145. On May 18, 2018, Plaintiff was informally observed and evaluated by Principal
Asselta. 2017-2018 Overall Rating Docs., Ex. "FF," at 22-25. Plaintiff received
"developing" and "effective" and one "ineffective" component ratings. See id. Plaintiff
was rated "ineffective" in the component category "Growing and developing
professionally." Id. at 18. Principal Asselta wrote that "[t]the teacher resists feedback on
teaching performance from supervisors. The teacher dismisses supervisor feedback on the
grounds that she believes she is an excellent teacher." Id. at 18. In the observation report,
Principal Asselta pre-observation, observation, and post-observation feedback. See id. at
19-20. Principal Asselta wrote that while she could see that Plaintiff was trying to
improve her practice, that it would be more effective to have the children involved in
generating questions and peer editing to push each other's thinking. See id. at 20.
Principal Asselta added that the less was not "highly effective" but that it could have
been if Plaintiff had planned for "multiple entry points and with components of
Danielson." See id. at 20.

**Partially disputed.**

This was a formal observation. Asselta had conferenced with Plaintiff during a pre-
observation conference where the lesson plan was reviewed. Asselta was aware that there
was no rubric, yet didn't ask for one until the post-observation conference. Plaintiff
specifically asked Asselta if there was anything else to adjust on the lesson plan (Zoulas
Decl. Exhibit "BB", Zoulas Decl. Exhibit "EE", Blair Decl. Exhibit "V" at 9).

Additionally Plaintiff tried to have a professional conversation with Asselta about the
science lesson during the post-observation conference, however, Asselta refused to have
a two-way discussion. Once again, the focus and tone of the conversation was very
negative with things being stated that were not true (Blair Decl. Exhibit "V" at 9). Each
time Plaintiff tried to explain something to Asselta, she would take out her special
notebook and document Plaintiff's comments. For example, Asselta brought up that a
student, Jan B., had wanted to comment during the lesson introduction, Plaintiff
explained to her that she was well aware that Jan B. consistently disrupted Plaintiff's
lessons with distracting, off-handed comments. Plaintiff tried to explain that it is within
her professional discretion on how to handle this type of situation and that she chose to
redirect the child at that moment, and that Jan B. was given a chance to express his ideas
later on in the lesson when Plaintiff believed it was less distracting to her. Asselta then
proceeded to write down that Plaintiff ignored Jan B., which is completely false.  In
component 3d, Asselta wrote that Plaintiff monitors student learning for the class as a
whole, even though Plaintiff spent the majority of the lesson working with each group
individually, supporting, questioning, eliciting ideas, and further discussing the activity
with them (Zoulas Decl. ¶ 104). Additionally, Asselta wrote that she advises Plaintiff to
plan for multiple entry points, however Plaintiff did plan for multiple entry points and
discussed this with Asselta during the pre-observation conference (Zoulas Decl. Exhibit
"BB", Zoulas Decl. "EE") Plaintiff planned for multiple entry points during the May 18,
2018 formal lesson observation. This was done by providing careful grouping of students,
differentiated questioning by Plaintiff for each group and each student during the science
activity, a higher-level science extension activity for more advanced students, and

additional support for students that needed it. Multiple entry points is another term for differentiation, (Zoulas Decl. ¶ 105).

In the fourth paragraph of evaluator notes section of the observation report, Asselta began writing about Plaintiff in the third person (Blair Decl. Exhibit "FF" at 24)

Plaintiff will also add that during the pre-observation conference, Asselta had a visiting, retired principal barge into the meeting and try to sit down as if that was the normal thing to do. Plaintiff stated that she wanted privacy and then the retired principal left. This can be heard on the recording Plaintiff made, dated May 16, 2018 and that she referenced earlier in this response. (Zoulas Decl. Exhibit "BB", Zoulas Decl. Exhibit "EE").

Asselta made a final revision to the May 17, 2017 observation report on June 16, 2017, at 4:01 p.m., which is about a month from the date Plaintiff filed her SDHR complaint. The June 1, 2017 observation report also had a final revision by Asselta on June 16, 2017 at 4:07 p.m. (Blair Decl. Exhibit "U" at 12-15 and 16-17). Plaintiff's MOTP score for the 2016-2017 school year, subsequently dropped by 25% from the prior school year (Blair Decl. Exhibit "U" at 20). The State Division of Human Rights age discrimination complaint was filed on May 18, 2017 (Blair Decl. Exhibit "EE" at 1 and 9).

