UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------

Peggy Zoulas

|  | PLAINTIFF'S DECLARATION IN OPPOSIOTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT |

                              Plaintiff

              -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION: CARMEN ASSELTA, PEINCIPAL
OF PS 34K: MARIA LORE, ASSISTANT PRINCIPAL          Case: 18-CV-2718-GHW
OF PS 34K

                              Defendants

-------------------------------------------------------


   Peggy Zoulas, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury that the following is true and correct[1]:

   1.      I am the Plaintiff in the above-captioned matter, and I respectfully submit my declaration in opposition to Defendant's motion for summary judgment based upon my own personal knowledge and experience.

   2.      Principal Asselta is on terminal leave from PS 34K beginning on October 17, 2020, pending her January 2021 retirement. This was announced by her on October 9, 2020 during a Zoom staff meeting.

   3.      LoRe-Dioguardi turned 59 years old on October 12, 2020.

   4.      Plaintiff declares that Mrs. Winnicki behaved unprofessionally towards Plaintiff during her tenure at PS 34K. Alicja Winnicki repeatedly referenced Plaintiff's attire and physique. When Plaintiff complained to her union

---

[1] This document was prepared with assistance of the NYLAG Legal Clinic for Pro Se Litigants in the SDNY.

representative, Teri Macioli, Teri Masciol bad-mouthed her to then Principal Winnicki, and additionally disclosed private comments to then Principal Winnicki, that were meant to stay between Plaintiff and her union representative.

5.      A teacher cannot be "best" at the teaching that occurs in another teacher's classroom.

6.      A teacher can be placed on a Teacher Improvement Plan (TIP), by receiving an Effective rating from the Principal, which is then combined with an attributed score for MOSL, which was calculated by using other teachers' scores. This is what occurred to Plaintiff during the 2015-2016 school year.

7.      The MOSL selection for the 2015-2016 school year was to combine the scores of all teachers at the school for the NYS ELA and Math tests then attribute those scores to all the teachers at the school. These same state test scores and the process by which they were derived are unfair and the process too convoluted and complex. Since the state test scores were then forbidden to be used for teacher ratings, the state then allowed them to be used for MOSL scores.

8.      During the 2015-2016 school year, Asselta began rating Plaintiff harshly and undeservedly.

9.      On March 9, 2016, Plaintiff did not reprimand the student, Nicole P., loudly. The incident was unfolding in a loud and noisy schoolyard. Plaintiff needed to ensure that the child could clearly hear her. Plaintiff had called out twice to the child as the 9-year-old child was racing towards the schoolyard gate, unaccompanied. Nicole P. did not hear the Plaintiff calling out to her and continued on her path towards the street. Additionally, LoRe-DioGuardi, demanded that Mr. Fantuzzi and Ms. Belfiore write

witness statements against Plaintiff, the contents of which were dictated by her. They complied due to administrator pressure that she inflicted on them.

10.     LoRe-Dioguardi was confused when she testified about a schoolyard incident that occurred on March 9, 2016.

11.     Asselta, who authored the letter for file, dated March 31, 2016, never explained in the letter that a student, Nicole P., attempted to run out of the schoolyard and was stopped from doing so by Plaintiff. Therefore, LoRe-Dioguardi could not remember what had occurred.

12.     Up until this point in time of March 2016, Plaintiff had not experienced any systematic false accusations or other patterns of professionally-damaging behavior by Defendant Asselta. Additionally, Plaintiff believed that LoRe-DioGuardi had behaved in a bizzare and unprofessional manner with regards to the incident that occurred on March 9, 2016. Plaintiff was therefore looking forward to having an open discussion about the incident with Asselta.  Plaintiff therefore did not see a need to have union representation during the meeting with Asselta on March 17, 2016. However, during the meeting, Asselta mocked Plaintiff when Plaintiff stated that her student, Nicole P. suddenly took off across the schoolyard and was heading quickly towards the street. Defendant Asselta stated, "What did you think was going to happen, Ms. Zoulas?"

13.     Instead, Asselta stated only that the Plaintiff behaved unprofessionally by yelling and making the child cry, when it was LoRe-DioGuardi who had made the child cry by shaming her in front of other people. Asselta, never described how the child put herself in immediate danger by running off towards the street nor gave Plaintiff credit for thinking and acting quickly to catch up with Nicole P. before she had the chance to get

past the schoolyard gate. Additionally, during LoRe-DioGuardi's Deposition, when she was questioned about that incident, she failed to recall what had occurred because the letter for file never stated that information.

14.    Defendant LoRe DioGuardi, who was present in the schoolyard on March 9, 2016, chose to immediately escalate the situation with Nicole P. instead of deescalate it as is required by trained staff. LoRe-DioGuardi created a scene in the schoolyard by yelling at Plaintiff that she and she alone would be in charge of the incident. LoRe DioGuardi began shaming the child, telling her she should be ashamed of herself for running off without permission. This was the reason the child cried. Additionally, LoRe DioGuardi then refused to allow Plaintiff to speak to Nicole P.'s parent when the parent came to pick her up. When Plaintiff tried to speak to Asselta, by walking over to her office door, LoRe-Dioguardi, who was already in there, began screaming for the security guard, Mr. Raul Fantuzzi, to escort Plaintiff away from Asselta's office.

15.    Evelyn Vazquez did not witness the incident involving a child entering the adult bathroom at PS 34K nor did she witness anything of which she wrote about in the email she sent to Defendant Asselta on May 27, 2016. She was not present at the time. Therefore, this is hearsay.

16.    On May 27, 2016, Plaintiff was attempting to use the adult bathroom on the second floor when she witnessed Renata, an employee of the After-School Settlement Program, send a child to use this adult bathroom at PS 34K.

17.    Plaintiff denies that she yelled at Renata on May 27, 2016. Plaintiff states that she is the one who expressed to Renata that she feels embarrassed and uncomfortable to see students entering the adult bathroom. Principal Asselta, never discussed the illegal

use of the staff bathrooms with Plaintiff, nor did she inquire as to what had occurred on that day.

18.    Asselta moved Plaintiff's classroom for the coming school year, 2016-2017, directly above her office, where they are only separated by an open metal staircase that reverberates sounds loudly. Plaintiff's classroom was the only class located above Asselta's office. This move was completely illogical and unnecessary as Plaintiff's then room, 207 was given to another 4th grade classroom. However, there is no rational explanation for why Plaintiff was not assigned to that particular incoming fourth grade, nor why some students were not shifted to Plaintiff's roster. This would have avoided the unnecessary, chaotic, and disruptive movement of teacher classrooms.

