UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/1/2021
```

--------------------------------------------------------------- X
                                :

PEGGY ZOULAS,                      :
                                :
                      Plaintiff,   :          1:18-cv-2718-GHW
                                :
         -against-             :          <u>MEMORANDUM</u>
                                :         <u>OPINION AND ORDER</u>
NEW YORK CITY DEPARTMENT OF     :
EDUCATION,                   :
                                :
                      Defendant.  :
                                :
-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

      This case arises out of a soured relationship between a teacher and her principal. Plaintiff

Peggy Zoulas is an elementary school teacher in New York City. She alleges that, shortly after she

turned 55, the principal at her school began to treat her unfairly. According to Zoulas, that principal

began to call her "old" and a "veteran teacher," and to discriminate against her by giving her

negative performance reviews. She says that when she complained to the New York State Division

of Human Rights (the "SDHR"), she received further negative performance reviews and was the

victim of a series of subtle administrative slights. Those performance reviews and slights, Zoulas

argues, amounted to retaliation and, coupled with other conduct, created a hostile work

environment.

      Zoulas alleged facts in her complaint that plausibly entitled her to relief under the Age

Discrimination and Employment Act (the "ADEA"). On summary judgment, however, she has

failed to point to evidence in the record that would permit a reasonable jury to find in her favor.

She has failed to demonstrate that she suffered an adverse employment action within the ADEA's

limitations period, which renders her discrimination claim time-barred. To support her retaliation

and hostile work environment claims, she has come forward with evidence of conduct that, while

subjectively distressing to Zoulas, falls short of the objective standards applied to such claims. Although Zoulas has presented many complaints about her supervisors and students, as well as evidence that one of her supervisors made ageist comments about her, "it is not the province of the Court to sit as a super-human resources department." *Lewis v. Two's Co.*, No. 7:06-cv-4775 (WWE), 2008 WL 6192169, at *5 (S.D.N.Y. Mar. 16, 2008). The ADEA does not burden federal courts with resolving run-of-the-mill workplace conflicts or punishing employers for bureaucratic inefficiency. Because Zoulas's arguments in opposition to this motion rest on conduct that no reasonable jury could find sufficiently retaliatory or abusive to support a claim under the ADEA, the defendant, the New York City Department of Education (the "NYCDOE"), is entitled to summary judgment on Zoulas's retaliation and hostile work environment claims. Accordingly, the NYCDOE's motion for summary judgment on all three of Zoulas's claims is GRANTED.

## I.    BACKGROUND

### A.    Facts[1]

#### 1.    Zoulas and Her Colleagues

Plaintiff Peggy Zoulas is an elementary school teacher employed by the New York City Department of Education. Dkt. No. 121, Pl.'s Rule 56.1 Resps. ("Pl.'s 56.1 Stmt.") ¶ 8. Zoulas was born in 1961. *Id.* ¶ 7. She has worked at P.S. 34 Oliver H. Perry since February 2000. *Id.* ¶ 8.

From the summer of 2012 until approximately January 2021, P.S. 34's principal was Carmen Asselta. *Id.* ¶ 9; Dkt. No. 122, Decl. of Peggy Zoulas ("Pl.'s Decl.") ¶ 2. Asselta was born in 1966. Pl.'s 56.1 Stmt. ¶ 9.

From approximately 2002 until after the 2017–18 school year, P.S. 34's assistant principal

---

[1] On summary judgment, the Court views the facts in the light most favorable to the non-moving party. *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). Because this is the NYCDOE's motion, the following summary is based on undisputed facts, where they exist, and on Zoulas's version of events where the facts are disputed. The Court has identified the disputed facts.

was Maria LoRe-Dioguardi.  Dkt. No. 111-04, LoRe-Dioguardi Dep. 19:22–24; Pl.'s 56.1 Stmt. ¶ 10.

LoRe-Dioguardi was born in 1961.  Pl.'s 56.1 Stmt. ¶ 10.

### 2.  Ageism

On "many occasions" after Zoulas turned 55, Asselta referred to Zoulas a "veteran teacher"

and said that Zoulas was "getting up there and should just retire."  Pl.'s Decl. ¶ 111; *see also* Dkt. No.

111-05 ("Pl. Dep.") at 59:8–13 (testifying that Asselta called her a "veteran teacher . . . quite often").[2]

On at least one occasion, Asselta told Zoulas that she was "getting up there," "should know better,"

and had "been teaching for a long, long time."  Pl. Dep. 59:11–13.  Zoulas had never heard Asselta

refer to any other teacher as a "veteran teacher."  *Id.* at 59:19–20.  At faculty conferences, Zoulas

overheard Asselta make positive comments about the appearance and energy of younger members

of the faculty.  Pl.'s Decl. ¶ 112.

At one faculty conference in June 2018, Asselta discussed the school's budget.  *Id.* ¶ 107.

Zoulas felt that by discussing the school budget, Asselta was harassing older members of the faculty,

"because there is an implication that older, higher-salaried teachers were partially to blame" for the

school's expenses.  *Id.*  If the school needed to cut jobs, "[o]nly newly-hired or least senior teachers"

were at risk, so Zoulas did not feel that it was necessary for Asselta to discuss the school's budget

with more senior faculty members such as herself.  *Id.*

On several occasions, LoRe-Dioguardi asked Zoulas when she graduated from high school

and what materials she used in grade school.  Dkt. No. 111-5 at 58:17–19.  She said that Zoulas

"must remember the books about Dick and Jane from the 70s."  *Id.* at 58:19–20.  Zoulas did not

respond to those comments.  *Id.* at 58:22.

---

[2] This is disputed.  Asselta testified that she never told Zoulas that she was "getting up there," a "veteran teacher," "too old for this job," or that "she should just retire."  Dkt. No. 111-6, Asselta Dep. at 114:14–116:7.

### 3.      Performance Ratings and Improvement Plan

Under New York State law, public school teachers are required receive annual performance ratings.  *Id.* ¶¶ 13–14.  Those ratings are computed according to what is known as the "Advance" teacher development and evaluation system.  *Id.  See generally* Dkt. No. 111-09, Advance Guide for Educators ("Advance Guide").  The ratings are numerical but correspond to one of four ranges on a "High effective, Effective, Developing, or Ineffective"—or "HEDI"—scale.  Pl.'s 56.1 Stmt. ¶ 14.  The highest ratings fall in the "high effective" range; lower ratings, into the "effective" range; still lower ratings, into the "developing" range; and the lowest ratings, into the "ineffective" range.  *Id.*  A teacher who receives an overall rating in the "developing" or "ineffective" ranges will be placed on a teacher-improvement plan ("TIP") the following year.  *Id.* ¶ 24.

A teacher's overall annual rating is a weighted average of three sub-ratings:  the Measures of Teacher Practice ("MOTP") rating and the two Measures of Student Learning ("MOSL") ratings.  *Id.* ¶ 15.  The MOTP rating accounts for sixty percent of a teacher's overall rating and is based on observations of the teacher's classroom.  *Id.* ¶ 16.  The MOSL ratings account for forty percent of a teacher's overall rating and are based on a comparison of students' performance on certain assessments at the beginning of the school year with their performance on those assessments at the end of the school year.  *Id.* ¶ 17; Advance Guide at 12.  The Advance guidelines for the 2015–16 school year stated that teachers should receive their MOTP ratings by June 28 and their MOSL ratings (and, hence, their overall ratings) by September 1.  Advance Guide at 19.

The MOTP rating, like the overall rating, is a numerical rating that corresponds to one of four ranges on a "HEDI" scale.  *See, e.g.,* Dkt. No. 111-12 at 13.  The MOTP rating is a weighted average of scores assigned in several categories, over the course of several classroom observations.  *See* Pl.'s 56.1 Stmt. ¶ 16; Advance Guide at 6–7.  After each observation, the administrator who conducted the observation must provide feedback to the teacher she observed.  Advance Guide at 9.

That feedback must align with the categories for which the administrator has provided ratings. *Id.* The purpose of the feedback is to "establish[] the link between evaluation and development." *Id.*

The MOSL ratings, like the MOTP rating and the overall rating, are numerical ratings that correspond to four ranges on a "HEDI" scale. *See, e.g.,* Dkt. No. 111-12 at 13. The MOSL ratings ordinarily comprise the "State Measures" and the "Local Measures," each making up twenty percent of a teacher's overall rating. Advance Guide at 12. The State Measures "include state-determined measures (e.g., state tests), and for some grades and subjects, a list of allowable assessments (which are selected by principal when available)." *Id.* The Local Measures "include options chosen from a state-approved list by the school's Local Measures Committee and submitted to the principal, who may accept the recommendation or opt for the Local Measures default (school-wide) measure." *Id.*

During the 2013–14 school year, Zoulas's teaching observations were conducted by Asselta. Pl.'s 56.1 Stmt. ¶ 25. Zoulas's ratings in each category over the course of four evaluations produced an MOTP rating of forty-eight out of sixty, which fell in the "effective" range. Dkt. No. 111-11 at 13. Her State Measures rating was thirteen out of twenty, which fell in the "developing" range. *Id.* at 14. Her Local Measures rating was seventeen out of twenty, which fell in the "effective" range. *Id.* Combined, her MOTP and MOSL ratings produced an overall rating of seventy-eight out of one hundred, which fell in the "effective" range. *Id.*

During the 2014–15 school year, Zoulas's teaching observations were again conducted by Asselta. Pl.'s 56.1 Stmt. ¶ 26. Zoulas's ratings in each category over the course of four evaluations produced an MOTP rating of forty-seven out of sixty. *Id.* Her State Measures rating was seventeen out of twenty, and her Local Measures rating was thirteen out of twenty. *Id.* All three of these ratings fell in the "effective" range. *Id.* Combined, they produced an overall rating of seventy-nine out of one hundred, which fell in the "effective" range. *Id.*

During the 2015–16 school year, Zoulas's teaching observations were again conducted by

Asselta. *Id.* ¶ 29. Asselta observed Zoulas's teaching on February 29, 2016, April 8, 2016, May 31, 2016, and June 2, 2016. Dkt. No. 111-14 at 2, 4, 6, 8. Zoulas's ratings in each category over the course of those evaluations produced an MOTP rating of forty-five out of sixty, a two-point drop from the year prior but still within the "effective" range. *Id.* at 14. Her Local Measures rating was fourteen out of twenty. *Id.* at 13. She did not receive a State Measures rating because all State Measures ratings were dropped that year "due to transition rules," which stated that "any measure based 50% or more on 3–8 math and/or ELA state assessments is excluded" from teachers' overall ratings. *Id.* Her overall rating was fifty-nine out of eighty points, or seventy-four out of one hundred points, which fell in the "developing" range. *Id.*

Under DOE rules, a teacher who receives an overall rating in the "ineffective" or "developing" ranges is placed on a TIP. Pl.'s 56.1 Stmt. ¶ 24. Because Zoulas received an overall rating in the "developing" range for the 2015–16 school year, she was placed on a TIP during the 2016–17 school year. *See id.* ¶ 48; Dkt. No. 111-22 at 1. According to the Advance Guide, a TIP "identifies specific improvement areas as well as a timeline and plan for assessing improvement." Advance Guide at 24.