146. Plaintiff alleges that she received verbal feedback from Principal Asselta on May 21, 2018, in which she was berated for forty-five minutes and that Principal Asselta wrote notes in her journal. Am. Compl., Ex. "C," ¶¶ 90-92, 111 -114, 172-173, 178-180.

**Not disputed.**

147. On May 22, 2018, Plaintiff requested a Step I grievance conference because Principal Asselta had "dictated the content and organization of [Plaintiff's] lesson plan by commenting that [Plaintiff] had no differentiation for struggling students or above grade level students." See Pl.'s Grievances, Ex. "AA," at 35-36. Plaintiff claimed that she did and requested that the lesson observation be removed. See id. On June 5, 2018, Principal Asselta met with Plaintiff and her union chapter leader to discuss the grievance. See id. at 38. In a letter dated June 12, 2018, Principal Asselta denied Plaintiff's grievance, finding Plaintiff's claim without merit. See id. at 37-38. Plaintiff requested a Step II grievance on June 11, 2018. See id. at 39. On September 6, 2018, Principal Asselta was notified of the Step II grievance conference. See id. at 40.

**Partially disputed.**

This grievance was in reference to the March 28, 2018 lesson observation, which was eventually removed from Plaintiff's record by arbitrator, Jay M. Siegel Esq., who found that it was flawed in at least ten different ways (Blair Decl. Exhibit "FF" at 19-21).

148. On May 23, 2018, Plaintiff complained in an email to Principal Asselta that Ms. Crawford's schedule for the Lego Robotics was not planned with Plaintiff's class included. Zoulas Emails, Ex. "X," at 14. Plaintiff alleged that no one discussed the

program with her or asked her the time frame she could a lot in the student's schedule. Id. Plaintiff asked to know why her class was omitted. Id. On May 30, 2018, Ms. Crawford wrote that she spoke with Plaintiff about scheduling and that Plaintiff said she could not take on an enrichment class, as her priority was the state states. Id. at 15.

**Partially disputed.**

After Plaintiff complained that the LEGO program was interfering with other work occurring in the classroom, no attempt was made to reconfigure Ms. Crawford's schedule nor was Ms. Crawford instructed to do so herself (Blair Decl. Exhibit "X" at 14). Instead, Asselta and LoRe-Dioguardi believed that the solution was to completely deprive Plaintiff's students of this program. In an email dated May 30, 2018, Ms. Crawford stated that she dropped the matter of scheduling with Ms. Zoulas after discussing with Asselta and LoRe-Dioguardi (Blair Decl. Exhibit "X" at 15).

149. On June 1, 2018, Plaintiff was informally observed and evaluated by Principal Asselta. 2017-2018 Overall Rating Docs., Ex. "FF," at 26-27. In all components in which Plaintiff was rated, she was rated "effective" and Principal Asselta provided comments for those components See On June 22, 2018, Principal Asselta emailed Plaintiff feedback for the observation. Id. at 28. Principal Asselta complimented the student's engagement during the observation and Plaintiff's asking of probing questions. Id. As for next steps, Principal Asselta asked that Plaintiff continue to give more "student choice" and develop a way of recording the feedback Plaintiff gives. Id. Principal Asselta offered to help Plaintiff. Id.

**Partially disputed.**

This lesson observation had a final revision by Asselta on June 22, 2018, about nine days after Asselta was served with formal notice of this lawsuit for age discrimination (Blair Decl. Exhibit "F" at 26-27, Zoulas Decl. Exhibit "Y")

This lesson conducted by Plaintiff on June 1, 2018, was taught in the same manner and style, as previous lessons that were rated with developing and ineffective components (Zoulas Decl. ¶ 106).

150. On June 3, 2018, Plaintiff submitted another APPR Resolution Assistance Request for her May 18, 2018 classroom observation report. See APPR Request, "Ex. "V," at 9. Plaintiff complained that Principal Asselta provided no evidence that, as she stated in Plaintiff's observation report, "students were only partially aware of assessment criteria." See id. Further, that Plaintiff had circulated with a checklist as Principal Asselta requested. Id. Plaintiff requested that the observation be removed. Plaintiff forwarded the request to Plaintiff on June 4, 2018, and wrote that Principal Asselta had taken Plaintiff's words out of context. Id.