19.    Defendant Asselta had invited certain teachers to participate in the Apple Institute that took place in July 2016. This included Ms. Visconti, Ms. Marshall, Ms. Zabroni, and Ms. Panopoulos. Plaintiff was not invited. Instead, as the date for the Institute approached and vacancies existed, Asselta announced to staff at the end of a faculty conference in late June of that year, that there were still spots left for the Apple Institute. Staff had already risen from their seats and were walking towards the exits. When Plaintiff announced she'd like to attend, Defendant LoRe-DioGuardi turned to Defendant Asselta and stated, "What do we do now?" Asselta responded, "We have to let her come". Asselta then very slowly and reluctantly stated to Plaintiff that she could attend. Additionally, during the three-day Apple Institute, Defendant LoRe Dioguardi repeatedly harassed Plaintiff by demanding she attend workshop groups with Asselta and not the one's she chose for herself. LoRe-DioGuardi did not demand this of the other teachers who were also attending the Apple Institute.

20.     The Leader in Me training program was required by the school. This training was not uniquely offered to Plaintiff as is implied in this Motion.

21.     There is no rational explanation for why Plaintiff was not assigned to that particular incoming fourth grade, class 401, nor why some students were not shifted to Plaintiff's roster. This would have avoided the unnecessary, chaotic, and disruptive movement of teacher classrooms Plaintiff also notes that Asselta made this decision to move her classroom, while Plaintiff received an overall Developing rating for the very first time.

22.     However, this unnecessary moving of Plaintiff's classroom to above Asselta's office was part of an overall pattern of behavior that began on or about when Plaintiff turned 55 years of age, on March 20, 2016.

23.     Plaintiff has witnessed on numerous occasions, younger teachers had brought their underage children to PS 34K to assist them in setting up their classrooms. Several of these underage children were also students of PS 34K. One teacher who brought her underage children to assist her set up her classroom before the school year started and who were students at PS 34K was Ms. Belfiore, who brought her two sons, ages 8 and 12. Another teacher who brought her underage 11-year-old daughter to set up her classroom was Ms. Visconti. Additionally, Ms. Marshall was permitted to bring her two young sons, ages 3 and 5 because she had no babysitter.

24.     In late August of 2016 before the 2016-2017 school year started, Defendant Asselta demanded that the children helpers leave Plaintiff's room immediately and instructed the School secretary, Ms. Tabala to call their parents and have them picked

up. Neither the custodian nor the school aid was asked to assist Plaintiff. No one assisted Plaintiff.

25.     In late August 2016, after Plaintiff's student helpers were sent home by Asselta, Plaintiff then called her Union representative, Ira Munet to relay what had just occurred and to inquire about what recourse she had. Ira Munet responded to Plaintiff that she only needed to have desks, chairs and books ready for students in order to begin the school year.

26.     This is a right that any teacher should be able to request to have the MOSL score calculation, formula, and who is responsible for the process, explained. Plaintiff was denied an explanation of the MOSL score calculation, formula, and who is responsible for the process by Asselta when she requested this in September 2016. Plaintiff did not prevent Defendant Asselta from explaining the MOSL score. This is a false statement that Asselta made during her deposition.

27.     However, those same New York State ELA and Math test scores were then permitted to be used for MOSL scores, using an obscure "black box" formula. This was after it was decided during the 2015-2016 school year, that the New York State test scores would no longer be used to calculate a teachers' overall rating.

28.     MOSL score calculations were never explained to Plaintiff. Plaintiff was responding to the rating in writing, as she is permitted to do. The rating was being disputed through the APPR process, until March 23, 2017.

29.     The Advance Guide has a generic explanation of the Advance Rating System used by the Department of Education, NYC. Plaintiff was not seeking a generic explanation, but a specific explanation for how her rating was calculated.

30.     One student whom Plaintiff had asked to assist her in carrying heavy piles of books was Rafal P., a student assigned to Plaintiff's classroom for the 2016-2017 school year. LoRe-DioGuardi, however, prevented him and other student helpers from carrying the heavy books by yelling loudly at them to put the books back. She also yelled loudly that if Plaintiff needs the books moved, she should do it herself. She yelled this to Plaintiff in front of her whole class, thereby humiliating her and diminishing her authority.

31.     Plaintiff states that none of what the Defendants reference in paragraph 47 of their 56.1 Statement occurred.

32.     Plaintiff overheard her students laughing at her and making statements out loud such as, "Ms. Zoulas is going to be fired, then we don't have to do any homework" in the lunchroom when she went to pick them up during the three-week period for which the witness statements were being collected. Additionally, Plaintiff has the right to bring order to her classroom by using a loud teacher voice, and that this does not constitute verbal abuse. Plaintiff used a loud teacher voice to say, "Three, Two, One", a verbal signal to students to be quiet. Plaintiff also used a loud teacher voice to say, "Sit down, go to your seat, be quiet" to students that were out of their seats and laughing during instruction. This does not constitute verbal abuse. Additionally, Asselta never offered assistance or support to Plaintiff concerning poor student behavior.

33.     Plaintiff asserts that it is not solely being placed on a TIP that constitutes age discrimination, but the totality of the fabricated letters for file, fabricated observation reports, undeserved ratings, TIP Plan, administrator behaviors and comments, age-related animus, issues with feedback, failure to support, denial of assistance, being told to ask young, inexperienced teachers for teaching advice, discriminatory system for notifying and sending staff for professional development

opportunities, notebook documenting of Plaintiff's statements and behavior, and other components of the First Amended Complaint, and the fact that ALL of this begin on or about the time Plaintiff turned 55 years of age on March 20, 2016, and not solely the TIP that constitutes age discrimination by Asselta.

34.     In paragraph 49 of the Defendants' 56.1 statement, Asselta claims that she drafted the TIP because she wanted to give Plaintiff every opportunity to succeed. Plaintiff was not in need of assistance after the 2015-2016 school year. Plaintiff received an Effective rating on her MOTP. Plaintiff received a Developing rating on her MOSL, which was an attributed score, in which she had no control over how other teachers taught in their classrooms. Plaintiff never received professional development concerning differentiation. Plaintiff was sent to a professional development entitled "RTI" which stands for Response to Intervention, a multi-tier approach to the early identification and support of students with learning and behavioral needs. During this professional development workshop, the instructor informed participants that the workshop was geared towards Special Education teachers and students. Plaintiff never taught special education students.