During the 2016–17 school year, Zoulas's teaching observations were again conducted by Asselta. *See* Dkt. No. 111-22 at 5. Asselta observed Zoulas's teaching on March 17, 2017, April 28, 2017, May 17, 2017, and June 1, 2017. *See id.* at 6, 9, 12, 16. When Asselta conducted the June 1, 2017, observation, Asselta "appeared upset and sad." Pl.'s Decl. ¶ 81. That was because Asselta's mother was ill at the time; her mother died the next day. *Id.* Asselta sent an email to Zoulas three weeks later in which she thanked Zoulas for being patient while she dealt with her mother's death and provided expanded feedback on the lesson she had observed; Zoulas replied the next day that "the feedback timeline for this lesson has already expired" and that Asselta's delay was part of "a pattern of being unhelpful" to her. *See* Dkt. No. 111-22 at 18. Zoulas's ratings in each category

6

over the course of the four evaluations produced an MOTP rating of 1.82, which fell in the

"developing" range.  *Id.* at 21.  Zoulas's overall rating, however, was in the "effective" range.  Pl.'s

56.1 Stmt. ¶ 116; *see also* Dkt. No. 111-7 at 3.

### 4.    Per-Session Work

On June 29, 2016, Zoulas applied for a per-session position as part of the "Leader in Me"

training program.  Pl.'s 56.1 Stmt. ¶ 36.  Asselta approved this request.  *Id.*  At another point after

the 2015–16 school year, Zoulas applied but was not selected for a position with the "Green STEM"

program, which was an afterschool program at P.S. 34.  *Id.* ¶¶ 37, 175.

On January 14, 2017, Zoulas applied for a per-session position grading state English and

Math tests.  *Id.* ¶ 73.  That position was open to teachers who had received "effective" or "highly

effective" overall ratings for the 2015–16 school year.  *Id.*  Because Zoulas had received a

"developing" overall rating for the 2015–16 school year, she was not eligible for the position.

Zoulas was not selected.  *Id.*

### 5.    Professional Development

Several teachers at P.S. 34 brought professional development opportunities to Asselta's

attention and asked her for permission to attend.  *Id.* ¶ 167.  Zoulas did not bring such opportunities

to Asselta's attention and did not know that other teachers were doing so.  *Id.*; *see also* Pl.'s Decl.

¶¶ 115–17.

In June 2016, Zoulas asked Asselta if she could participate in a three-day technology training

workshop at the Apple Institute.  Pl.'s 56.1 Stmt. ¶ 35.  Asselta agreed, noting with some hesitation

that she had to allow Zoulas to attend.  *Id.*  Zoulas attended the workshop with Asselta, LoRe-

Dioguardi, and several teachers.  *Id.*

Asselta sent Zoulas to attend several professional development opportunities during the

2016–17 school year.  *See* Pl.'s 56.1 Stmt. ¶¶ 71, 72; Pl.'s Decl. ¶ 115 (stating that she was sent to

three trainings during that year).  Zoulas states that she was sent to attend those professional development opportunities because she was on a TIP.  *See* Pl.'s Decl. ¶ 115.

### 6.    SDHR Complaint

Zoulas filed a complaint with New York State Division of Human Rights on May 18, 2017, alleging that Asselta had discriminated against her because of her age by providing her with negative observation ratings on May 5, 2017, and May 18, 2017.  Pl.'s 56.1 Stmt. ¶ 103; Dkt. No. 111-32 at 2–3.  She cross-filed the complaint with the EEOC.  Pl.'s 56.1 Stmt. ¶ 103.  Asselta learned of this complaint on May 18, 2017, the day it was filed.  *Id.* ¶ 105.  In a determination dated November 7, 2017, SDHR Regional Director William LaMot found that "[t]here is a lack of evidence in support of [Zoulas's] allegations of age discrimination" and dismissed the complaint.  *Id.* ¶ 119; Dkt. No. 111-32 at 9.

### 7.    Investigations

Zoulas was the subject of several investigations into complaints made against her by her students, their parents, and other teachers.

On March 9, 2016, Zoulas yelled out to a student who she saw running towards the street during dismissal.  Pl.'s 56.1 Stmt. ¶ 30.  Assistant Principal LoRe-Dioguardi directed two school employees who witnessed the incident to write that Zoulas had yelled angrily at a student during dismissal and that LoRe-Dioguardi had intervened to allow the student to go home.  *See id.* ¶¶ 30–32; Pl.'s Decl. ¶¶ 9, 11–14; Dkt. No. 111-15 at 2–3.[3]  Asselta met with Zoulas on March 17, 2016, to discuss the claims made by the employees in their written statements.  Dkt. No. 111-15 at 1.  On March 31, 2016, Asselta wrote a letter to file in which she wrote that she had concluded that Zoulas "did loudly reprimand [her] student during dismissal" and "did not follow Assistant Principal LoRe-

---

[3] The NYCDOE does not concede that LoRe-Dioguardi pressured the employees into writing these statements.  *See* Pl.'s 56.1 Stmt. ¶ 30.  Zoulas's counsel did not ask LoRe-Dioguardi about the written statements during her deposition.  *See* Dkt. No. 111-3 at 263–85.

Dioguardi's instructions and spoke to her in an inappropriate and unprofessional manner." *Id.* Zoulas maintains that she had to yell in order for the student to hear her, and that she "did not reprimand the student . . . loudly." Pl.'s Decl. ¶ 9.

On or around September 22, 2016, four parents of students in Zoulas's class reported to Asselta that Zoulas had yelled at their children. Dkt. No. 111-21 at 1; Dkt. No. 111-6, Asselta Dep. at 122:7–12. Asselta submitted an incident report to the NYCDOE. *See* Dkt. No. 111-21 at 1. Asselta then conducted an investigation into the complaints. *See* Asselta Dep. at 123–27. Between October 6, 2016, and October 26, 2016, Asselta collected written statements from four students who claimed that they had been mistreated by Zoulas. *See id.*; Dkt. No. 111-21 at 7–10. On November 8, 2016, Asselta met with Zoulas to discuss the claims. Asselta Dep. at 144:17–20; *see also* Dkt. No. 111-21 at 11–12. On December 19, 2016, Asselta wrote a letter to Zoulas's file concluding on the basis of Zoulas's statements and the statements submitted by others that "on September 21, 2016, [Zoulas] did verbally abuse [her] class by repeatedly yelling at them. In addition, one of [Zoulas's] students cried because [Zoulas] yelled at him in front of the class for not getting his test signed." Dkt. No. 111-21 at 12. Zoulas confirmed that she had received that letter on December 21, 2016. *Id.* Zoulas maintains that she "does not scream at children" but "uses a loud teacher voice on occasion." Pl.'s 56.1 Stmt. ¶ 67; Pl.'s Decl. ¶ 53.

On October 6, 2016, Asselta overheard Zoulas speaking at a high volume to her class from Asselta's office, which was located under Zoulas's classroom. Asselta Dep. at 166:10–15. Asselta and LoRe-Dioguardi went to Zoulas's classroom to investigate. *Id.* at 166:15–17. One of Zoulas's students had tripped and knocked over a projector stand. Pl.'s Decl. ¶ 36. Neither Asselta nor LoRe-Dioguardi "spoke to the child," nor did either of them speak to Zoulas "to offer support or assistance." *Id.* ¶ 37. Asselta met with Zoulas to discuss the incident on October 13, 2016. Dkt. No. 111-24 at 1; Asselta Dep. at 168:15–18. After meeting with Zoulas, Asselta wrote a letter to

Zoulas's file dated January 6, 2017, in which she noted that Zoulas had told her that she was merely "speaking loudly" but nonetheless found that Zoulas had "engag[ed] in unprofessional conduct by screaming at [her] class." *See* Dkt. No. 111-24 at 1.

On October 20, 2016, Zoulas entered the lunchroom to find that her students were "screaming at the top of their lungs." Pl.'s Decl. ¶ 42. Zoulas tried to quiet them down, but "they were unable to hear her." *Id.* Zoulas used a microphone to amplify her voice so as to be heard. *Id.* At the end of the school day, LoRe-Dioguardi entered Zoulas's classroom and found that she had written a "Reflection Assignment" on the board. *Id.* ¶ 43. LoRe-Dioguardi told Zoulas that she considered the assignment a punishment for the students' behavior in the lunchroom and therefore inappropriate. *Id.* Zoulas asked the parent of one of her students to tell the other parents that the assignment had been canceled. Asselta Dep. at 183:12–17; *see also* Dkt. No. 111-25 at 19 ("I would like to pass a quick message from Ms. Zoulas . . . the kid[s] don't have to write a paragraph about them screaming in school during lunch."). That night, Teri Mascioli, a teacher who was on lunch duty when Zoulas came to collect her class, emailed to LoRe-Dioguardi and Asselta a brief account of the incident that had occurred that day in the lunchroom. *See* Dkt. No. 111-26 at 1. According to Mascioli, Zoulas "scream[ed] at the children and told them they would all have a writing assignment when they went upstairs" to their classroom. *Id.* On October 24, 2016, Asselta submitted an intake form to the NYCDOE Office of Special Investigations in which she reported what Mascioli and LoRe-Dioguardi had told her. *See id.* at 2. In a letter dated January 20, 2017, Asselta wrote that "[a]fter reviewing the allegations made against [Zoulas], the witnesses' statements and [Zoulas's] explanation, I conclude that on October 20, 2016, [Zoulas] did engage in verbal abuse and corporal punishment of [her] class by screaming at them in the lunchroom and by assigning them a written punishment for homework." *Id.* at 5. Zoulas maintains that "Asselta's comments are her opinion" and that the "assignment was appropriate" given the students' misbehavior. Pl.'s Decl. ¶ 60.