**Not disputed.**

151. Plaintiff alleges that Principal Asselta had another conversation with the staff about the budget on June 11, 2018, which, despite Principal Asselta allegedly stating that she was trying to secure more funds, constituted intimidation and harassment of older staff. Am. Compl., Ex. "C," ¶¶ 197-205.

**Partially disputed.**

On June 11, 2018, during Monday's faculty conference, Asselta had another conversation with the staff about the school budget. It constituted intimidation and harassment of older staff because there is an implication there that older, higher-salaried teachers were partly to blame.

Additionally, after this announcement, teachers did talk amongst themselves about the fact that at PS 34K, there are a lot more senior teachers than at other schools. Only newly-hired or least senior teachers could possibly be affected by excessing, a process of reducing staff in excess, or layoffs since the Department of Education uses a seniority system for this. There was no need to announce this to all the staff (Zoulas Decl. ¶ 107)

Seniority rules determine the order of excessing and layoffs. Newly-hired or least senior teachers are first to be excessed or laid off. According to the UFT, the least senior teacher within a license or program area will be excessed first (Zoulas Decl. Exhibit "GG" at 1 and 4).

Additionally, according to the UFT, the principal should notify any person at risk of being excessed, in writing by June 15 of that school year. Also, the UFT states that excessing could be due to budget reductions or an unexpected drop in student enrollment (Zoulas Decl. Exhibit "GG" at 1 and 2).

The UFT does not state in the article titled "Q&A on Excessing" that the principal should notify all staff of impending excessing due to budget reductions (Zoulas Decl. Exhibit "GG").

Additionally, Plaintiff's salary increased significantly from 2016 to 2019 (Blair Decl. Exhibit "E" page 364, lines 23-25, page 365, lines 2-25, page 366, line 2).

According to LoRe-Dioguardi, there were some lean budget years under Asselta's administration where they felt concerned about the budget, and that the single biggest piece of PS 34's budget was probably salaries. Additionally, she testified that a teacher that's been teaching for twenty years costs more than a teacher that's been teaching for two years (Blair Decl. Exhibit "B" at page 335, lines 15-25, page 336, lines 2-23). LoRe-Dioguardi also testified that if a twenty-five year teacher retired during the school year, then the following year they calculated what would be a fair amount to budget for a teacher, but that it would be less than a twenty-five-year teacher's salary (Blair Decl. Exhibit "B", page 338, lines 14-24).

Additionally, the Department of Education had for several years now made each school responsible for its own budget and that was coupled with a reduction in the budget every year. They also utilized the Fair Student Funding that only gives schools 89% of their funding needs (Blair Decl. Exhibit "C" at 192). This forced administrators to look for ways to reduce the payroll portion of the budget.

Additionally, the Department of Education uses a tier compensation structure, so that a teacher cannot attain the highest salary rate unless they are older (Blair Decl. Exhibit "E" page 362, lines 18-25, page 363, lines 2-25, page 364, lines 2-18).

152. Plaintiff was received a "developing" MOTP rating. See 2017-2018 Overall Rating Docs., Ex. "FF," at 29. On June 26, 2018, Plaintiff complained in an email to Principal Asselta that Principal Asselta had sent Panek to her classroom to sign the final rating without Plaintiff having had a summative conference. Zoulas Emails, Ex. "X," at 16. Plaintiff also added that Panek only brought two observation reports rather than all four. Id.

**Partially disputed.**

After the email was sent by Plaintiff to Asselta, Plaintiff was called downstairs to the principal's office for the summative conference. Initially, Plaintiff stated that before she could sign the MOTP rating sheet, she needed to see all four observation reports at the same time. Asselta only had two of four observation reports in the folder with the MOTP rating sheet.  At that moment, Asselta opened her desk drawer and slowly pulled out the two missing observation reports. That's when Plaintiff saw for the first time, the secret writing at the top of both of these observation reports (Blair Decl. Exhibit "X" at 16, Zoulas Decl. Exhibit "C", Zoulas Decl. Exhibit "FF")

On the Advance website, however, Asselta had posted the version of these two observation reports that were without the hand-written notations. Thereby, these other versions with the secret notations were being kept without Plaintiff's knowledge. The two observation reports being referenced here are for the observations conducted on January 31, 2018 and March 28, 2018 (Zoulas Decl. ¶ 108).