35.     Asselta repeatedly wrote in Plaintiff's observation reports that she did not differentiate when she did.

36.     Both administrators, Asselta and LoRe-Dioguardi entered Plaintiff's classroom on October 6, 2016, after Filip K. had knocked over the projector and stand. However, neither administrator offered any assistance during this situation, nor did they inquire as to what had occurred. Additionally, LoRe-Dioguardi went to the closet to look inside, then proceeded to look under the children's desks. Plaintiff was never told what

she was looking for in this bizarre manner, however, to Plaintiff it appeared that LoRe-Dioguardi was creating a scene and mocking the situation.

37.     Plaintiff states that neither administrator offered assistance or support on October 6, 2016 or at a later date, when Filip K. knocked over the projector stand in the classroom when he jumped out of his seat without permission and tripped.  Neither administrator spoke to the child, Filip K., nor called in his parent to review school rules. Neither administrator spoke to Plaintiff to offer support or assistance.

38.     The 2017-2018 school directories, in which Plaintiff's name had been omitted and instead had a row of stars in place of her name, were never collected. Teachers were never instructed that they received directories that had Plaintiff's name omitted and replaced by a row of stars, and that they should discard those directories.

39.     Plaintiff received numerous disruptive calls to her classroom, during the 2016-2017 school year asking for Ms. Larkin. During both school years, 2016-2017 and 2017-2018, Plaintiff was the only staff member who had errors concerning the staff directories.

40.     Sometime in December of 2017, when new directories were printed that were formatted in the customary manner and that included Plaintiff's name, LoRe-Dioguardi took them and threw them like a pile of trash in the corner of the teacher's room floor.

41.     In October of 2017, LoRe-DioGuardi instructed a school paraprofessional, to type a new staff directory, one that deviated significantly from the customary format. LoRe Dioguardi instructed the paraprofessional, Ms. Domarecki, to omit Plaintiff's name and that she should instead type a row of stars. Asselta testified falsely during her

deposition, that the error was immediately corrected, however, this never occurred. Plaintiff spoke to Asselta in her office on October 13, 2017, immediately after she received the directory with her name omitted. Additionally, Plaintiff filed two grievances, wrote 5 emails, and had a step-two grievance and still the directories were never collected. To this day, the directories were never collected, nor were teachers and staff informed that they should be discarded. New directories were not produced until mid-December, at least two full months later.

42.   Plaintiff never screamed at her students during this incident on October 20, 2016. Plaintiff utilized a microphone. Teri Mascioli was nowhere to be found when Plaintiff went to pick up her class after lunch, in the basement on that day. Teri Mascioli had abandoned her duties, but showed up after Plaintiff had quieted her class by using the microphone. Teri Mascioli, however, then emailed Asselta and lied that Plaintiff had yelled at her class over the microphone. Plaintiff found her class was screaming at the top of their lungs, and when she tried to tell them to be quiet, they were unable to hear her, nor did they respond to her presence in the basement. She then picked up the microphone and asked students to quiet down.

43.   All students were in the lunchroom at the time the screaming occurred on October 20, 2016. LoRe-Dioguardi entered Plaintiff's classroom at the end of the school day, and was able to see on the whiteboard, the words: Reflection Assignment, but proceeded to call it a punishment. Plaintiff contacted parents to cancel the assignment because LoRe-Dioguardi was calling it a punishment.

44.     Plaintiff, herself, did not apologize to parents for giving the reflection assignment and then cancelling it on October 20, 2016, as there was no need for this. It was an assignment that was being canceled.

45.     The workshop that is referenced in paragraph 57 of the Defendants' 56.1 statement, was called, RTI: Pathway to Positive Behavior Supports and Strategic Interventions. This workshop was geared towards special education teachers. Plaintiff is not a special education teacher nor does she teach special education children.

46.     The incident described in paragraph 59 of Defendant's 56.1 Statement of Facts never occurred. The parent and child fabricated this incident. Asselta, never came upstairs to Plaintiff's classroom to ascertain where the child, Aiden M. was moved to. During the meeting that was held on December 13, 2016, Plaintiff requested that Asselta come upstairs to her classroom so that Plaintiff can show her where she had moved Aiden M. to. He received a desk and chair and was placed next to Filip K. in the last row center of the classroom.

47.     Asselta did not follow standard procedure as is outlined in the Chancellor's Regulations, A-420 and A-421, for how to conduct a school investigation concerning the October 26, 2016 incident where it was alleged that Plaintiff placed a child in the corner.

48.     Plaintiff also overheard her students discussing the allegations in the lunchroom during the two weeks in which witness statements were being collected concerning the October 26, 2016 incident in which it was alleged that Plaintiff had put a child in the corner. Plaintiff overheard several of her students state that she was going to be fired. Also, she heard them laughing and saying," the corner, the corner, ha, ha, ha she put him in the corner. " Plaintiff felt humiliated by these comments.

49.    A colleague, Yolanda Zeiba, commented to Plaintiff later that afternoon on November 22, 2016, that she heard Plaintiff being summoned to the Principal's office by Asselta on the school intercom, and asked Plaintiff if something was wrong. The school intercom could also be heard outdoors because at the time there were speakers that connected the intercom system to the outdoors.

50.    Plaintiff was sent to this professional development  called RTI: Pathway for Positive Behavioral Supports and Strategic Interventions workshop on December 2, 2016, because she was on a TIP plan. However, this workshop was specifically geared for teachers with special education students. Plaintiff is not a special education teacher nor does she teach special education students.

51.    Jeannie Sheehan is a parent at the school and not a teacher. Jeannie Sheehan did not provide enough detail to this portion of her email to determine who and what she is referring to. We don't know what she means by "disrespectful" nor whom she believes she overheard Plaintiff talking about. Plaintiff denies that she was speaking about another teacher. Additionally Plaintiff denies that she was speaking "disrespectfully". Additionally, Plaintiff has never seen Ms. Sheehan in or near her classroom nor at the supermarket.

52.    With regards to the investigation that was conducted for the September 21, 2016 allegation about Plaintiff yelling and causing a child to cry, student witnesses were called in over a three-week period of time. This provided children an opportunity to discuss the investigation with each other before they were called in to write statements.

53.    Plaintiff does not scream at children. Plaintiff uses a loud teacher voice on occasion, in order to be heard above the loud classroom noise that occurs from time to time. Plaintiff has a duty to bring the classroom back to the instruction at hand when

students sidetrack and misbehave.  Plaintiff had consistently been given the most difficult-to-manage students on or about the time she turned 55 years of age. Additionally, Plaintiff was not given support in any manner, when children misbehaved.

54.    Defendant Asselta had begun creating a false narrative about Plaintiff after she turned 55 years of age, by spreading false rumors to parents and their children, then conducting investigations that violated the Chancellor's Regulations. Children believed that "the teacher" Plaintiff, would be fired and they wouldn't have any more homework.