10

On October 27, 2016, a parent of one of Zoulas's students reported to Asselta that Zoulas had forced the student to sit in the corner of the classroom and to complete his assignment on his lap as a punishment for talking during class. Pl.'s 56.1 Stmt. ¶ 59. Asselta investigated the incident as a case of alleged corporal punishment. *See* Dkt. No. 111-27.[4] Asselta concluded, "[a]fter reviewing the allegations made against [Zoulas], the witnesses' statements and [Zoulas's] explanation," that Zoulas "did engage in verbal abuse and corporal punishment." *Id.* Zoulas maintains that the student and his parent exaggerated the incident, and that she had simply moved the student to a desk in the last row of her classroom. Pl.'s 56.1 Stmt. ¶ 59.

### 8.   Other Conduct

#### a)   Field Trip Request

On November 3, 2017, Zoulas submitted a request to LoRe-Dioguardi to approve a field trip to Brooklyn Bridge Park in May 2018. *Id.* ¶ 121. Although LoRe-Dioguardi usually handled trip requests, she instead passed the request to Asselta, who did not immediately grant it. *Id.* Asselta later explained that she had been waiting to approve the trip until she could be sure that it did not conflict with other school events and that sufficient chaperones would be available. *Id.* Two weeks later, Zoulas filed a formal grievance to request that her trip be approved. *Id.* However, the grievance process did not result in approval for the trip. *See* Dkt. No. 111-28, Ex. AA at 33 ("Whether or not to approve a trip request is within the sole discretion of the administration and is not a grievable issue."). Asselta voluntarily approved the trip after Zoulas's grievance was dismissed, over four months before it was to be held. Pl.'s 56.1 Stmt. ¶ 121.

---

[4] Zoulas testified at her deposition that she had heard from the student's mother that the student had told her that Asselta had told him that she "want[ed] to get rid of Ms. Zoulas and she want[ed] him to help." Pl. Dep. at 211:6–15. This testimony would be inadmissible as evidence of Asselta's statement to the student. *See* Fed. R. Evid. 801–02. The Court therefore disregards it.

### b)      Staff Directory

On October 13, 2017, Zoulas sent an email to Asselta in which she complained that the phone directory that had been distributed to staff at P.S. 34 was missing her name.[5]  *Id.* ¶ 53.  She noted that she had told Asselta that she found the omission "upsetting" and that she was "deeply offended" by it.  *Id.*  Asselta told Zoulas that the directories would be collected.  *Id.*

Three days later, Zoulas filed a formal grievance "requesting that all erroneous directories be collected and discarded" and "that all staff members [be] made aware that they were given an incorrect copy . . . immediately."  Dkt. No. 111-28 at 27; *see also* Pl.'s 56.1 Stmt. ¶ 53.  Zoulas later appealed that grievance in a hearing scheduled for November 30, 2017.  *See* Dkt. No. 111-28 at 28.  On December 1, 2017, Zoulas filed a further grievance requesting that Asselta "immediately" notify "all staff members . . . that they received a staff directory with a major error" and that she instruct them "to destroy and discard <u>all</u> erroneous directories."  *Id.* at 34.  Asselta did not collect the old directories, nor did she direct the staff to discard them.  Pl.'s Decl. ¶ 41.  In mid-December, however, new directories were printed that corrected the error.  *Id.*

### c)      Notes from the School Secretary

When Zoulas and Asselta met at the end of the 2017–18 school year for a "summative conference," Zoulas learned that there were "handwritten note[s] . . . secretly written" on her January 31 and March 28, 2018, observation reports.  Pl.'s Decl. ¶¶ 99, 102–03; *see also* Pl.'s 56.1 Stmt. ¶ 152.  The first note, on the January 31 observation report, is dated March 23, 2018, and

---

[5] Zoulas states in her Local Rule 56.1 responses and her declaration in connection with this motion that the erroneous directory was prepared by "a school paraprofessional" who had been instructed by LoRe-Dioguardi to omit Zoulas's name and instead type a row of stars.  *See* Def.'s 56.1 Stmt. ¶ 54; Pl.'s Decl. ¶ 41.  The Court cannot consider that statement.  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Zoulas does not indicate her basis for believing that the directory had been prepared by that paraprofessional, nor does she indicate her basis for believing that LoRe-Dioguardi had instructed the paraprofessional to omit her name.  There is no evidence in the record from which the Court can infer that Zoulas would have personal knowledge of a conversation between LoRe-Dioguardi and another member of the staff.  Accordingly, the Court disregards Zoulas's statement about the manner in which the directory was prepared.

signed by the school secretary, Ms. Panek. *See* Dkt. No. 111-33 at 1. It reads: "Ms. Zoulas refused to sign. This is in dispute, she sent letter to principal & union" and "in front of Mrs. M. LoRe." *Id.* The second note, on the March 28 observation report, is dated May 8 and signed by Panek. *Id.* at 10. It reads: "Mrs. Zoulas refused to sign this documents [sic]. She got upset and very unpleasant. She said that she will sign on [sic] the end of month, that she can review online." *Id.*

### B. Procedural History

Plaintiff Peggy Zoulas initiated this action on March 27, 2018. Dkt. No. 1. She filed an amended complaint, the operative complaint in this action, on September 27, 2018. Dkt. No. 31. The amended complaint named as defendants the NYCDOE, P.S. 34 Principal Carmen Asselta, and P.S. 34 Assistant Principal Marie LoRe-Dioguardi. *Id.* Those defendants moved to dismiss the amended complaint on December 7, 2018. Dkt. No. 43. After receiving briefing on that motion to dismiss, the Court granted it in part and denied it in part on August 29, 2019. *See* Dkt. No. 52. Of the claims the Court understood Zoulas to have raised in her amended complaint, only her ADEA discrimination, retaliation, and hostile work environment claims survived the motion to motion to dismiss. *See id.* at 43. Because the ADEA does not permit claims against individuals, the Court also dismissed Zoulas's claims against Asselta and LoRe-Dioguardi, leaving the NYCDOE as the sole defendant in this action. *See id.* at 25 n.3.

On December 11, 2020, the NYCDOE filed a motion for summary judgment on all three of Zoulas's claims. Dkt. No. 110. The NYCDOE also filed a brief in support of that motion, Dkt. No. 112 ("Def.'s Br."); a Local Rule 56.1 statement of undisputed facts, Dkt. No. 111-1 ("Def.'s 56.1 Stmt."); and a raft of exhibits referenced in its brief and statement of undisputed facts, Dkt. Nos. 111-2 through -35. On March 21, 2021, after the Court granted her several extensions so that she could seek legal assistance in drafting her brief, Zoulas filed a brief in opposition to the NYCDOE's motion for summary judgment, Dkt. No. 120 ("Pl.'s Opp'n"), as well as a raft of her

own exhibits, Dkt. Nos. 120-1 through -32.  The following day, on March 22, Zoulas filed a

document labeled "Plaintiff's Opposition to Defendant's Motion for Summary Judgment" that

contains the substance of the NYCDOE's Local Rule 56.1 statement of undisputed facts and

Zoulas's responses to each paragraph of that statement.  Dkt. No. 121 ("Pl.'s 56.1 Stmt.").  Finally,

on May 6, 2021, the NYCDOE filed a brief in reply to Zoulas's brief in opposition.  Dkt. No. 125

("Def.'s Reply").

## II.     LEGAL STANDARD

### A.     Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c)).  The

movant must "identify[] each claim or defense—or the part of each claim or defense—on which" it

seeks summary judgment. Fed. R. Civ. P. 56(a).  A genuine dispute exists where "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if

it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

The movant bears the initial burden of showing "the absence of a genuine issue of material

fact."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  If the

movant carries that burden, the burden shifts to the non-movant to present "evidence sufficient to

satisfy every element of the claim."  *Id.* (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for

summary judgment, the non-movant "must come forward with 'specific facts showing that there is a

genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)) (emphasis omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. And the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. At summary judgment, the non-movant "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

On a motion for summary judgment, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236 (quotation omitted). The court cannot "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

### B.    *Pro Se* Deference

It is well established that courts have an obligation to afford a special solicitude to *pro se* litigants. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006). The underlying rationale for this rule "is that a *pro se* litigant generally lacks both legal training and experience and, accordingly, is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). The special solicitude extended to *pro se* litigants takes a variety of forms and includes a liberal reading of pleadings and a relaxation of the limits on the amendment of pleadings. *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007); *see also Holmes v. Goldin*, 615 F.2d 83, 85 (2d Cir. 1980).

However, it is not appropriate to afford *pro se* litigants special solicitude where a licensed attorney assisted in drafting their briefs, motions, or other court documents. *See, e.g.*, *Knox v. Cty. of Ulster*, No. 1:11-CV-0112 GTS/CFH, 2013 WL 286282, at *1 n.1 (N.D.N.Y. Jan. 24, 2013) (denying *pro se* plaintiff "special solicitude" because "the Court strongly suspects that Plaintiff has . . . been aided by an attorney in the drafting of his papers opposing the current motion, which are organized, typewritten, and contain citations to dozens of instructive legal authorities in proper BlueBook format"); *Spira v. J.P. Morgan Chase & Co.,* 466 F. App'x 20, 22 n.1 (2d Cir. 2012) (summary order) (denying *pro se* plaintiff "special consideration" because "he was represented by his wife, a licensed attorney, in the district court, and . . . she is responsible for ghostwriting his appellate briefs").  The policy of "liberally construing *pro se* submissions is to protect *pro se* litigants from inadvertent forfeiture of rights due to their lack of legal training."  *Knox*, 2013 WL 286282, at *1 n.1.  "[W]here, as here, those submissions are 'ghostwritten' by an attorney, such liberal construction may create unfairness toward the opposing party."  *Id.*; *see also Askins v. Metro. Transit Auth.*, No. 1:19-CV-4927-GHW, 2020 WL 1082423, at *3 n.2 (S.D.N.Y. Mar. 5, 2020).