Fall 2018

153. On September 7, 2018, Plaintiff submitted an APPR Resolution Assistance Request. See APPR Request, "Ex. "V," at 10. Plaintiff complained that the summative conference with Principal Asselta was held after the deadline. Id. Plaintiff also wrote that she was only asked to sign the MOTP rating, that there was no discussion about how the year went, and two observations were allegedly altered from the copies in Advance. Id.

**Partially disputed.**

(Zoulas Decl. Exhibit "C", Zoulas Decl. Exhibit "FF")

154. On September 21, 2018, Plaintiff requested a Step I grievance conference because she received observation reports with "malicious and falsified" handwritten notes on them without her knowledge. See Pl.'s Grievances, Ex. "AA," at 41-42. Plaintiff alleged that attempts had been made to have her sign the "legal documents" while she was teaching or signed out for the day. Id. Plaintiff requested the removal of both observation reports. Id. at 43.

**Not disputed.**

155. On September 28, 2018 Plaintiff signed her APPR Overall Rating Report. See 2017-2018 Overall Rating Docs., Ex. "FF," at 30. Plaintiff received "developing" MOPT and MOSL ratings. Id. However, in accordance with two observations awards, two of Plaintiff's observation reports were removed from Plaintiff Overall Rating. See Pl.'s Tr., Ex. "D", at 38:5 – 38:13; 38:19 – 39:4. Plaintiff received an "effective" Overall Rating for the 2017-2018 school year. See Service and Rating History, Ex. "F," at 2.

**Not Disputed.**

156. On September 24, 2018, Plaintiff requested a new printer. Zoulas Emails, Ex. "X," at 17. Principal Asselta responded to Plaintiff that a new printer would be ordered for Plaintiff and then submitted the request. See id. at 17-18.

**Partially disputed.**

Plaintiff had a new, functioning printer until in 2016 when LoRe-Dioguardi instructed the custodian to remove it from her classroom, after Plaintiff had gone for the day. The following morning, Plaintiff found her printer gone, and instead there was a broken printer that looked like hers, but had a different serial number (Zoulas Decl. ¶ 109) (Blair Decl. Exhibit "C" at 24).

Allegations of Age Discrimination

157. Plaintiff alleges that Asselta and LoRe-Dioguardi began to treat Plaintiff differently after she turned fifty-five in the spring of 2016. See Pl.'s Tr., Ex. "D", at 35:9 – 35:15; 42:6 – 42:7; 48:11 – 48:13; 48:25 – 49:3; 98:10 – 98:12.

**Not disputed.**

158. Specifically, Plaintiff testified that Principal Asselta changed the way to she spoke to Plaintiff, ceased casual conversations with Plaintiff, stopped saying good morning, and "started to become rude to [Plaintiff] and disrespectful" in public. Pl.'s Tr., Ex. "D", at 35:18 – 35:25; 105:3 – 105:10. Plaintiff added that Principal Asselta stopped having time for Plaintiff to stop by her office, was always busy when Plaintiff needed something, ignored Plaintiff's requests, and alleged that there was a significant decline in Plaintiff's ratings. Id. at 35:25 – 36:7; 105:3 – 105:10. In addition, began to call Plaintiff a "veteran teacher," and said that Plaintiff was "getting up there," "should know better," and had

been teaching for a "long, long time." Id. at 59:2 – 59:13; 209:12 – 209:19. Plaintiff also
alleges that Principal Asselta said, on June 6, 2018 following a conversation with a
student's family, Plaintiff was a "veteran teacher" and "starting to look tired and old" and
said Plaintiff should "just retire." Id. at 209:18 – 209:22; see also Am. Compl., Ex. "C,"
at ¶¶ 169-171. Plaintiff admits that Principal Asselta did not call her a "dinosaur." Id. at
210:15 – 210:20.