55.    Asselta included language concerning Plaintiff's termination at the ends of the letters for file that she had written after Plaintiff turned 55 years of age, because Defendant Asselta was building a case against Plaintiff, in which an alternative narrative was created about Plaintiff and in which many details were fabricated.

56.    In late February 2015, Asselta attended a conference for elementary school principals led by then schools Chancellor, Carmen Farina on "How to Purge Bad Teachers". Politico News, then printed Farina's comments on how this is done. The methods described were the same as were used against Plaintiff.

57.    Both administrators, Asselta and LoRe-Dioguardi entered Plaintiff's classroom, on October 6, 2016 after Filip K. knocked over the projector stand. However, neither administrator offered any assistance during this situation, nor did they inquire as to what had occurred. Additionally, LoRe-Dioguardi went to the closet to look inside, then proceeded to look under the children's desks. Plaintiff was never told what she was looking for in this bizarre manner, however, to Plaintiff it appeared that LoRe-Dioguardi was creating a scene and mocking the situation. It was the Plaintiff who stated that the

Defendant Asselta's demeanor was accusatory when she entered Plaintiff's classroom that day.

58.     Plaintiff denies that she gave a punishment on October 20, 2016 after she had gone to pick the students up from the lunchroom and found them screaming at the top of their lungs. The word punishment as used in this instance was made up by LoRe-Dioguardi in order to create an alternative narrative that makes it appear that Plaintiff did something wrong when she didn't.

59.     A colleague, Yolanda Zeiba, commented to Plaintiff later that afternoon on November 22, 2016, that she heard Plaintiff being summoned to the Principal's office by Asselta on the school intercom, and asked Plaintiff if something was wrong.

60.     Defendant Asselta's comments are her opinion. A reflection assignment was appropriate and instructive after the children were found unsupervised and screaming at the top of their lungs in the basement on October 20, 2016. Children were asked to reflect on what had occurred and what could be done better next time. It was LoRe-Dioguardi that began calling the assignment a "punishment assignment". Then Asselta continued using this derogatory term. This was done to continue the false narrative that had been created against Plaintiff in order to accuse Plaintiff of doing something wrong.

61.     Plaintiff was sent to this professional development, Word Work and Word Play: Teaching Vocabulary with Fiction and Nonfiction Texts Grades K-5 workshop scheduled for January 31, 2017 because she was on a TIP plan.

62.     Plaintiff was not hired for this per-session work involving a state scoring position to grade ELA and Math, even though Plaintiff had prior experience in scoring

the New York State Tests. The requirement stated that the applicant needed to have an

Effective or Highly Effective rating.

63.     It is not reasonable to believe that Plaintiff would continue pursuing a

grievance concerning access to her teacher file for six months, had Defendant Asselta

provided her with it.

64.     Defendant Asselta has established a pattern of denying she received

documents through email. Additionally, Defendant Asselta has established a pattern of

harassing Plaintiff and retaliating against Plaintiff for exercising her union rights.

65.     Plaintiff denies that she screamed at the students on October 20, 2016

when students were screaming at the top of their lungs in the lunchroom. Plaintiff utilized

a microphone that was available, because students were not able to hear her when she

requested their attention. Additionally, children were not aware that Plaintiff had stepped

into the room to pick them up. A witness, school-aide, Ms. Lynn Shoresky who witnessed

the entire situation, was never questioned, even though Plaintiff had requested that she be

asked to give a statement.  Teri Mascioli gave a false statement to Asselta. Teri Mascioli

had left the children unsupervised. A reflection assignment was appropriate and

instructive after the children were found unsupervised and screaming at the top of their

lungs in the basement. Children were asked to reflect on what had occurred and what

could be done better next time. Plaintiff never asked the class parent to apologize to

parents. She only asked that she let them know the assignment was canceled. Defendant

Asselta did not address the students' inappropriate school behavior with the students.

Defendant Asselta, did not show support for Plaintiff, with regards to the behavior

management of students. Children were permitted to run through the school building,

screaming at the top of their lungs. This behavior was consistently witnessed and ignored by both administrators.

66.     Plaintiff declares that she never placed any child in the corner. This was a rumor perpetuated by the students due to Asselta spreading rumors about her to the parents. Additionally, Plaintiff states that both Aiden M. and his mother made false statements about Plaintiff to Defendant Asselta, who then made false statements to OSI. Plaintiff states that Asselta had been spreading false rumors about her to the parents and requested their assistance to "get rid" of her. Filip K. stated to his mother on January 30, 2017, that the principal wanted to "get rid" of Plaintiff and wanted him to help.

67.     Asselta's statements about a teacher moving desks is hypothetical and does not pertain to this particular incident. that was alleged to have occurred on October 26, 2016. Additionally neither Aiden M. nor his mother visited Plaintiff's classroom to identify where Aiden M. was asked to sit.

68.     The school principal, Asselta and Assistant Principal, LoRe-Dioguardi, have been directly involved with the harassment of Plaintiff and in many instances, initiated the harassment or instructed other Department of Education employees to contribute to the harassment, including Angelika Panek, the payroll secretary, Ms. Domarecki, Ms. Peluso, Teri Mascioli, Ms. Belfiore.

69.     Defendant Asselta most certainly received all the Step One grievances. Step One grievances are sent by the UFT. Additionally, Asselta was notified by the school chapter leader, Teri Mascioli.

70.     This letter for file dated December 19, 2016, should have been removed from Plaintiff's file. Department of Education refuses to remove letters to file for

procedural violations when they are required to do so. Just because the UFT chose not to pursue this matter further does not mean that there were no procedural violations.

71.    Plaintiff stated that the letter for file dated January 26, 2017, was based on a faulty investigation.

72.    Plaintiff still had two students to dismiss on February 14, 2017 when she was approached by LoRe-Dioguardi. With decades of school experience, LoRe Dioguardi , was aware that approaching a teacher to engage in conversation during dismissal is inappropriate and unnecessary. According to the CBA, all correspondence concerning schedule changes should be in writing.  On or about when Plaintiff turned 55 years of age, all of her comments began to be overly scrutinized. This had never occurred before.