Although nominally *pro se*, Zoulas has obtained extensive assistance from counsel throughout these proceedings, including in opposing this motion.  Three attorneys from the Seton Hall University School of Law Conflict Management Program appeared on Zoulas's behalf to represent her in mediation.  Dkt. No. 13.  Two attorneys from the New York Legal Assistance Group ("NYLAG") assisted her in preparing her first amended complaint, *see* Dkt. No. 29, and she received further assistance from NYLAG in responding to the motion to dismiss, *see* Dkt. No. 37.  Four attorneys from Cravath, Swaine & Moore appeared on Zoulas's behalf to represent her during the discovery period.  *See* Dkt. Nos. 66, 74, 86, 89.  She has told the Court that she has relied on assistance from NYLAG in opposing this motion for summary judgment.  *See* Dkt. Nos. 116, 118; Pl.'s Opp'n at 1 n.1 ("Portions of this document were prepared with assistance of the NYLAG Legal

Clinic for Pro Se Litigants in the SDNY.").

It is obvious to the Court that most or all of Zoulas's opposition brief was ghostwritten by a lawyer or someone with a degree of legal know-how that would make applying *pro se* deference to the brief inappropriate.  It cites numerous cases in correct Bluebook format, including one unreported case available only on Westlaw.  *See, e.g.,* Pl.'s Opp'n at 8.  Its style bears no resemblance to that of Zoulas's initial complaint or her correspondence with this Court.  Indeed, its use of legal terminology alone shows that it is not the work of a *pro se* plaintiff whose inexperience with the law merits special solicitude.  *Compare, e.g., id.* at 10 ("To the extent that Defendants are taking the position that Ms. Zoulas was denied session work because she was on an improvement plan, which had been put in place due to a poor performance rating before the limitations period, she responds that the performance rating was an adverse work event due to her age, and that it is not time barred."), *with* Dkt. No. 29, Ltr. from Zoulas ("I was also not aware until a receptionist at SDHR informed me this morning, that they have on their records that I rebutted a response from the defendant, however, I have no knowledge of this either.").  The Court therefore accords Zoulas's opposition brief no *pro se* deference, just as if it had been signed by the attorney who ghostwrote it.

## III.  DISCUSSION

### A.  Age Discrimination (ADEA)

#### 1.  Legal Standard

Claims for age discrimination under the ADEA are analyzed under the *McDonnell Douglas* burden-shifting framework.  *Gorzynski v. JetBlue Airways Corp.*, 596 F. 3d 93, 106 (2d Cir. 2010).  First, a plaintiff must establish a *prima facie* case of age discrimination.  To do so, a plaintiff must show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination."  *Id.* at 107 (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d

129, 134 (2d Cir. 2000)).  If the plaintiff makes a *prima facie* showing, "the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action." *Id.* at 106.  If "such a reason is provided, the plaintiff can no longer rely on the *prima facie* case but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Id.* (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008))  A plaintiff can survive summary judgment only if "the facts, taken in [her] favor, suffice to meet her burden of showing a triable issue as to whether her age was a 'but for' cause" of the adverse employment action. *Id.*

Claims for age discrimination under the ADEA are subject to an administrative exhaustion requirement.  Before a plaintiff may assert claims the ADEA in federal court, she must present the claims forming the basis of such a suit in a complaint to the EEOC. *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 213 (2d Cir. 2006).  "[G]enerally if the plaintiff has filed an administrative claim in a state whose laws prohibit [employment] discrimination, the limitations period for filling an action is 300 days after the alleged unlawful practice." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019).  "Where the plaintiff complains of discrete discriminatory or retaliatory acts such as 'termination, failure to promote, denial of transfer, or refusal to hire,' such claims are not actionable if they occurred prior to the 300-day period even though they may be 'related to' acts that occurred within the permissible 300-day period." *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)).

A claim of employment discrimination under the ADEA accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct. *See Dickens v. Hudson Sheraton Corp.*, 167 F. Supp. 3d 499, 514 (S.D.N.Y. 2016) (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)).  When assessing whether a claim of discrimination is time-barred, "the proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (citing *Ricks*, 449 U.S. at 258).  "Were it

otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief." *Wallace v. Kato*, 549 U.S. 384, 391 (2007) (discussing the limitations period for § 1983 actions).

### 2.    Application

Zoulas's discrimination claim is time-barred.  Zoulas argues that she suffered discrimination when she was "prevented from taking on extra session work during the 2016–2017 school year." Pl.'s Opp'n at 10.  But Zoulas herself has said that she was ineligible for that extra session work because had received a "developing" overall rating for the 2015–16 school year.  *See* Pl.'s 56.1 Stmt. ¶ 73; Pl.'s Opp'n at 4 ("Plaintiff was denied session-work in September 2016 and January 2017 due to her rating.").  She has not adduced any evidence that the NYCDOE engaged in discrimination when it denied her per-session work.  The NYCDOE simply followed its age-neutral policy of limiting per-session work to teachers who had received adequate performance ratings the year prior. *See id.*

Furthermore, although Zoulas received her overall rating around September 22, 2016, approximately 238 days before filing her SDHR complaint, *see* Dkt. No. 111-14 at 13, she has adduced no evidence that the NYCDOE engaged in discrimination when it calculated that rating.[6] Instead, the evidence in the record shows that Zoulas's 2015–16 overall rating was merely a weighted average of her 2015–16 MOTP and Local Measures ratings.  *See id.*  Of those two ratings, only the MOTP rating was particular to Zoulas:  the Local Measures rating for the 2015-2016 school year was computed by "combin[ing] the scores of all teachers at the school for NYS ELA and Math tests and then attribut[ing] those scores to all the teachers at the school."  Pl.'s 56.1 Stmt. ¶ 28.  As a

---

[6] Indeed, this claim survived the NYCDOE's motion to dismiss only because Zoulas alleged that her 2015–16 overall rating was not merely the product of earlier observations but outright "falsified" by the NYCDOE—i.e., that the NYCDOE calculated Zoulas's rating differently from other teachers' or simply made it up.  *See* Dkt. No. 52, Aug. 29 Order at 31 n.6.  She has not presented the Court with any evidence of such a plot.

result, "[a]ll teachers [at P.S. 34] received a Developing MOSL rating that year [2015–16]." *Id.* ¶ 42. And Zoulas was aware of her MOTP rating no later than June 28, 2016, which is 324 days before she filed her SDHR complaint. *See* Dkt. No. 111-14 at 10. Since June 28, 2016, falls outside of the 300-day limitations period, Zoulas's claim is time-barred. Indeed, even if she had received her MOTP rating within the 300-day limitations period, her claim would still be time-barred because the MOTP rating, like the overall rating, is merely an average of other scores—the ratings Asselta assigned her after each of her four observations—of which Zoulas was already aware. *See* Dkt. No. 111-14 at 14.

Zoulas argues that "her performance rating for the 2015-2016 school year . . . was not a discrete discriminatory act, because it had ongoing ramifications during the next school year, including causing her to be ineligible for extra session work." Pl.'s Opp'n at 10. If every action with future ramifications amounted to a continuing violation, hardly any action would be time-barred. Adverse employment actions may ripple throughout an employee's career; that does not mean that an employee can sue for them so long as he can point to a ripple within the past 300 days. The allegedly discriminatory acts in this case are the four performance reviews conducted by Asselta towards the end of the 2015–16 school year.[7] Those reviews determined, by a transparent and purely mathematical process, Zoulas's 2015–16 MOTP rating. That MOTP rating, in turn, along with the Local Measures score attributed to every teacher at P.S. 34, determined Zoulas's 2015–16 overall rating. The NYCDOE did not somehow commit fresh discrimination every time it reported an average of Zoulas's allegedly discriminatory performance reviews or took non-discriminatory actions based on them.

Instructive here is the Second Circuit's decision in *Washington v. County of Rockland*, 373 F.3d

---

[7] As discussed above, Zoulas has not adduced any evidence that the ratings themselves were anything more sinister than weighted averages of the scores Asselta assigned her after each observation.

310 (2d Cir. 2004). In *Washington*, the Second Circuit considered whether an employee's claim that his employer filed discriminatory disciplinary charges against him was time-barred even though the employer had subsequently prosecuted the charges within the limitations period. The Court held that filing the charges was a "discrete event" that could be separated from the employer's subsequent prosecution of those charges. *Id.* at 317–18. Here, as in *Washington*, Zoulas has not presented any evidence that her employer did anything more than fail to walk back its prior discriminatory act. Many negative employment actions have recurring consequences. That does not mean that a plaintiff's claim is renewed every time "the consequences of the act[s] become painful." *See Chardon*, 454 U.S. at 8.

Zoulas details at length her objections to the manner in which teachers in New York were evaluated in 2015–16. *See, e.g.,* Pl.'s 56.1 Stmt. ¶¶ 28, 40–41. Those objections are irrelevant to this discrimination lawsuit. To be a victim of discrimination, a person must be treated worse than others. Zoulas complains that the NYCDOE treated *all* teachers poorly by evaluating them using a "convoluted and complex" process that judges them based on other teachers' performance. *Id.* ¶ 28. Therefore, whatever the merits of Zoulas's grievances, they do nothing to advance her claim that she was treated worse because of her age.

Zoulas has failed to point to evidence that she was subjected to an adverse employment action because of her age within the 300 days preceding her NYSDHR complaint. She has therefore failed to show that her ADEA discrimination claim falls within the statutory period. Accordingly, the NYCDOE's motion for summary judgment on this claim is GRANTED.

### B. Retaliation (ADEA)

#### 1. Legal Standard

"The ADEA . . . prohibits 'employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers.'" *Davis-Garett*, 921 F.3d at 42-43

(quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  Specifically, the

ADEA provides that "[i]t shall be unlawful for an employer to discriminate against any of his

employees . . . because such individual . . . has opposed any practice made unlawful by this section,

or because such individual has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or litigation under this chapter."  29 U.S.C. § 623(d).

> "Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis."  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).  First, the plaintiff must establish a *prima facie* case of retaliation by showing:  "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Jute*, 420 F.3d at 173 (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001).  The plaintiff's burden in this regard is "*de minimis,*" and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Id.* (internal quotation marks omitted).
>
> If the plaintiff sustains this initial burden, "a presumption of retaliation arises."  *Id.*  The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.*  If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action."  *Id.*  A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]."  *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

*Hicks v. Baines*, 593 F.3d 159, 164–65 (2d Cir. 2010).