**Partially disputed.**

Plaintiff believed that Asselta thought of her as a dinosaur because of constant comments
about younger teachers, including being told several times to ask young teachers in their
early 20's or 30's and with virtually no school experience, for ideas to improve her
teaching (Zoulas Decl. ¶ 110). This includes Ms. Lodola, who is mentioned in the March
28, 2018 observation report and Ms. Peluso, who is likely the person Asselta referred to
in section 4e (p&p) of the January 31, 2018 observation report. This is because the
1/31/18 observation report was revised on March 19, 2018, just 5 days after Plaintiff sent
an email to Ms. Peluso, complaining that Ms. Peluso was giving her unsolicited and
unnecessary help. At the time, Ms. Peluso was a 23-year-old counselor with less than one
year of school experience (Blair Decl. Exhibit "FF" at 1-3 and 10-12, Zoulas Decl.
Exhibit "F" at 11, Zoulas Decl. Exhibit "B" at 6-7). Additionally, there were many times
after Plaintiff had turned 55 years of age on March 20, 2016, that Asselta referred to her
as a veteran teacher and told her that she's getting up there and should just retire (Zoulas
Decl. ¶ 111) (Blair Decl. ,Exhibit "C" at 84, 102, 134, 170 and 171).

Asselta would also make constant references to young people as she addressed the staff
during faculty conferences after March of 2016. Asselta would make statements about
how much she admired young teacher's energy and how they tied their hair up in a pony
tail on top of their head and that they looked so youthful and cute. Asselta would make
these comments on a regular basis. Additionally, Plaintiff was at the time and still is one
of the oldest two or three teachers at the school  (Zoulas Decl. ¶ 112).

159. Further, Plaintiff alleges that teacher Ms. Czastkiewicz was "pummeled" with
negative evaluations after she was placed into a new position and forced to retire during
the 2015-2016 school year. See Am. Compl., Ex. "C," at ¶¶ 213-215. The MOTP scores
for evaluated teachers at P.S. 34 during the 2015-2016 school year were either "effective"
or "highly effective." See Teacher Evaluation Ratings, Ex. "S," at 1.

**Partially disputed.**

Since Ms. Czastkiewicz agreed to retire at the end of the 2014-2015 school year, she was
given an overall Effective rating.  Plaintiff testified that she observed both administrators
targeting Ms. Czaskiewicz and that she cried often about being constantly told she could
not teach effectively. Additionally, Plaintiff spoke with Ms. Czaskiewicz directly about
this situation. Ms. Czastkiewicz was replaced with a 23-year old teacher, Ms. Sasiela,
who was asked to teach the Dual Language Program (Zoulas Decl. ¶ 113) (Blair Decl.

Exhibit "D", page 123, lines 21-25, pages 124-128, page 129, lines 1-11, Blair Decl.
Exhibit "C" at 213, 214, and 215).

160. Plaintiff alleges that LoRe-Dioguardi began to speak and behave "rudely" and
"disrespectfully" to Plaintiff in public and would ignore Plaintiff after Plaintiff turned
fifty- five. Id. at 42:8 – 42:11; 42:15 – 42:17. LoRe-Dioguardi allegedly was also no
longer available when Plaintiff needed assistance and stopped scheduling things for
Plaintiff that she used to schedule. Id. at 42:17 – 42:18. Additionally, LoRe-Dioguardi
allegedly made comments about Plaintiff's age where she would bring up in
conversations when Plaintiff graduated from high school. Id. at 58:10 – 58:17. For
example, Plaintiff testified that LoRe-Dioguardi would say "things like oh, you must
remember the books about Dick and Jane from the '70s, from the early '70s and late '60s,
you must remember those." Id. at 58:19 – 58:21.

**Not disputed.**

161. Plaintiff testified that she believed Principal Asselta knew her age because Winnicki
had requested every teacher to provide her with their birth and Plaintiff was hired by
Winnicki. Pl.'s Tr., Ex. "D", at 107:3 – 107:13. Plaintiff admits that Principal Asselta did
not ask for Plaintiff's birth date. Pl.'s Tr., Ex. "D," at 107:14 – 107:15.

**Partially disputed.**

This information about a teacher's birth year is included in all teachers' personnel files,
which are located at the school (Blair Decl. Exhibit "B" at page 349, lines 23-25 and page
350, lines 2-8).