73.    Defendant Asselta observed 20 minutes to the introduction portion of a math lesson. Children are not expected to do peer editing during this portion of the lesson. Instead, they are being given instruction on the skill, in this case commutative and associative property. Afterwards, children were asked to complete two checkmark problems in order for Plaintiff to ascertain which children did not grasp the concept and what type of support they would need. This method is the approach used by the "Go Math" Program that the school uses. Plaintiff was sent to Go Math training to learn this method. Plaintiff used her professional discretion to decide that students struggled long enough and needed to be given one of the answers to a math problem. Giving an answer is absolutely permitted when it is clear that children are "stuck". Asselta left the classroom immediately after Plaintiff circulated the room to see children's work on the two check-mark problems. Amanda Bueno is a middle school teacher and has no experience with younger children. Amanda Bueno never made any effort to assist

teachers at The School to use her middle-school math ideas for elementary-school children. At the time, none of the other fourth grade teachers believed Amanda Bueno had shared any ideas that they could use in the classroom. This included Ms. Martinez and Ms. Marshall. In addition, Amanda Bueno has difficulty with articulation, and therefore had difficulty conveying her ideas. Teachers were never given a directive by Asselta that we were required to incorporate certain math ideas from Amanda Bueno into our lessons. On March 17, 2017, it was the first time Asselta entered my classroom since the beginning of the school year in September 2016. She stayed for 25 minutes. The first 5 minutes were spent with students getting their notebooks and other materials out. It was Friday afternoon, and students had just come back from gym and were sweating, hot, and thirsty. This is the year Plaintiff was on a TIP Plan.

74.     LoRe-Dioguardi walked into Plaintiff's classroom on April 3, 2017 during a Math inter-visitation, talking on her cell phone, and stayed on the cell phone, talking in front of the students for the next three minutes. Students were staring and laughing.

75.     At the immediate moment when Asselta entered the classroom, on April 28, 2017, children had just returned from gym and were "dripping in sweat". Plaintiff informed Asselta that children needed several minutes to transition back to work. Plaintiff observed that Asselta had been waiting by the stairs, then entered her classroom immediately as soon as children walked into the room from gym. Plaintiff explained to Asselta that children needed a few moments to transition, but Asselta refused to speak to Plaintiff nor look in her direction to acknowledge her. Thereby, Asselta behaved in a hostile manner towards Plaintiff. Asselta, never once spoke to students nor did she ask for a lesson plan. A read aloud with questions and discussion is instruction.

76.     It is at the teacher's professional discretion to plan for the allocation of time during the children's school day. It is not feasible to review all homework as "lessons". Additionally, if in the teacher's professional observation, children need more time with a topic or skill, the teacher can plan for review lessons that properly address those needs.

77.     Asselta did observe a lesson on April 28, 2017.

78.     Asselta was also notified of the Step 1 grievance. Asselta harassed Plaintiff by making Plaintiff wait 6 weeks to have the requested, expired material removed.  Additionally, Plaintiff had to travel once again to downtown Manhattan to attend a Step 2 grievance. Each time Plaintiff traveled to a Step 2 grievance, her students had to be left with a substitute teacher for most of the school day.

79.     Asselta was given a blank copy of the assessment sheet that would be used for this lesson on May 17, 2017. Plaintiff then used the assessment sheet to jot down her personal notes and observations of the student work as Plaintiff circulated the room. Teachers are not expected to share their personal notes with an administrator nor is an administrator supposed to ask for that. Additionally, Plaintiff gave Asselta completed student work from the lesson from each child, which is an assessment of student work and learning. Asselta reviewed the lesson plan during the Pre-Observation Conference and approved it in its entirety, but then claimed in the Post-Observation Conference that it was not "rigorous". When Plaintiff went into Asselta's office for the post-observation conference. Asselta proceeded to berate Plaintiff's lesson, undeservedly and falsely.

80.     Asselta stated that she was aware of Plaintiff's Special Harassment Complaint, but stated that she doesn't remember Plaintiff stating anything about age. This

was a "Special Harassment" Complaint as per UFT teacher's contract that was filed by

Plaintiff during the 2016-2017 school year. This was not the proper venue for a complaint

for age discrimination. Plaintiff was told by her union representative, Ira Munet, to jot

down all incidents of harassment that had occurred and state when they occurred.

81.    Asselta was under severe emotional duress in May and June of 2017. This

was because her mother was suffering a terminal illness. Asselta refused to allow LoRe-

Dioguardi to conduct the observation and instead drove to the school from her home in

Staten Island on June 1, 2017, to conduct Plaintiff's required 4th observation on the

deadline date of June 1, 2017. At that moment, Asselta's mother was deathly ill and in

fact died the following morning on June 2, 2017. During the lesson observation, Asselta

appeared upset and sad. Although Asselta's mother's death was very sad news, it was

inappropriate for Asselta to conduct this observation under duress. Plaintiff disputes the

comments that Asselta made on this observation report for this lesson as being untrue and

unsubstantiated. Nowhere in the observation report does Asselta state that the lesson was

on "Book Clubs". None of the comments were factual and additionally, were written in

vague, subjective terms. None of Plaintiff's questions were cited nor were any student

responses.

82.    Asselta gave a Developing rating for component 1e (p&p) on the June 1,

2017 lesson observation, which is for punitive purposes. She provided no evidence that

she witnessed something concerning Plaintiff's designing coherent instruction within 15

school days of this observation.

83.    However, after Plaintiff sent Asselta 8 dozen artifacts to support her work on

the TIP plan, Asselta called her into her office and complained to Plaintiff that she was

confused and didn't know why Plaintiff sent the artifacts to her.

84.     Plaintiff provided the investigator, Mr. Kshensky with the name and phone number of Mrs. Kaminski., the parent that discussed with Plaintiff that her son, had told her that "The principal is trying to get rid of Ms. Zoulas and she wants me to help her." However, he claimed in the Special Complaint Decision that Plaintiff did not provide any witnesses, however, she most certainly did. Additionally, the Chancellor's representative, Mr. Lichtenstein, called her complaints, "slights", which shows he was mocking Plaintiff.

85.     As per UFT protocol, Asselta was emailed the Step One grievance by the UFT, concerning the Staff Directory that had Plaintiff's name omitted and replaced with a row of stars. The directory had been distributed on October 13, 2017. Plaintiff made a verbal complaint to Asselta immediately after the incident occurred.

86.     LoRe-Dioguardi refused to approve the trip to Brooklyn Bridge Park, which was submitted on November 3, 2017, without any basis, and instead brought the trip request into Asselta's office. The trip did not interfere with any school functions as it was a morning trip that lasted from 9:30 a.m. to 12:00 noon, nor did Plaintiff request any chaperones. These excuses are baseless. Neither LoRe-Dioguardi nor Asselta discussed the trip with Plaintiff, but instead ignored the Step One grievance request that was sent to Asselta as per UFT protocol. Plaintiff had no choice, but to go through the grievance process in order to eventually get approval for the trip. Both administrators behaved in an extremely hostile manner towards Plaintiff with regards to this school trip. This did not happen to other teachers that submitted trip plans. Plaintiff was harassed for two months, in order to get approval for this school trip.