With respect to the third element, materially adverse actions, "the proper question for a

retaliation claim is whether the [alleged adverse action] to which [the plaintiff] was subjected could

well have dissuaded a reasonable employee in his position from complaining of unlawful

discrimination."  *Davis-Garett*, 921 F.3d at 44 (internal citation and quotation marks omitted).  "The

Supreme Court and Second Circuit have defined 'adverse action' for the purposes of [an ADEA]

retaliation claim broadly."  *Cerni v. J.P. Morgan Sec. LLC*, 208 F.Supp.3d 533, 539 (S.D.N.Y. 2016).  A

plaintiff need only "show that a reasonable employee would have found the challenged action

materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 539. "[T]he broadness of this definition means that 'the scope of [the] anti-retaliation provision is broader than that of its discriminatory action provision." *Id.* at 539 (quoting *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007)).

"'[P]etty slights or minor annoyances that often take place at work and that all employees experience' do not constitute actionable retaliation." *Hicks*, 593 F.3d at 165 (quoting *Burlington Northern*, 548 U.S. at 68). "Thus, '[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'" *Id.* (quoting *Burlington Northern*, 548 U.S. at 67). Although the standard is objective, "[c]ontext matters." *Id.*

> "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *White* at 69, 126 S. Ct. 2405 (quoting *Oncale*, 523 U.S. at 81–82). Therefore, "an act that would be immaterial in some situations is material in others." *Id.* at 69 (internal quotation marks omitted). For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Id.* And of course context can diminish as well as enlarge material effect.

*Id.* "[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Id.* (quoting *Zelnik v. Fashion Inst. Of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

### 2.   Application

Zoulas has not adduced evidence from which a reasonable jury could infer that she experienced actionable retaliation for filing a complaint with the SDHR in 2017. Although she has shown that she engaged in protected conduct and that her principal was aware of it, she has, at most, adduced evidence that she continued to experience the same middling performance reviews that

prompted her SDHR complaint and suffered a string of sporadic annoyances of the sort often encountered in the workplace. Neither of those types of evidence, taken in context, suggests that she suffered an adverse employment action because of her protected activity. She has therefore failed to meet her burden of pointing to evidence from which a reasonable jury could conclude that she had suffered conduct that would discourage a reasonable person from making or supporting a claim of discrimination.

### a)    Protected Conduct and Awareness

Zoulas has easily satisfied the first two elements of a *prima facie* retaliation claim. *See Jute*, 420 F.3d at 173 ("(1) participation in a protected activity; (2) that the defendant knew of the protected activity . . . ."). The only protected activity at issue is Zoulas's May 18, 2017, SDHR complaint. *See* Pl.'s Opp'n at 12; Pl.'s 56.1 Stmt. ¶ 103. The NYCDOE does not contest that filing the SDHR complaint constituted protected conduct. *See* Def.'s Br. at 13; *see also* Dkt. No. 52, Aug. Opinion at 35 (finding that the complaint constituted protected conduct). Nor does the NYCDOE contest that Asselta was aware of the complaint when it was filed. *See* Def.'s Br. at 13; Def.'s 56.1 Stmt. ¶¶ 104–05 (noting that "Asselta testified that she [] became aware of [Zoulas's] age discrimination claim when [Zoulas] filed her SDHR complaint").

### b)    Performance Reviews

"If an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory." *Wright v. N.Y.C. Off-Track Betting Corp.*, No. 05 Civ. 9790 (WHP), 2008 WL 762196, at *5 (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94–95 (2d Cir. 2001)). A negative performance review shortly after protected conduct may give rise to an inference of retaliation, but not when similarly negative performance reviews preceded that protected conduct. *Compare Smith v. N.Y.C. Dep't of Educ.*, No. 18 Civ. 8545 (PGG), 2019 WL 6307471, at *12 (S.D.N.Y. Nov. 25, 2019) (inference of causation arises where teacher "was given

his first negative performance review . . . and was denied a qualified co-teacher" the month after
filing the lawsuit), *with Floyd v. S. Westchester BOCES*, No. 14 CV 5842 VB, 2015 WL 5459992, at *9
(S.D.N.Y. July 31, 2015) ("Because plaintiff alleges defendant discriminated against him in several
ways, including by giving him a negative evaluation . . . *before* he filed charges with the EEOC, the
Court cannot conclude plaintiff's negative performance evaluation [after he filed charges] . . . give[s]
rise to a plausible inference of retaliation."), *and Rodriguez v. Glen Cove City Sch. Dist.*, No. 14-CV-3815
(JS) (ARL), 2016 WL 951524, at *6 (E.D.N.Y. Mar. 8, 2016) (no inference of causation arises where
teacher "received her first negative performance evaluation . . . before filing her EEOC complaint"
and then later received both positive and negative evaluations).

 In her brief in opposition to this motion, Zoulas argues that she suffered retaliation when
Asselta conducted her regular classroom observations on June 1, 2017, and January 31, 2018.  *See*
Pl.'s Opp'n at 12–13.  Zoulas has adduced no evidence showing that these classroom observations
were retaliatory.  The record shows that the observation reports contained scores in line with or
better than the scores Zoulas had received before engaging in her protected conduct.

 Zoulas's complaints that the comments in Asselta's June 2017 report were "not factual," that
"[n]one of Plaintiff's questions and no student responses were cited," and that "Plaintiff did not
receive feedback until June 22, 2017," *id.* at 12, do nothing to show that Asselta conducted the
observation in a manner materially different from the manner in which she conducted performance
reviews before Zoulas lodged her complaint with the SDHR.  To the contrary, as the NYCDOE
notes, the scores Asselta gave Zoulas on her June 1, 2017, performance review are in line with or
better than the scores Asselta gave Zoulas on the three performance reviews before Zoulas lodged

her complaint.  *See* Def.'s Br. at 16; Dkt No. 111-22 at 6–17.[8]  Nor can Zoulas argue that she was

harmed by the lack of detail in Asselta's written feedback, given that the record shows that when

Asselta provided her with more detailed written feedback and proposed meeting with her to provide

still more feedback, Zoulas refused, noting that "the feedback timeline for this lesson has already

expired."  *See* Dkt. No. 111-22 at 18.

Zoulas's complaints about her January 31, 2018, observation report fail for the largely same

reasons as her complaints about her June 1, 2017, observation report.  The scores Asselta gave

Zoulas on that report are in line with or better than the scores she gave Zoulas before Zoulas filed

her complaint with the SDHR.  *See* Dkt. No. 111-33 at 1–3.[9]  Even if the comments Asselta gave on

that report were "vague," Pl.'s Opp'n at 13, receiving vague comments on an objectively positive

observation report would not deter a reasonable person from complaining of discrimination.

### c)      Other Conduct

The rest of Zoulas's evidence relates to incidents that vary from trivial to puzzling.  Because

Zoulas has referenced several incidents in her brief in opposition, *see* Pl.'s Opp'n at 12–14, the Court

will take up each in turn:

a.   Zoulas testified that when she emailed Asselta examples of her students' work, Asselta was

confused and asked her why she had done so.  *See* Pl.'s 56.1 Stmt. ¶ 111; Pl.'s Decl. ¶ 83.

Zoulas does not explain how it caused her to feel that she was the victim of retaliation.  The

---

[8] On her March 17, 2017, observation report, Zoulas received scores of "Developing" in seven categories and "Ineffective" in one category.  Dkt. No. 111-22 at 6–8.  On her April 28, 2017, observation report, Zoulas received scores of "Developing" in one category and "Ineffective" in five categories.  *Id.* at 9–11.  On her May 17, 2017, observation report, Zoulas received scores of "Developing" in eight categories and "Effective" in two categories.  *Id.* at 12–14.  On her June 1, 2017, observation report, Zoulas received scores of "Developing" in six categories and "Ineffective" in two categories.  *Id.* at 16–17.  The only negative outlier is the April report, which was based on an observation that occurred before Zoulas engaged in protected conduct by filing her SDHR complaint.

[9] On her January 31, 2018, observation report, Zoulas received scores of "Effective" in three categories, "Developing" in three categories, and "Ineffective" in two categories.  Dkt. No. 111-33 at 1–3.  The average of those scores is approximately the same as the average of the scores Zoulas received on her May 17, 2017, observation report, which was the best observation report she received that year.  *See* Dkt. No. 111-22 at 12–14.

Court is at a loss to supply an explanation.  This is not conduct that a reasonable jury would find to be an adverse action supporting a claim for retaliation.

b.  Zoulas received a "developing" MOTP rating for the 2016–17 school year.  Pl.'s Opp'n at 12; Pl.'s 56.1 Stmt. ¶ 114.  Zoulas's MOTP rating was simply an average of ratings from the four observations conducted over the previous school year, three of which predate Zoulas's SDHR complaint.  Even if that final rating were retaliatory—and, as discussed above, the record does not support the conclusion that it was—averaging them still would not be.

c.  The internal staff directory printed in October 2017 omitted Zoulas's name, and a new directory was not distributed for two months.  Pl.'s Opp'n at 13; Pl.'s 56.1 Stmt. ¶¶ 53–54. Zoulas has not shown that this omission was any more than an error, nor that it would rise above the level of a petty slight.  Moreover, this event happened five months after Zoulas filed her SDHR complaint, and she has not presented additional facts to support the conclusion that the omission was provoked by her complaint.  Therefore, even if Zoulas had shown that the omission was intentional and objectively serious, the evidence would still not permit a reasonable jury to infer that it was made for a retaliatory purpose.  *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (noting that a court may "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases"); *Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 480 (2d Cir. 2009) ("[W]here the protected activity took place two months prior to the alleged adverse action, and where there is nothing other than that temporal proximity invoked to establish a retaliatory intent, the causal relationship is not established.").

d.  Zoulas did not receive approval from Asselta for a class trip to Brooklyn Bridge Park until four months before it was to be held.  Pl.'s Opp'n at 13; Pl.'s 56.1 Stmt. ¶ 121.  Asselta explained that she was unable to immediately grant approval for the trip because she was not

yet sure whether another activity would interfere with the trip and because Zoulas did not

tell her whether sufficient chaperones would be available at the requested time.  Pl.'s 56.1

Stmt. ¶ 121.  Zoulas claims that these explanations are pretextual because the trip was to take

place in the morning and she did not request any chaperones.  *See id.*  Even if Zoulas's

statements amount to evidence of pretext, no reasonably jury could find that a bureaucratic

delay of this sort would deter a reasonable person from filing a complaint of discrimination.