162. Plaintiff alleges that school administration, in part, engaged in discrimination due to
the Fair Student Funding formula that only pay 89% of school's budgetary needs. Am.
Compl., Ex. "C," ¶ 192. Plaintiff contends that Defendant had a "strong financial
incentive" to discriminate against motivated by an alleged desire to reduce the budget.
Pl.'s Tr., Ex. "D", at 206:24 – 207:20.

**Not disputed.**

163. Principal Asselta testified that the budget for P.S. 34 was at one point over $3
million and was in 2019 around $2.6 to $2.7 million. Asselta Tr., Ex. "E," at 382:5 –
382:15. Principal Asselta testified that at least fifteen teachers at P.S. 34, out of around
thirty-five in total, make over $100,000 a year. Asselta Tr., Ex. "E," at 391:7 - 391:13.

**Partially disputed.**

From the years 2015-2018, looking at the organization sheets, the number of teachers
earning over $100,000 would be about 20, not 15 (Zoulas Decl. ¶ 114) (Blair Decl.
Exhibit "L")

Professional Development

164. Plaintiff alleges that she was denied professional development and training opportunities conducted outside of the school, and that here were no processes to request training. Am. Compl., Ex. "C," ¶¶ 182, 186 -187; see also Pl.'s Tr., Ex. "D," at 177:5 – 177:10; 176:7 – 176:18.

**Partially disputed.**

Outside professional development opportunities and who was permitted to attend were within the sole discretion of Asselta. LoRe-Dioguardi testified that professional development helped teachers improve their skills, ability to teach, and can help them be a more effective classroom teacher (Blair Decl. Exhibit "D", page 176, lines 7-25, page 177, lines 1-14, Blair Decl. Exhibit "B", page 301, lines 6-21, page 302, lines 6-16, page 303, lines 11-21).

165. When asked if Plaintiff asked for professional development opportunities outside of the school during the 2017-2018 school year, Plaintiff testified that: "that was not an avenue we were told to take. The principal decided who was going to go." Pl.'s Tr., Ex. "D," at 180:14 – 180:19. When asked if Plaintiff could sign up for professional development opportunities at DOE, Plaintiff responded that she was "never informed of such a thing." Pl.'s Tr., Ex. "D," at 180:20 – 180:24. Plaintiff also testified to her lack of knowledge that she could request approval from Principal Asselta for an outside professional development opportunity. Id. at 183:4 – 183:9.

**Partially disputed.**

Some staff members, especially younger teachers, had an ongoing dialogue with Asselta and LoRe-Dioguardi through emails and in-person conversations concerning outside professional development opportunities (Blair Decl. Exhibit "HH" at 2-4, 13-17, 25-27). Plaintiff did not have an open dialogue with Asselta as evidenced by this email exchange in which Plaintiff tried to offer Asselta some ideas after they had attended the Apple Institute in July of 2016. Asselta responded to Plaintiff's email immediately, by stating that she would not be available. Plaintiff was the only person to whom the email was sent (Zoulas Decl. Exhibit "F" at 1 and 12).

166. Plaintiff alleges that younger teachers were sent out for outside professional development opportunities. Id. at 184:4 – 184:11.

**Partially disputed.**

Younger teachers were sent out for professional development significantly more often between the 2016 and 2019 school years.. During this same period of time, Plaintiff was not sent to any outside professional development opportunities, except for three during the year Plaintiff was placed on a TIP Plan (Zoulas Decl. ¶ 115). Some younger teachers, in their 20's at the time, who were sent to outside professional development opportunities

frequently include: Carl Stovner, Nicole Ruggiero, Kyu Kang, Sarah Bucchino, Emilia Sasiela, and Adrienne Stazzone. Mr. Stovner was sent out so many times, that he actually emailed Asselta and LoRe-Dioguardi on 12/14/17 to check if they still want him to attend that day's professional development. On 9/25/19, Ms. Bucchino and Ms. Kang were given approval to attend a workshop that cost $299 per person (Zoulas Decl. Exhibit "K").

167. Multiple teachers at P.S. 34 brought outside professional development opportunities to Principal Asselta and were approved to attend. See Professional Development Request Emails, Exhibit "HH."

**Partially disputed.**

Plaintiff was never made aware that some teachers had an open dialogue with Asselta and LoRe-Dioguardi about professional development opportunities. Plaintiff obtained this information for the first time during the discovery process for this lawsuit (Zoulas Decl. ¶ 116).