87.     When Asselta came to Plaintiff's room on January 22, 2018 with an unannounced guest, Plaintiff asked her who the guest was, but Asselta looked at the guest

then they both laughed as if something was funny about Plaintiff's question. She never answered Plaintiff's question. Asselta embarrassed Plaintiff in front of this guest and in front of Plaintiff's students.

88.   Asselta made comments on the observation report about parts of the lesson she did not observe because she chose to leave the room 15 minutes after the lesson had begun.  This was concerning the January 31, 2018 lesson observation. This math lesson took 65 minutes of time to complete.

89.   Asselta made untruthful comments throughout the lesson observation that was conducted on January 31, 2018, including vague and untruthful comments in section 4e (p&p) which is a section that is used for a punitive purpose.

90.   Asselta made the following vague, untruthful, and unsubstantiated comments in section 4e (p&p) of the January 31, 2018 lesson observation report, "The teacher makes no effort to share knowledge with others or to assume professional responsibilities. The teacher resists feedback on teaching performance from either supervisors or more experienced colleagues. Teacher becomes irate with administration and staff."

91.   After Plaintiff received feedback from Asselta for the January 31, 2018 lesson observation, Plaintiff sent several emails to Asselta concerning the feedback. Plaintiff stated in the email that the feedback was given three weeks after the math lesson. Students had long since completed the entire math chapter and had been given a formal assessment on it, in which they had performed very well. The feedback was therefore outdated.

92.     Plaintiff is stating that Asselta has made numerous statements on the observation report for the January 31, 2018 observation, that are out of context as well as numerous opinion statements with no supporting documentation. For example, it says in 1e (obs.) that, "Some of the learning activities and materials are aligned with the instructional outcomes and represent a moderate cognitive challenge." However, Asselta does not explain which ones she is referring to. In 3d(obs.) Asselta states, "Students do not appear to be aware of assessment criteria." Yet Asselta did not question any children about this, but instead gave her opinion of how it "appeared."

93.     On or about the time Plaintiff turned 55 years of age, Asselta began documenting many of her comments in a special notebook. Asselta was not taking notes, she was documenting. During informal conversations, Asselta, would take out the special notebook in mid conversation and write down a phrase or particular comment that Plaintiff made. One example was when Plaintiff was receiving feedback for a previous observation and defended herself by stating she is a good teacher, Asselta took out the special notebook from her desk drawer and wrote down this comment. On another occasion, Plaintiff was complaining to Asselta about the overall behavior of children in the school building, by stating they were behaving "wildly". Asselta immediately took out her special notebook from her desk, and wrote down the word, "wildly". However, Asselta never offered Plaintiff a solution or assistance.

94.     Plaintiff disputes that the child, Raymond C., was directed to disobey. This is not referenced in the email Plaintiff sent to Asselta on February 27, 2018. Mr. John Guito, the new counselor, had made a false statement to Plaintiff while he was in her classroom observing Raymond C., that the child, Raymond C., was sitting in the

corner. Plaintiff corrected him and noted the child was indeed sitting in the front towards

the middle. Plaintiff believes that the comment was so bizarre and inaccurate that she

believes that Mr. John Guito was instructed by Asselta to harass her and make false

accusations.

95.    Plaintiff recalls the particular students who were yelled at by LoRe-

Dioguardi in front of the entire school, in the basement were very upset and vocalized

this to Plaintiff immediately after it occurred. The students were Meagan T. on February

28, 2018 and Jan B. and Raymond C. on March 1, 2018. As Plaintiff led students through

the basement to go to their classrooms, LoRe-Dioguardi yelled loudly, "Meagan, why are

you talking?" But, Meagan is shy and only whispers. LoRe-Dioguardi did not scream at

students from other classes in this aggressive and publicly- displayed manner.

96.    Asselta had begun harassing Mr. Raul Fantuzzi for the previous two years

as a pattern of age discrimination. Additionally, Asselta had told several parents that she

wanted to get rid of Mr. Fantuzzi and needed their help. Plaintiff witnessed one such

parent, Ms. Khamo, had become very argumentative and rude towards Mr. Fantuzzi and

began following him around with her camera-phone. Mr. Fantuzzi was not sleeping. He

had shut his eyes for two seconds, momentarily. as people do occasionally, especially if

they wear glasses.

97.    There was another screaming incident in the basement during morning

line-up where once again, LoRe-Dioguardi screamed very loudly at the same child,

Meagan T. on March 15, 2018 in an aggressive and publicly-displayed manner. This

happened immediately the day after Plaintiff sent an email to Ms. Peluso, asking her to

stop interfering with her class

98.     On Friday, March 23, 2018, Ms. Panek, the school secretary and LoRe-DioGuardi demanded that Plaintiff sign for an observation report after Plaintiff had already signed out for the day. This is not the correct protocol for delivering an observation report to a teacher.  Nor is there any urgency to obtain a signature since the reports are already posted online on the Advance website under each teacher's individual account. I had already signed out for the day when the secretary, Ms. Panek literally shoved the document towards me. March 23, 2018 was a Friday, therefore both Ms. Panek and LoRe-dioguardi demanded that I sign for the observation report after my weekend had already started. LoRe-Dioguardi became visibly irate when I explained to her that I had already signed out for the day and that I could sign for the report on Monday.

99.     A secret message was later written at the top of the observation report, for the January 31, 2018 lesson observation, without the Plaintiff's knowledge. Plaintiff didn't realize until the end-of-year summative conference that there were two versions of this observation report, one with a secret note written at the top and one without the secret note.

100.     On the March 28, 2018 lesson observation report, Asselta advised Plaintiff to seek the advise of Ms. Lodola, a then 35 year-old ICT teacher with less than one year of teaching experience. Ms. Valentina Lodola-Rahaman graduated from high school in 2001, as confirmed on her Linkedin account. During the 2017-2018 school year Plaintiff did not have any special education students in her classroom nor students with academically-focused IEP's. Additionally, should Plaintiff have needed assistance with a special education student, Asselta could have referred her to Ms. Iwona

Borys who was the head of special education at the school and who had serviced many of Plaintiff's at-risk students over the years. Asselta could also have referred Plaintiff to a then 55-year-old teacher who was co-teaching with Ms. Lodola, Ms. Panopoulos. Asselta once-again made comments that were out of context, opinion-oriented, and had no documentation to support them. For example, in 3d, Asselta stated that, "Students appear to be only partially aware of assessment criteria." However, Asselta never discussed this with any of the students. All students were aware of the assessment criteria because this had been reinforced on a daily basis since the beginning of the school year. In 3d, Asselta also stated that "Teacher monitors student learning for the class as a whole." This is absolutely false. Plaintiff attends to each student, individually, and this was evident during the lesson and in all Plaintiff's lessons. Asselta also stated that, "Teacher uses a stamp which says "Super" as the assessment for student understanding." This was written out of context. Plaintiff doesn't solely use a stamp, but uses it in conjunction with a quick discussion with each student on what went well on the two check-mark problems and where there was a misunderstanding or in what capacity the student needs more support. In 3c, once again, Asselta states, "The learning tasks are partially aligned with the instructional outcomes, but require only minimal thinking by students." However, this is not true. The lesson and all the tasks are from the Go Math Program that Asselta has the entire school using. Additionally, when reviewing the lesson in it's entirety, you can see there are many opportunities for students to extend their thinking, and additionally to work on an enrichment activity, which is attached to every math lesson. For students that need additional support, Plaintiff offers a reteach sheet where she models the skill again.