*See Nunez v. Lima*, 762 F. App'x 65, 70 (2d Cir. 2019) (summary order) (holding that initial

refusals to approve time sheets and other processing delays did not constitute material

adverse action because the time sheets were ultimately approved, making the initial refusals

"at most a minor annoyance," and processing delays did not risk disciplinary consequences).

The only obviously onerous part of the whole episode was Zoulas's futile effort to prosecute

a grievance against Asselta for refusing to approve the trip immediately.[10]  A mere delay in

processing a request that is ultimately granted falls squarely into the category of "minor

annoyances that often take place at work and that all employees experience."  *Hicks*, 593

F.3d at 165.  It does not amount to retaliation.

e.   Zoulas argues that she suffered retaliation in January 2018 when she "reported a disruption

in her classroom . . . but was not provided the help she requested."  *See* Pl's Opp'n at 13.  As

evidence, she cites paragraph 125 of the parties' undisputed facts.  *See id.*  That paragraph,

however, only reports that Zoulas described the incident to Asselta by email, and it cites only

---

[10] Zoulas also testified that Asselta and LoRe-Dioguardi "behaved in an extremely hostile manner towards Plaintiff with regards to this school trip" and that she was "harassed for two months . . . in order to get approval for this school trip." Pl.'s 56.1 Stmt. ¶ 121; Pl.'s Decl. ¶ 86.  "[M]ere conclusory allegations . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).  Zoulas's testimony would permit a reasonable jury to conclude that Zoulas subjectively felt that Asselta and LoRe-Dioguardi behaved in a hostile manner and subjectively felt that she was suffering harassment in the course of seeking approval for the trip.  However, that testimony does not contain any factual statements from which a reasonable jury could assess for itself whether Zoulas faced conduct that would *objectively* discourage a reasonable person from making or supporting a charge of discrimination.  The testimony therefore does not affect the Court's conclusion that Zoulas has failed to point to evidence that would permit a reasonable jury to conclude that she had suffered retaliation under the ADEA.

to two emails and Zoulas's amended complaint.  *See* Pl.'s 56.1 Stmt. ¶ 125.  Zoulas cannot

rely on allegations in her unverified complaint as evidence at summary judgment.  *See*

*Fitzgerald v. Henderson*, 251 F.3d 345, 360–61 (2d Cir. 2001).[11]  Furthermore, even assuming

that the emails are admissible as evidence of the conduct they describe,[12] that conduct is

objectively benign.  Zoulas "called downstairs to have [the student] removed."  Dkt. No.

111-25 at 9.  LoRe-Dioguardi and Peluso came to Zoulas's classroom and, instead of

removing the student, argued with him.  *Id.*  Before they took Zoulas's statement of what

had happened before they arrived, they asked one of the student's friends for his statement.

*Id.* at 10.  Zoulas felt unhappy that they had not asked her first and that they did not remove

the student from the classroom as she had requested.  *Id.*  The former is at most a minor

slight; the latter, a difference of professional opinion.  Neither would permit a reasonable

jury to conclude that Zoulas had suffered conduct that would deter a reasonable person

from making or supporting a claim of retaliation.

f.  On March 23, 2018, Panek and LoRe-Dioguardi approached Zoulas while she was leaving

work for the day and asked her to sign an observation report to indicate that she had

received it.  Pl.'s Decl. ¶ 98.  According to Zoulas, she refused to sign the report because

Panek and LoRe-Dioguardi has not used "the appropriate protocol for delivering an

observations report."  *Id.*  No reasonable jury could find that being asked to sign a document

on one's way out of work is so harmful that it would dissuade a reasonable person from

complaining of discrimination.  Even if Panek did, as Zoulas contends, "literally shove[] the

document towards [her]," *id.*, such a gesture by the school's secretary is far too ambiguous

---

[11]  The attorney or attorneys Zoulas consulted in connection with this motion was surely aware that allegations in an unverified complaint cannot stand in place of "[a]n affidavit or declaration . . . made on personal knowledge."  *See* Fed. R. Civ. P. 56(c)(4); *Fitzgerald*, 251 F.3d at 360–61 (2d Cir. 2001).

[12]  The Court notes that accepting the emails as evidence of the events they describe may present a hearsay issue under Fed. R. Evid. 802.  However, the Court does not reach the hearsay issue because the conduct described in the emails is not sufficiently serious to support Zoulas's retaliation claim.

and trivial to support a retaliation claim, even if it could be understood as retaliation for a complaint filed against the school's principal ten months beforehand.[13]

g. Zoulas argues that she suffered retaliation when Panek's notes on two of her observation reports that she had refused to sign them did not appear on the versions of her reports that were uploaded to the system for her review. *See* Pl.'s Opp'n at 14. Zoulas's argument is not entirely clear, but neither the existence of these notes nor the fact that Asselta did not show them to Zoulas until asked for physical copies of the reports can possibly constitute retaliation. The notes are too benign to constitute an adverse employment action and too late in time to permit an inference of causation. The notes did not relate to Zoulas's performance or otherwise affect her ratings; they merely reported—accurately—that Panek had been unable to obtain signatures from Zoulas.[14] Zoulas has not articulated any way in which the notes (or not being shown them) caused her harm. *See* Pl.'s Opp'n at 13–14. The only reasonable conclusions a jury could draw from the evidence Zoulas has presented is that Panek tried and failed twice to get Zoulas to sign her observation reports and that she noted that fact on the hard-copy reports to explain why they were unsigned. Furthermore, the notes are dated March 23 and May 18, 2018. As discussed above, those dates are too far

---

[13] As the Court held in its order on the NYCDOE's motion to dismiss, a jury could infer that conduct closely following the SDHR's November 7, 2017, dismissal of Zoulas's discrimination complaint was done with retaliatory motive, on the theory that Asselta "purposefully deferred retaliating against [Zoulas] until the SDHR had completed its investigation." Dkt. No. 52 at 38; *see also White v. City of Middletown*, F.Supp.3d 195, 219 (D. Conn. 2014) ("Where there are longer gaps in time between protected activity and adverse employment action, the inference of causation may be inferred from the fact that the employer was waiting for the opportune time to retaliate."). This conduct, however, took place more than four months after the SDHR had concluded its investigation. That is too long, absent other evidence of retaliatory motive, to permit a reasonable jury to infer that the conduct was caused by Zoulas's protected activity. *See Stoddard*, 309 F. App'x at 480.

[14] The evidence presented by Zoulas herself largely substantiates the notes. Zoulas argues that she did not so much "refuse" to sign the observation reports as was "unable" to do so because she was teaching or leaving work for the day. Pl.'s Opp'n at 13. That Zoulas would have used a different word to characterize her declining Panek's request for a signature does not make Panek's characterization false. To the contrary, Zoulas's account of her interaction with Panek is mostly compatible with Panek's. *Compare* Pl.'s Decl. ¶ 98 ("I explained to her that I had already signed out for the day and that I could sign for the report on Monday."), *and id.* ¶ 103 ("Plaintiff did not speak to Ms. Panek, but instead used hand gestures to say 'no' and waved her hand for her to leave. Plaintiff[] then turned around to avoid any further distraction . . . ."), *with* Dkt. No. 111-33 at 1 ("Ms. Zoulas refused to sign."), *and id.* at 10 ("Mrs. Zoulas refused to sign this documents [sic].").

after the November 2017 dismissal of Zoulas's SDHR complaint to permit an inference of

causation on the basis of timing alone.  *See Stoddard*, 309 F. App'x at 480.

### d)    Unsubstantiated Allegations

Zoulas's opposition brief contains two references to allegedly retaliatory events of which

Zoulas has not proffered any admissible evidence.  The Court must therefore disregard them.  *See*

Fed. R. Civ. P. 56(c)(2).

First, Zoulas argues that she suffered retaliation when she "overheard Asselta telling SAPIS

counselor Peluso that she was not allowed to speak to [Zoulas]."  Pl.'s Opp'n at 12.  As evidence,

she cites only paragraph 117 of the parties' undisputed facts.  That paragraph, which Zoulas did not

dispute, merely states that Zoulas alleged in her amended complaint that she had overheard Asselta

making this statement "on an unspecified date in September 2017."  Pl.'s 56.1 Stmt. ¶ 117.  Zoulas

did not testify to this alleged event in her deposition, nor did she mention it in her declaration.  *See*

Pl. Dep.; Pl.'s Decl.  She is therefore unable to rely on it in opposing this motion.[15]

Second, Zoulas argues that she suffered retaliation when, "[b]etween January and March

2018, Peluso accused [Zoulas's] class of making noise as they walked through the building."  Pl.'s

Opp'n at 13.  As evidence, she cites paragraph 102 of the parties' undisputed facts.  That paragraph

is not germane to Zoulas's argument, so the Court understands her citation to refer to paragraph

120 of the parties' undisputed facts.  *See id.*  That paragraph, however, states only that Zoulas *alleged*

that Peluso made accusations against Zoulas's class, and it cites only to Zoulas's amended complaint.

*See* Pl.'s 56.1 Stmt. ¶ 120.  Zoulas did not testify to these alleged accusations by Peluso, nor did she

mention them in her declaration.  *See* Pl. Dep.; Pl.'s Decl.  She has therefore failed to meet her

---

[15] The Court notes that even if Zoulas had presented admissible evidence that this incident occurred, it is doubtful that Zoulas would be able to satisfy her burden of showing that the incident was causally connected to her SDHR complaint. She had filed the complaint approximately four months before this incident allegedly occurred, making it difficult for her to rely on timing alone to create an inference of retaliation.  Such an inference is still more difficult to make if, as Zoulas has suggested, Asselta waited until the complaint was dismissed as baseless in November to retaliate against her.

burden of presenting admissible evidence to support the allegations she made about Peluso in her complaint.

### e)      Cumulative Conduct

Even taken collectively, the incidents of alleged retaliation that occurred close in time to Zoulas's protected conduct and for which Zoulas has adduced evidence are insufficient to permit a rational jury to find that Zoulas was subject to actionable retaliation.  If anything, the alleged incidents seem even more trivial in the aggregate than they do in isolation.  Over the course of nearly a year, Zoulas was asked to explain an email, received a rating that averaged scores from observation reports she had already received, had her name omitted from an internal directory for two months, had to wait two months to receive approval for a field trip four months before it took place, was not deferred to on a question of student discipline, was asked to sign an observation report on her way out of work, and learned that the school's secretary had quietly noted that she had refused to sign two of her observation reports.  No reasonable jury could conclude that, under all the circumstances, such workaday nuisances would discourage a reasonable person from complaining of discrimination.  The NYCDOE's motion for summary judgment on this claim is therefore GRANTED.