Additionally, according to testimony from LoRe-Dioguardi's deposition, she and Asselta would discuss who would go and who was better suited. Sometimes, it would depend on who were the lead teachers (Blair Decl. Exhibit "B" at page 302, lines 22-25 and page 303, lines 2-10).

168. LoRe-Dioguardi testified that they would learn from professional development opportunities through email notices, publications from DOE, and vendors. LoRe-Dioguardi, 299:19 - 300:13. Teachers would also share professional development opportunities. Id. at 300:13 - 300:20.

**Partially disputed.**

LoRe Dioguardi testified that the school would receive email notices from the superintendent's office, publications from the Department of Education, PD opportunities from particular vendors, and other departments within the DOE (Blair Decl. Exhibit "B", page 299, lines 19-25, page 300, lines 2-13).

Neither Asselta nor LoRe-Dioguardi discussed with Plaintiff that she should forward to them professional development opportunities (Zoulas Decl. ¶ 117). Once, Plaintiff emailed Asselta information about Google classroom ideas to share, but Asselta never responded to Plaintiff's offer of ideas. Instead, Asselta sent a return email to Plaintiff stating that she will be going on vacation and will have limited access to her email. Plaintiff was the only person to whom the email was addressed. (Zoulas Decl. Exhibit "F" at 1 and 12).

169. Principal Asselta testified that for the past few years, many professional opportunities through the Brooklyn North Support Center concerned special education and so she has sent new special education teachers for those opportunities. Asselta Tr.,

Ex. "E," at 309:6 – 310:2; 310:13 – 310:21; 310:25 – 311:2: 311:8 – 311:14. Principal Asselta added that teachers could find professional development opportunities on their own or through the Brooklyn North Support Center, and then notify Principal Asselta for approval. Asselta Tr., Ex. "E," at 310:7 – 310:12; 310:22 – 311:6; 311:8 – 311:9. Principal Asselta also testified that she had an open door, but when she tried to speak with Plaintiff, Plaintiff was "not very receptive." Asselta Tr., Ex. "E," at 216:11 – 216:20.

**Partially disputed.**

Asselta did not have an "Open Door" for Plaintiff as she stated. Asselta provided no path for professional development opportunities except that it was within her sole discretion who would be invited and with whom she had an open dialogue. What Plaintiff was not receptive to was the false statements that were being made by Asselta and LoRe-Dioguardi about her teaching and professional conduct.  Plaintiff was also not receptive to the age-related animus, harassment, and ongoing retaliation (Zoulas Decl. ¶ 118).

170. Principal Asselta testified that she has never had a teacher claim they were not receiving professional development and if a teacher asked for professional development opportunities, she would help them find an available opportunity. See Asselta Tr., Ex. "E," at 335:9 - 335:21.with

**Partially disputed.**

Plaintiff has asserted on several occasions that she was denied outside professional development opportunities because she was targeted for age discrimination (Zoulas Decl. ¶ 119).

The comments that were made by Asselta during her deposition and that are stated on page 335, lines 13-21 of that deposition (Bl;air Decl. Exhibit "E", page 335, lines 13-21), are hypothetical and do not reflect what actually occurred. She had stated that if a teacher ever asked her for a professional development opportunity, she would get it for them (Zoulas Decl. ¶ 120).

**Stem Lab**

171. Plaintiff alleges that on dates unspecified, but during the 2016-2017 school year, she had discussions with Principal Asselta about her interest in the Eco Schools Program, including the Stem Lab. Am. Compl., Ex. "C," ¶¶ 28-31. Plaintiff testified that she spoke with Principal Asselta about her interests and a grant the school had received for educational purposes. See Pl.'s Tr., Ex. "D", at 118:23 – 119:11. Plaintiff testified that she had conversations about how Plaintiff would "love" to get involved in anything that came to the school. Id. at 119:16 – 119:23.

**Not disputed.**

172. Plaintiff admits that Principal Asselta announced the Stem Lab position and that there was a job posting. See Pl.'s Tr., Ex. "D", at 119:24 – 120:2; 120:18 – 120:20. However, Plaintiff alleges that Principal Asselta said during the meeting making the announcement that she already had someone in mind and so Plaintiff did not apply. See ¶ 31; see also Pl.'s Tr., Ex. "D", at 120:6 – 120:14; 120:18 – 121:6; 122:13 – 123:13.