Additionally, Plaintiff uses flexible grouping during every math lesson, which is a differentiation technique.

101.    Once again, on the March 28, 2018 lesson observation report, Asselta claimed that Plaintiff did not differentiate when she did. The differentiation is built into the Go Math Program for each lesson. There are multiple opportunities for early finishers to think more deeply and for struggling students to receive more assistance in the form of reteach, teacher modeling, and manipulatives that are available and used for every lesson. Asselta consistently arrives to watch the first fifteen minutes of a math lesson, then chooses to leave rather than observe the entire lesson. Then she claims she didn't "see" any differentiation. She didn't see it because she wasn't there, and she didn't look.

102.    On May 8, 2018, Ms. Panek, the school secretary, was sent to Plaintiff's classroom by Asselta, while Plaintiff was teaching, to obtain a signature for an observation report. Plaintiff was unable to sign for the report because she was teaching her class. Asselta had then instructed the school-secretary, Ms. Panek to write a secret notation at the top of the observation report. Plaintiff was never made aware of this alteration until the end-of-year summative conference when she was asked to sign for her MOTP rating.

103.    On May 8, 2018, Ms. Panek had entered Plaintiff's classroom while Plaintiff was in the middle of instruction. Plaintiff did not speak to Ms. Panek, but instead used hand gestures to say "no" and waved her hand for her to leave. Plaintiff, then turned around to avoid any further distraction, and continued teaching. Plaintiff denies that she refused to sign this document. Plaintiff was unable to sign at that moment. The hand-

written note that was secretly written at the top of the March 28, 2018 observation report was malicious and false.

104.    Each time Plaintiff tried to explain something to Asselta, she would take out her special notebook and document Plaintiff's comments. For example, Asselta brought up that a student, Jan B., had wanted to comment during the lesson introduction, Plaintiff explained to her that she was well aware that Jan B. consistently disrupted Plaintiff's lessons with distracting, off-handed comments. Plaintiff tried to explain that it is within her professional discretion on how to handle this type of situation and that she chose to redirect the child at that moment, and that Jan B. was given a chance to express his ideas later on in the lesson when Plaintiff believed it was less distracting to her. Asselta then proceeded to write down that Plaintiff ignored Jan B., which is completely false.  In component 3d, Asselta wrote that Plaintiff monitors student learning for the class as a whole, even though Plaintiff spent the majority of the lesson working with each group individually, supporting, questioning, eliciting ideas, and further discussing the activity with them.

105.    Plaintiff planned for multiple entry points during the May 18, 2018 formal lesson observation This was done by providing careful grouping of students, differentiated questioning by Plaintiff for each group and each student during the science activity, a higher-level science extension activity for more advanced students, and additional support for students that needed it. Multiple entry points is another term for differentiation.

106.    The lesson conducted by Plaintiff on June 1, 2018 was taught in the same manner and style, as previous lessons that were rated with developing and ineffective components.

107.    On June 11, 2018, during Monday's faculty conference, Asselta had another conversation with the staff about the school budget. It constituted intimidation and harassment of older staff because there is an implication there that older, higher-salaried teachers were partly to blame. Additionally, after this announcement, teachers did talk amongst themselves about the fact that at PS 34K, there are a lot more senior teachers than at other schools. Only newly-hired or least senior teachers could possibly be affected by excessing, a process of reducing staff in excess, or layoffs since the Department of Education uses a seniority system for this. There was no need to announce this to all the staff.

108.    On the Advance website, however, Asselta had posted the version of these two observation reports that were without the hand-written notations. Thereby, these other versions with the secret notations were being kept without Plaintiff's knowledge. The two observation reports being referenced here are for the observations conducted on January 31, 2018 and March 28, 2019.

109.    Plaintiff had a new, functioning printer until in 2016 when LoRe-Dioguardi instructed the custodian to remove it from her classroom, after Plaintiff had gone for the day. The following morning, Plaintiff found her printer gone, and instead there was a broken printer that looked like hers, but had a different serial number.

110.    Plaintiff believed that Asselta thought of her as a dinosaur because of constant comments about younger teachers, including being told several times to ask

young teachers in their early 20's or 30's and with virtually no school experience, for ideas to improve her teaching.

111.   There were many times after Plaintiff had turned 55 years of age on March 20, 2016, that Asselta referred to her as a veteran teacher and told her that she's getting up there and should just retire.

112.   Asselta would also make constant references to young people as she addressed the staff during faculty conferences after March of 2016. Asselta would make statements about how much she admired young teacher's energy and how they tied their hair up in a pony tail on top of their head and that they looked so youthful and cute. Asselta would make these comments on a regular basis. Additionally, Plaintiff was at the time and still is one of the oldest two or three teachers at the school.

113.   Since Ms. Czastkiewicz agreed to retire at the end of the 2014-2015 school year, she was given an overall Effective rating. Plaintiff testified that she observed both administrators targeting Ms. Czaskiewicz and that she cried often about being constantly told she could not teach effectively. Additionally, Plaintiff spoke with Ms. Czaskiewicz directly about this situation. Ms. Czastkiewicz was replaced with a 23-year old teacher, Ms. Sasiela, who was asked to teach the Dual Language Program.

114.   From the years 2015-2018, looking at the organization sheets, the number of teachers earning over $100,000 would be about 20, not 15.

115.   Younger teachers were sent out for professional development significantly more often between the 2016 and 2019 school years. During this same period of time, Plaintiff was not sent to any outside professional development opportunities, except for three during the year Plaintiff was placed on a TIP Plan.

116.    Plaintiff was never made aware that some teachers had an open dialogue with Asselta and LoRe-Dioguardi about professional development opportunities. Plaintiff obtained this information for the first time during the discovery process for this lawsuit.