### C.      Hostile Work Environment (ADEA)

#### 1.      Legal Standard

Hostile work environment claims brought under the ADEA are assessed under the same standard as hostile work environment claims brought under Title VII.  *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (citing *Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).

> In order to establish a hostile work environment claim under [the ADEA], a plaintiff must produce enough evidence to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (internal quotation marks omitted).  A plaintiff must show not only that she subjectively perceived the

environment to be abusive, but also that the environment was objectively hostile and abusive. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003). Generally, unless an incident of harassment is sufficiently severe, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted). Accordingly, to analyze a hostile work environment claim, we are required to look to the record as a whole and assess the totality of the circumstances, *see Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001), considering a variety of factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). We must also consider the extent to which the conduct occurred because of the plaintiff's [age]. *See Alfano*, 294 F.3d at 374.

*Gorzynski*, 596 F.3d at 102.

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.

*Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002).

Summary judgment is appropriate when a plaintiff fails to adduce evidence that "rise[s] to the level of severity or pervasiveness needed to support a hostile work environment claim." *Smith v. New Venture Gear, Inc.* 319 F. App'x 52, 56 (2d Cir. 2009). In other words, a case presents no triable issue of fact when the incidents of supposed hostility for which plaintiff has adduced admissible evidence are so trivial, infrequent, or disconnected from the plaintiff's protected status that no reasonable jury could find that the plaintiff was subjected to a hostile work environment on account of her membership in a protected class. As the authorities quoted above make clear, a claim for hostile work environment requires evidence of conduct that could be characterized as intimidation, ridicule, insult, hostility, abuse, or humiliation. The conduct must be so severe and constant that a reasonable person in the plaintiff's position would find not just the conduct but *the work environment itself* abusive. *See Demoret*, 451 F.3d at 149.

### 2. Application

This is not such a case. Although Zoulas has in her opposition papers recited a laundry list

of grievances, they neither individually nor collectively come close to establishing that Zoulas was

subjected to a hostile work environment because of her age.  They establish instead that Zoulas was,

over the course of several years, subjected to the kind of bureaucratic headaches and professional

disagreements that beset employees of all stripes.  That does not suffice to create a genuine issue of

material fact regarding whether the NYCDOE has violated federal law.

**a)      Professional Development**

Zoulas argues that she was subjected to a hostile work environment when less-experienced

teachers attended more professional development opportunities and exchanged more emails with

Asselta about those opportunities than she did.  *See* Pl.'s Opp'n at 16.  There is nothing hostile or

abusive about that.  Zoulas has proffered no evidence that she was ever prevented from attending a

training event.[16]  Merely not being solicited to attend professional development opportunities that

other employees sought out their own is insufficient to suggest a hostile work environment.

Hostility or abuse may in some cases deny employees access to professional development

opportunities, but that does not mean that being denied such access is itself hostile or abusive.  The

plaintiff must adduce evidence of conduct that "alter[ed] the conditions of the victim's employment

*and* create[d] an abusive working environment."  *Demoret*, 451 F.3d at 149 (emphasis added).  Here, if

Zoulas has established anything, it is that Asselta did not make Zoulas aware that she could request

to attend workshops and only encouraged her to attend workshops when Zoulas was on a TIP.  *See*

Pl.'s Decl. ¶ 115.  Even inferring that Asselta made these omissions because of Zoulas's age, they

constitute, at most, mild neglect.  Even if that neglect were severe and pervasive, it would still not

constitute a hostile work environment, because Zoulas did not even learn of it until she received

---

[16] As the NYCDOE notes, the only time Zoulas ever requested to attend a training event, Asselta agreed, albeit with momentary hesitation, noting that she was required to allow Zoulas to come.  Zoulas's attempt to cast Asselta's supposedly begrudging approval as hostile is unavailing:  a hostile denial of professional development requires far more than momentary reluctance.

Asselta's emails in discovery.  *See id.* ¶ 116.

> **b)**     **October 2016 Corporal Punishment Investigation**

Zoulas argues that she suffered a hostile work environment when Asselta investigated allegations by a student and his parent that Zoulas had forced the student to sit in the corner of her classroom as punishment.  Pl.'s Opp'n at 16.  She argues that "Asselta manufactured [the] situation to try to cause [Zoulas] to be disciplined" and that "Asselta did not follow standard procedure in investigating the incident."  *Id.*  Those arguments misrepresent the evidence in the record and are otherwise unavailing.  Zoulas has presented no admissible evidence that Asselta "manufactured" the allegations.  To the contrary, Zoulas has testified that the "parent and child fabricated this incident." Pl.'s Decl. ¶ 46.  And although Zoulas states that the parent of the child told her that Asselta told the child that she wanted his help getting rid of Zoulas, such secondhand testimony is inadmissible hearsay.  *See* Fed. R. Evid. 802.  The Court therefore disregards it.  *See* Fed. R. Civ. P. 56(c)(2).

Zoulas's argument about Asselta's supposed deviation from "standard procedure" in her investigation of the student's allegation likewise overstates the evidence.  The only supposed deviation of which Zoulas has adduced any admissible evidence is that Asselta interviewed witnesses about the accusation over two weeks instead of over a shorter period of time.  *See* Pl.'s 56.1 Stmt. ¶ 59; Pl.'s Decl. ¶ 48.  The NYCDOE guidelines Zoulas cites merely require that written statements be taken "as quickly as practicable."  Dkt. No. 120-11 at 7.  Zoulas has presented no evidence that Asselta did not take the statements as quickly as practicable, nor that taking the statements over two weeks amounted to hostility.

Indeed, the only supposed hostility Zoulas suffered in connection with this investigation came from the children in Zoulas's class.  Zoulas testified that she once overheard her students mocking her about the allegations during lunch.  Pl.'s Decl. ¶ 48.  Even accepting Zoulas's account of the incident, it is too trivial and too disconnected from evidence of discriminatory animus to

support a hostile work environment claim under the ADEA.  A reasonable teacher would understand that the lunchroom chatter of a group nine-year-olds is an unreliable source of information about the world, and that she should accordingly take it with more than a grain of salt.

Even if there were evidence in the record that the children in Zoulas's class had treated her with the kind of continuous and concerted harassment required to constitute a hostile work environment, Zoulas has not proffered any evidence that her students' conduct was the product of age-related animus on the part of the defendant.  The only evidence of age-related animus Zoulas has adduced relates to Asselta and LoRe-Dioguardi.  Even assuming *arguendo* that the evidence in the record could permit a reasonable jury to find that Asselta or LoRe-Dioguardi possessed age-related animus in their dealings with Zoulas, Zoulas has not presented any plausible reason why her students' lunchroom speculation should be attributed to either administrator.  A parent alleged that Zoulas had engaged in corporal punishment.  Asselta investigated the allegation, as she was required to do.  In the course of that investigation, she naturally interviewed students who may have witnessed the corporal punishment.  And those students—being children—spoke indelicately about the investigation during lunch.  None of that gives rise to a plausible inference that Asselta or LoRe-Dioguardi—or their supposed animus towards fellow over-55s—is to blame for the comments Zoulas overheard.

### c)    Teacher Observations

Zoulas argues that she suffered a hostile work environment because of the manner in which Asselta conducted observations of Zoulas's teaching on June 1, 2017, January 31, 2018, March 28, 2018, and June 1, 2018.  *See* Pl.'s Decl. at 16–18.  None of those observations involved the type, let alone severity, of conduct required to establish a hostile work environment claim.

First, Zoulas notes that Asselta observed her for twenty minutes on June 1, 2017, and fifteen minutes on January 31, 2018.  *See* Pl.'s Decl. at 16–17.  She seems to imply that Asselta spent too

little time in her classroom during these informal observations.  That is not the case.  The forms

Asselta filled out when she conducted the observations clearly state that an informal observation can

be conducted in only fifteen minutes.  *See* Dkt. No. 111-33 at 1, 10.  Even if there were something

hostile or abusive about scrutinizing an employee's performance for too little time, Zoulas has not

shown that Asselta did so.

Second, Zoulas complains that Asselta's comments on the observation reports were vague

and omitted or mischaracterized certain details of her teaching style.  *See* Pl.'s Opp'n at 16–17; Pl.'s

Decl. ¶¶ 88–92, 100–01.  Because of those defects, Zoulas successfully challenged the inclusion of

two of the observation reports in her file, and neither of those observations was included in her

2017–18 MOTP rating.  Pl.'s 56.1 Stmt. ¶¶ 126, 141.  Those defects constitute neither hostility,

harassment, nor abuse.  Scrutiny, even if excessive, is not itself hostility.  *See, e.g., Trachtenberg v. Dep't

of Educ. of City of N.Y.*, 937 F.Supp.2d 460, 472–73 (S.D.N.Y. 2013); *Spaulding v. N.Y.C. Dep't of Educ.*,

12 Civ. 3041 (KAM) (VMS), 2015 WL 12645530, at *58 (E.D.N.Y. Feb. 19, 2015).  Asselta's failures

to sufficiently evidence the basis for her performance ratings therefore do nothing to advance

Zoulas's hostile work environment claim.

Third, Zoulas complains that Asselta did not provide her with expanded feedback on her

June 1, 2017, performance review until June 22, 2017, one week later than required.  Pl.'s Opp'n at

16.  Even assuming that Asselta took an extra week to provide Zoulas with comments because of

age-related animus rather than because her mother died the day after the observation, a minor delay

in performing a routine task cannot rationally be characterized as an act of abuse.

Fourth, Zoulas complains that Asselta made a "final revision" of Zoulas's June 1, 2018,

observation report nine days after she was made aware that Zoulas had filed this lawsuit.  Pl.'s

Opp'n at 18; *see also* Dkt. No. 111-33 at 26.  What is missing here is any evidence—or even

argument—that Asselta's revision harassed or abused Zoulas.  Rather, the observation report shows

that Asselta rated Zoulas "Effective" in all categories.  *See* Dkt. No. 111-33 at 26.