**Partially disputed.**

Asselta stated to the staff during a faculty conference in May of 2016, that she had already decided who she was giving the STEM lab position to. Then she paused and scanned the room to make sure everyone heard her (Zoulas Decl. ¶ 121).

Plaintiff knew there was no sense in applying since the entire staff had just been informed in essence, that the position was no longer available (Blair Decl. Exhibit "D", page 120, lines 10-25, page 121, lines 1-23).

173. Teacher Marshall was selected for the Stem Lab position. See Pl.'s Tr., Ex. "D", at 121:15 – 121:16; see also Asselta Tr., Ex. "E," at 347:2 – 347:7.

Not disputed.

174. Principal Asselta explained that P.S. 34 is an "Eco school" and that Marshall had been working with the sustainability coordinator to develop the STEM program. See Asselta Tr., Ex. "E," at 346:17 – 346:25. Principal Asselta testified that Marshall was qualified to run the STEM program because she was trained by the sustainability coach in the Solar 1 curriculum used in the STEM program. Asselta Tr., Ex. "E," at 353:20 – 354:4.

**Partially disputed.**

Ms. Marshall was trained by the sustainability coach after she was selected for the position to lead the STEM lab. So, in effect, she did not qualify at the time she applied until and when she received the training.  At the time, Ms. Marshall was about 33 years old (Zoulas Decl. ¶ 122) (Blair Decl. Exhibit "E", page 353, lines 14-25, page 354, lines 2-4)

Plaintiff believes she was a more qualified candidate for the STEM lab position. Plaintiff has a science degree and additionally is highly interested in science, especially the area of environmental conservation (Blair Decl. Exhibit "E", page 356, lines 20-25, page 357, lines 2-11). LoRe-Dioguardi testified that Plaintiff would definitely be a potential candidate with her science background (Blair Decl. Exhibit "B", page, 333, lines 15-25, page 334, lines 2-9)

**Green Stem After School Program**

175. The Green Stem afterschool program was based on a larger Wildlife Preparation grant the school received. Asselta Tr., Ex. "E," at 347:16 – 348:5. Principal Asselta testified that it only lasted a few months during one school year and was run by the sustainability coach the school was assigned through Eco schools program. See Asselta Tr., Ex. "E," at 348:16 – 348:24. Principal Asselta testified that Andrea Kubis was originally chosen to work with the sustainability program because she was doing the science program in the school. Asselta Tr., Ex. "E," at 350:16 - 351:5; see also Professional Development Request Emails, Ex. "HH," at 24. Principal Asselta also testified that she could recommend someone for the position but that it was the purview of Eco-schools and she did not know Plaintiff was interested. Asselta Tr., Ex. "E," at 350:9 – 351:5.

**Partially disputed.**

Originally, Ms. Andonov was given the position for Green Stem, however she became ill and had to be replaced. Ms. Kubis was assigned to take her place, however, she made it clear that she was only "filling in" until someone else could be found. About four weeks later, Mr. Granito, the physical education teacher at the school was asked to work in the Green Stem After-School Program (Blair Decl. Exhibit "D", page 144, lines 22-25, page 145, lines 1-7, Exhibit "C" at 33-38).

Plaintiff had applied for this position, however, was not selected (Blair Decl. Exhibit "D", page 144, lines 15-21, Exhibit C at 32-33). Additionally, Plaintiff through discussions with Ms. Kubis, expressed further interest in teaching the Green Stem Program and specifically discussed and expressed with Ms. Kubis an interest in taking over the program after she left. Ms. Kubis then recommended Plaintiff to LoRe-Dioguardi, but LoRe-Dioguardi chose Mr. Granito to take over the position instead (Blair Decl. Exhibit "C" at 37) (Zoulas Decl. ¶ 123).


Dated: March 22, 2021                                    Respectfully submitted,


                                              _____


                                                    Peggy Zoulas
                                               130 Noble Street, #2
                                              Brooklyn, New York 11222
                                                    917-647-8241

                                                Signed /s/ Peggy Zoulas

Case 18-CV-2718-GHW                    Filed 03/22/211                              70 of 71

Case 18-CV-2718-GHW                    Filed 03/22/211                        71 of 71