117.    Neither Asselta nor LoRe-Dioguardi discussed with Plaintiff that she should forward to them professional development opportunities.

118.    Asselta did not have an "Open Door" for Plaintiff as she stated. Asselta provided no path for professional development opportunities except that it was within her sole discretion who would be invited and with whom she had an open dialogue. What Plaintiff was not receptive to was the false statements that were being made by Asselta and LoRe-Dioguardi about her teaching and professional conduct.  Plaintiff was also not receptive to the age-related animus, harassment, and ongoing retaliation.

119.    Plaintiff has asserted on several occasions that she was denied outside professional development opportunities because she was targeted for age discrimination.

120.    The comments that were made by Asselta during her deposition and that are stated on page 335, lines 13-21 of that deposition are hypothetical and do not reflect what actually occurred. Asselta had stated that if a teacher ever asked her for a professional development opportunity, she would get it for them.

121.    Asselta stated to the staff during a faculty conference in May of 2016, that she had already decided who she was giving the STEM lab position to. Then she paused and scanned the room to make sure everyone heard her.

122.    Ms. Marshall was trained by the sustainability coach after she was selected for the position to lead the STEM lab. So, in effect, she did not qualify at the time she

applied until and when she received the training.  At the time, Ms. Marshall was about 33 years old.

123.    Plaintiff through discussions with Ms. Kubis, expressed further interest in teaching the Green Stem Program and specifically discussed and expressed with Ms. Kubis an interest in taking over the program after she left. Ms. Kubis then recommended Plaintiff to LoRe-Dioguardi, but LoRe-Dioguardi chose Mr. Granito to take over the position instead.

124.    Attached hereto as **Exhibit "A"** is a true and correct copy of a document with number 1-23 (2016-2017 Advance Guide).

125.        Attached hereto as **Exhibit "B"** is a true and correct copy of a document with number 1-7 (NYS Certificates and Zoulas Note).

126.        Attached hereto as **Exhibit "C"** is a true and correct copy of a document with number 1-13 (End-Of-Year Conference 2018 Transcript).

127.        Attached hereto as **Exhibit "D"** is a true and correct copy of a document with number 1-2 (Sheri Lederman Article).

128.        Attached hereto as **Exhibit "E"** is a true and correct copy of a document with number 1-3 (OSHA/UFT Bathroom Law).

129.        Attached hereto as **Exhibit "F"** is a true and correct copy of a document with number 1-13 (Zoulas Emails).

130.        Attached hereto as **Exhibit "G"** is a true and correct copy of a document with number 1-16 (Chancellor's Regulation A-420).

131.        Attached hereto as **Exhibit "H"** is a true and correct copy of a document with number 1 (Signed Letter From Parents).

132.     Attached hereto as **Exhibit "I"** is a true and correct copy of a document with number 1-2 (Rebuttal Document April 28, 2017).

133.     Attached hereto as **Exhibit "J"** is a true and correct copy of a document with number 1-4 (2017 Staff Directory with Stars, 2016 Staff Directory).

134.     Attached hereto as **Exhibit "K"** is a true and correct copy of a document with number 1-48 (PD Documents for Younger Teachers).

135.     Attached hereto as **Exhibit "L"** is a true and correct copy of a document with number 1-2 (Sierra Jorgensen Letter).

136.     Attached hereto as **Exhibit "M"** is a true and correct copy of a document with number 1-12 (CBA Article 7 at C1h(1)).

137.     Attached hereto as **Exhibit "N"** is a true and correct copy of a document with number 1-7 (Politico Article: The Farina Method of Purging Bad Teachers).

138.     Attached hereto as **Exhibit "O"** is a true and correct copy of a document with number 1-3(Ms. Brahmstedt PD: Explicit Instruction).

139.     Attached hereto as **Exhibit "P"** is a true and correct copy of a document with number 1-4 (Witness Statements for 10/26/16 Incident).

140.     Attached hereto as **Exhibit "Q"** is a true and correct copy of a document with number 1-4 (Zoulas Step 1 and Step 2 Grievances).

141.     Attached hereto as **Exhibit "R"** is a true and correct copy of a document with number 1-2 (UFT November 13, 2017 Appeal Hearing Decision).

142.     Attached hereto as **Exhibit "S"** is a true and correct copy of a document with number 1-6 (PERB Improper Practice Case U-36-304).

143.     Attached hereto as **Exhibit "T"** is a true and correct copy of a document with number 1 (UFT Document: Can I Grieve A Letter To File).

144.     Attached hereto as **Exhibit "U"** is a true and correct copy of a document with number 1-6 (Rebuttal To March 17, 2017 Lesson Observation & Notes).

145.     Attached hereto as **Exhibit "V"** is a true and correct copy of a document with number 1-5 (Zoulas Notebook Journal Notes).

146.     Attached hereto as **Exhibit "W"** is a true and correct copy of a document with number 1-20 (Sample of Artifacts).

147.     Attached hereto as **Exhibit "X"** is a true and correct copy of a document with number 1-4 (Calculation Conversion For 2016-2017 MOTP).

148.     Attached hereto as **Exhibit "Y"** is a true and correct copy of a document with number 1 (Carmen Asselta Summons).

149.     Attached hereto as **Exhibit "Z"** is a true and correct copy of a document with number 1-3 (Wiktoria G. and Rafal P. Affidavits).

150.     Attached hereto as **Exhibit "AA"** is a true and correct copy of a document with number 1-18 (2017-2018 Advance Guide).

151.     Attached hereto as **Exhibit "BB"** is a true and correct copy of a document with number 1-25 (Pre-Observation Conference 2018 Transcript).

152.     Attached hereto as **Exhibit "CC"** is a true and correct copy of a document with number 1-16 (Chancellor's Regulation A-421).

153.     Attached hereto as **Exhibit "DD"** is a true and correct copy of a document with number 1 (CBA Article 21 at A5).

154.     Attached hereto as **Exhibit "EE"** is a true and correct copy of a recording with number 1 (Pre-Observation Conference 2018 Recording).

155.     Attached hereto as **Exhibit "FF"** is a true and correct copy of a recording with number 2 (End-Of-Year Conference 2018 Recording).

156.     Attached hereto as **Exhibit "GG"** is a true and correct copy of a document with number 1-7 (UFT Q&A on Excessing).

157.     I have read the forgoing (155) paragraphs and they are true and accurate to the best of my personal knowledge.

Dated: March 22, 2021                              Respectfully submitted,

_____

Peggy Zoulas
130 Noble Street, #2
Brooklyn, New York 11222
917-647-8241

Signed /s/ Peggy Zoulas