In sum, the four teacher observations Zoulas points to as evidence of a hostile work environment do nothing to support her claim.  They show only that Asselta occasionally put too little effort into the reports and occasionally disagreed with Zoulas on issues of pedagogy.  Mere critique of the type presented by the evidence in this case, articulated without insult, would not permit a reasonable jury to find that Zoulas was the subject of hostility and abuse.

#### d)      Student Reflections Email and Meeting

Zoulas argues that she suffered a hostile work environment when, after she sent Asselta an email with "numerous examples of student assessments and reflections . . . Asselta called [Zoulas] into her office and said she did not understand why [Zoulas] sent her these examples."  Pl.'s Opp'n at 16.  This incident is even less availing as an example of hostility than of retaliation.  Zoulas does not contend that Asselta insulted, berated, or humiliated her for sending her the email—merely that Asselta asked her to explain why she had sent her the email.  Being asked to explain an email is a textbook example of a modern workplace nuisance of the most minor variety.  It does nothing to support Zoulas's claim that she was subjected to a hostile work environment because of her age.

#### e)      2016–17 MOTP Rating

Zoulas argues that she suffered a hostile work environment because she received a "Developing" MOTP rating in June 2017.  Pl.'s Opp'n at 16.  As discussed above, Zoulas has presented no evidence that her MOTP ratings were ever computed differently from other teachers', nor that Asselta was involved with their computation.  The rating guide states that the MOTP ratings are nothing more than weighted averages of the scores given during teachers' observations.  The NYCDOE did not harass or abuse Zoulas in a way recognized by the law by performing the calculation for her, even if she was unhappy with the final figure.  Moreover, the Court notes that Zoulas's overall rating—the only rating that Zoulas has shown to have had any effect on her

38

employment—was still "Effective" that year.  *See* Dkt. No. 111-7 at 3.

### f)      Staff Directory

Zoulas argues that she suffered a hostile work environment when her name was omitted

from an internal directory of staff phone numbers in October 2017 and was not included until the

directory was reprinted two months later.  *See* Pl.'s Opp'n at 17.  Even if the omission were

intentional, and even if it could be attributed not to the person who prepared the directory but to

Asselta or LoRe-Dioguardi, no reasonable jury could find that such a minor and temporary slight—

indistinguishable from a typographical error—was harassment or abuse.  Zoulas has not pointed to

any evidence that the omission harmed her in any way other than by causing her to feel "deeply

offended."  *See* Pl.'s 56.1 Stmt. ¶ 53.  Because the standard for finding a hostile work environment is

an objective one, the fact that Zoulas perceived her two-month absence from the directory as a

serious personal attack does not advance her case.  No reasonable jury would find that this slight

was sufficient to give rise to a hostile work environment.

### g)      Delayed Approval of Field Trip

Zoulas argues that she suffered a hostile work environment when Asselta waited two

months to approve her request to take her class on a field trip.  *See* Pl.'s Opp'n at 17.  As discussed

above in relation to Zoulas's retaliation claim, that delay was at most a minor annoyance.  Although

Zoulas argues that she "was forced to go through a grievance process to get the trip approved" and

that "no basis was given for the lack of approval,"  Pl.'s Opp'n at 17, it is undisputed that Asselta

voluntarily approved the trip after Zoulas's grievance was denied as a misuse of the grievance

process, and that, as part of that process, Asselta provided two reasons for her delay, *see* Pl.'s 56.1

Stmt. ¶ 121.

Furthermore, as discussed above, Zoulas's conclusory statements that Asselta and LoRe-

Dioguardi "behaved in an extremely hostile manner towards Plaintiff with regards to this school

trip" and that she was "harassed for two months . . . in order to get approval for this school trip," Pl.'s Decl. ¶ 86, "cannot by themselves create a genuine issue of material fact where none would otherwise exist," *Fletcher*, 68 F.3d at 1456.  Those statements would not permit a jury to assess for itself whether Zoulas faced objectively hostile and abusive conduct.  They therefore do not affect the Court's conclusion that Zoulas has failed to point to evidence that would permit a reasonable jury to conclude that she had suffered a hostile work environment.

### h)    Peluso Allegations

Zoulas argues that she suffered a hostile work environment when she overheard Asselta telling the school's substance abuse counsellor not to speak to Zoulas and when that counsellor proceeded to accuse Zoulas's class of making noise as it walked through the building.  Pl.'s Opp'n at 17.  Setting aside the obvious contradiction between those arguments, Zoulas has not cited any evidence to support them besides the allegations in her complaint.  Her opposition brief cites only the parties' 56.1 Statements, which agree only on the fact that Zoulas made the allegations in her complaint.  *See* Pl.'s 56.1 Stmt. ¶¶ 117, 120, 136.  Those paragraphs of the parties' 56.1 Statements point to no admissible evidence that Asselta told the counsellor not to speak to Zoulas, nor that the counsellor complained about Zoulas's class making noise as it walked through the building.  *See id.* The Court therefore disregards those allegations.

### i)    Unruly Student

Zoulas argues that she was subjected to a hostile work environment when she asked to have an unruly student removed from her classroom, but LoRe-Dioguardi and Peluso instead spoke with the student rather than immediately removing him and took a statement from one of the student's friends before asking Zoulas for hers.  *See* Pl.'s Opp'n at 17; Pl.'s 56.1 Stmt. ¶ 125.  That conduct, Zoulas argues, diminished her authority "in front of her students and her colleague."  Pl.'s Opp'n at 17.  Setting aside the hearsay issues discussed above in connection with Zoulas's attempt to

characterize this incident as retaliation, the conduct Zoulas describes here is too minor to constitute a hostile work environment. The record shows that Zoulas felt troubled by the fact that LoRe-Dioguardi and Peluso did not defer to her on how to handle the student and did not ask for her version of events before asking for one of the other students'. *See* Dkt. No. 111-25 at 10 ("I find this to be very troubling . . . . And it also shows malice towards me."). That evidence would not, however, permit a reasonable jury to find that LoRe-Dioguardi and Peluso engaged in such objectively severe abuse that they created a hostile work environment.

### j) Referral to Another Teacher

Zoulas argues that she was subjected to a hostile work environment when Asselta suggested that she "speak to the fourth grade special education teacher . . . for advice on implementing Asselta's observations." Pl.'s Opp'n at 17. Zoulas suggests that Asselta should have directed her instead to another special education teacher with more experience. *Id.* Even reading Asselta's comment as a veiled insult to Zoulas's competence, it was a far cry from the level of insult required to establish a hostile work environment.

### k) Letters to File, Observation Reports, Negative Ratings, and Improvement Plan

Zoulas states that she was subjected to a hostile work environment when she "received numerous unwarranted letters to file, negative observation reports, negative ratings and a TIP." Pl.'s Opp'n at 18. She does not elaborate. As evidence, she points only to a paragraph of her declaration in which she paraphrases the same allegation. *See* Pl.'s Decl. ¶ 33. Such vague and conclusory statements are insufficient to support the conclusion that Zoulas suffered the level of hostile and abuse conduct required to establish a hostile work environment.

### l) Cumulative Conduct

The conduct Zoulas cites comes no closer to establishing a hostile work environment in the aggregate than in isolation. Courts in the Second Circuit have dismissed hostile work environment

claims where the plaintiff has alleged or pointed to evidence of conduct far more severe than Zoulas has. *See, e.g., Trachtenberg*, 937 F.Supp.2d at 472–73 (granting motion to dismiss where plaintiff teacher alleged that principal subjected her to "excessive scrutiny," intimidating stares, negative performance evaluations and letters containing "scurrilous charges," an undesirable office, and denial of training opportunities); *Todoverto v. McDonald*, 2016 WL 3826281, at *13 (S.D.N.Y. July 7, 2016) (granting summary judgment when plaintiffs received letters reprimanding them and "satisfactory" annual evaluation ratings, were denied vacation time, and were assigned thirty times over six months to an undesirable location); *Waters v. Gen. Bd. of Glob. Ministries*, 769 F.Supp.2d 545, 553–56 (S.D.N.Y. 2011) (granting summary judgment where plaintiff was subjected to menial cleaning and filing tasks, arbitrary cancellation of vacation requests, punishment for missing meetings, and a performance improvement plan); *Leung v. N.Y. Univ.*, No. 08-cv-5150 (GBD), 2010 WL 1372541, at *7 (S.D.N.Y. Mar. 29, 2010) (granting motion to dismiss where plaintiffs alleged "unfair scrutiny," undesirable work assignments, and baseless sexual harassment investigations), *vacated on other grounds*, 580 F. App'x 38 (2d Cir. 2014). In opposing this motion for summary judgment, Zoulas was required to point to evidence in the record showing that she had been subjected to hostile conduct so severe and pervasive that it rendered her work environment abusive. *See Demoret*, 451 F.3d at 149. Instead, she has pointed to evidence that, over approximately two years, she encountered middling performance reviews and a handful of annoyances, many of them with no obvious connection to her age. Those performance reviews and annoyances made Zoulas unhappy at work, but they do not objectively rise to the level required to establish a hostile work environment under the ADEA. The NYCDOE's motion for summary judgment on this claim is therefore GRANTED.

## IV.   CONCLUSION

Because Zoulas has failed to adduce evidence that she suffered an adverse employment

action within the 300 days prior to when she filed her SDHR complaint, her ADEA discrimination claim is time-barred. Because Zoulas has failed to adduce evidence from which a reasonable jury could conclude that, after filing her SDHR complaint, she began to experience conduct that would discourage a reasonable person from filing such a complaint, she has not shown a genuine issue of material fact with respect to her ADEA retaliation claim. Finally, because Zoulas has filed to adduce evidence from which a reasonable jury could conclude that she was subjected to such hostile and pervasive abuse and harassment on account of her age that the terms of her employment were changed, she has failed to demonstrate a genuine issue of material fact with respect to her ADEA hostile work environment claim. For those reasons, the NYCDOE's motion for summary judgment on all three of Zoulas's claims is GRANTED.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Court directs that Corporation Counsel mail a copy of this order to the plaintiff and that Corporation Counsel provide the plaintiff with copies of any unpublished cases cited in this decision pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.2.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 110, to enter judgment for the defendant, to close the case, and to mail a copy of this order to the plaintiff.

SO ORDERED.

Dated: September 1, 2021
New York, New York

_____
GREGORY H. WOODS
United States District Judge